UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| PHOENIX ANCIENT ART, S.A. and PETRARCH LLC DBA ELECTRUM,<br><br>                           Plaintiffs,<br><br>   -  against  -<br><br>QATAR INVESTMENT AND PROJECT HOLDING CO. W.L.L., SIMON JONES SUPERFRIEGHT LIMITED, and PHOENIX FREIGHT INC. DBA DOOR TO DOOR FINE ART SERVICES,<br><br>                           Defendants. | Civil Docket No. 24-CV-1699<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

_____

Plaintiffs Phoenix Ancient Art, S.A. ("Phoenix") and Petrarch LLC dba Electrum ("Electrum"), by and through their attorneys, Pearlstein & McCullough LLP, as and for its Complaint, allege as follows:

<u>PRELIMINARY STATEMENT</u>

1.      In this action, Plaintiffs assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Defendant Qatar Investments and Project Holding Co. W.L.L. ("QIPCO") and assert a claim of fraud against all Defendants. At issue is an agreement reached in September 2018 between Phoenix, Electrum, and QIPCO (the "Exchange Agreement") to exchange (the "Exchange") a group of six antiquities owned by Phoenix through an affiliate (the "Exchange Items") for a pair of antiquities, a chalcedony Statuette of a Nike-Victory (the "Nike") and a marble Head of Alexander (the "Alexander Head" and together with the Nike, the "Purchased Items") that QIPCO had previously purchased from Phoenix in 2013 and 2014, respectively. In failing to perform its obligations

1

under the Exchange Agreement, QIPCO acted in bad faith and with reckless disregard for Plaintiffs' rights and interests.

2.      On September 11, 2018, pursuant to the Exchange Agreement, Plaintiffs delivered five of the six Exchange Items (the "Shipped Items") in New York to QIPCO through its agent, Defendant Simon Jones Superfreight Limited ("Simon Jones Ltd.") which acts in the United States through its agent, Defendant Phoenix Freight Inc. dba Door to Door Fine Art Services ("DTD"). On the same day, DTD delivered the Shipped Items to Virgin Atlantic Airways for carriage to London, United Kingdom. On September 18, 2018, Her Majesty's Revenue and Customs ("HMRC") detained the Shipped Items for examination upon their arrival at Heathrow Airport. Simon Jones Ltd. informed the Plaintiffs that HMCR was detaining the Shipped Items on behalf of CBP because of "OFAC concerns." Shortly thereafter, HMRC ordered the return of the Shipped Items to the United States at the request of U.S. Customs and Border Protection ("CBP") because the Shipped Items were falsely declared on the export shipping documents in violation of US law. Richard Hart, QIPCO's lawyer, sent Electrum's counsel CBP's notice to DTD dated September 30, 2018 which stated: "Specific Reason for the Detention: OFAC."  The return receipt from London cited "OFAC" as the reason for the return.

3.      In connection with the export of the Shipped Items, Defendants unscrupulously misrepresented the nature and origin of the Shipped Items by omitting any description of their country of origin, such as "Pre-Achaemenid," "Greek" or "Roman," from the commercial invoice that accompanied the export shipment. Two of the Shipped Items were of "Pre-Achaemenid" origin. Objects of "Pre-Achaemenid" origin are generally known among art historians and in the antiquities trade to be of likely Iranian origin and must be declared as originating in Iran on any shipping documents. Prior to the export of the Shipped Items,

2

Electrum repeatedly notified QIPCO and Simon Jones Ltd. in writing that two of the Shipped Items were of Pre-Achaemenid origin. In particular, Electrum provided Simon Jones Ltd. with a fact sheet for the export of the Shipped Items that contained accurate information about their origin, but QIPCO, Simon Jones Ltd., and DTD instead used an invoice created by Simon Jones Ltd. in which they recklessly omitted information of the Pre-Achaemenid origin of two of the Shipped Items.

4.     CBP officially detained the Shipped Items on September 21, 2018. Two of the Shipped Items, an agate Dolphin (the "Dolphin"), identified as Roman, 3rd-4th century A.D., and a rock crystal Horse (the "Horse"), identified as Roman, 5th-6th century A.D., were released by CBP on January 28, 2019. However, a rock crystal Griffin (the "Griffin"), identified as Greek, 5th-4th century B.C., and two objects of Pre-Achaemenid origin— a Drinking Vessel (the "Drinking Vessel") and a Ceremonial Beaker (the "Ceremonial Beaker")—were not released until October 12, 2023, after more than five years in detention. The remaining Exchange Item, a Rhyton (the "Rhyton"), also a Pre-Achaemenid object, was already in the UK and was therefore not shipped with the other Exchange Items. The U.S. Government's detention and seizure of the Shipped Items damaged Plaintiffs in the amount of $1,650,753 in direct and compensatory damages.

5.     On October 4, 2018, Mr. Gherardi sent Marc Latamie, QIPCO's art advisor and agent, an email complaining about Simon Jones deceptive practices, summarizing the numerous defects in Simon Jones Ltd.'s declaration to HMRC and contrasting that with Electrum's prudent, responsible handling and fulsome declaration of recent shipments to QIPCO. The email

provides a damning litany of the Defendants' reckless evasion and deceit, and prefigures the allegations in this Complaint.[1]

6.      In the two-year period between September 2018 and September 2020, Plaintiffs and QIPCO, through one of QIPCO's Directors, Sheikh Hamad Bin Abdullah Al Thani ("Sheikh Hamad"), entered into a standstill agreement to toll the limitations period under the 2013 Nike purchase agreement and allow continued negotiations while postponing QIPCO's return of the Purchased Items until the disposition of CBP's detainment of the Shipped Items.

7.      During that time, Phoenix became aware of allegations in the press and the antiquities trade that Sheikh Hamad, individually or through QIPCO, was engaged in questionable business practices in his purchases of antiquities, such as trading in looted antiquities and willfully violating import/export laws.[2] Allegations regarding a bronze ibex

---

[1] "Dear Marc, We need to make clear to the client that we did not do anything wrong in this shipment, and in fact, *Simon Jones handled everything including pick up from the gallery, paperwork, and customs.* When we handled the shipping ourselves like in our recent shipment to London for the PAD show, the shipment flew on September 27th and cleared customs upon arrival on September 28th. Also, the last shipment we sent to Simon Jones for QIPCO in January, that we handled ourselves, cleared customs with no delays as well. *If we compare our paperwork with the paperwork that Simon Jones insisted on preparing, it is clear that he left out some information which likely raised a red flag with customs as it appears deceiving. It is also important to know that Simon did not provide us with a copy of this proforma until Friday, September 21st and the shipment flew on September 12th.* He also told us, when we wanted to involve our London lawyers, that this is a common customs delay and will only take a few days to clear…1. *The proforma is missing the country of origin for each piece. 2… the culture for each piece. 3… the publication history for the two rock crystal pieces and the agate piece* which shows that they were outside of Greece or Italy prior to 2001, which is in accordance with the bilateral agreements with those countries. 4…*the provenance for each piece…. If the facts were clearly outlined on the proforma invoice, as we do on our proforma invoices, I don't believe we would be dealing with this delay."* [Emphasis added]. In February 2024, Phoenix exported the Exchange Items from New York to London, on a fully-disclosed basis, without incident.

[2] "The Qatari collection is currently under scrutiny, according to the French newspaper Le Monde, which has reported the raising of wider concerns over the provenance and authenticity of works from Syria, Egypt and Yemen, with suggestions that some may originally have been illegally excavated from their respective countries of origin." https://www.theartnewspaper.com/2022/11/04/qatari-sheikhs-rare-ivory-mask-stolen-from-benin-city-by-the-british-is-one-of-five-on-public-displaynone-in-nigeria: "The Simon Simonian provenance, which appeared in the catalog of the Al Thani exhibition in Beijing and at the Château de Fontainebleau (Seine-et-Marne), disappeared from the museum's catalog in 2021. At the same time, the Simonian family appeared on the radar of American justice for the case of a looted Egyptian sarcophagus." https://www.lemonde.fr/culture/article/2022/06/26/trafic-d-objets-egyptiens-la-famille-Simonian-au-c-ur-de-l-enquete-qui-eclabousse-le-louvre_6132109_3246.html.

allegedly looted from Yemen were especially troubling.[3] It also became apparent to Plaintiffs that QIPCO had been purchasing antiquities on the market for quick resale and not long-term investment. QIPCO's business model was to buy investment-grade objects, exhibit them in highly promoted exhibitions in important museums in New York, Beijing, Japan, and France and lend objects to leading museums to enhance their value, and then resell them at public auctions and through art galleries. Individually or through QIPCO, Sheikh Hamad sold 388 pieces of his Mogul Collection at Christie's that fetched a total $109,031,875 and over 1,000 pieces from his furniture collection at Sotheby's France that fetched a total €76,560,562.[4]

---

[3] "Journalists, activists, and politicians are demanding that the legitimate government take a stance on what was revealed by the investigation that was carried out by Channel 2 of the official French television, the theft by the ruling Qatari family of rare Yemeni archaeological pieces and are calling for an investigation into the incident and the recovery of the looted pieces….The investigation revealed that 'a bronze ibex classified as a rare archaeological piece in Yemen was looted and had become part of the collection that is owned by a member of the ruling family of Qatar, Hamad bin Jassim Al Thani.' The authors of the investigation which was published on France T.V. Info's website, questioned, 'How could an ancient statue, whose original source has been identified as a Yemeni temple, end up in the hands of looters, and be transferred from the Fontainebleau Museum to the National Museum in Tokyo, without anyone noticing?' The investigation stated: 'The statue was displayed at the Fontainebleau Museum in 2018, and then a year later, it was displayed at the National Museum in Tokyo as part of the collection of Sheikh Hamad Al Thani, the paternal cousin of the Emir of Qatar." Researcher Jeremy Chetcatty was quoted as saying that the bronze ibex became part of the collection that is owned by Hamad bin Jassim Al Thani 'as the result of a looting operation that targeted a Yemeni temple as a result of the chaotic situation in Yemen.' According to the investigation, Amin Jaafar, the Public Relations Director, and curator of the Hamad bin Jassim Al Thani's collection, refused to answer journalists' questions about the source of the ibex, adding that he was willing to 'discuss the matter but not in front of the camera.' Commenting on the findings of the investigation, political writer Saeed Bakran said, 'Qatari princes are accused of stealing valuable historical artifacts from Hadramout and specifically from the (Meryamah) area near Sayun.'" https://newsemen.life/new/68323. February 23, 2021. Similar allegations were published in https://www.qabaayilalyaman.com/12266/, February 23, 2021 ("The televised report unveiled a bronze statue of the ancient statue of Athtar, which was looted from the archaeological site of Meryamah in Yemen, and suddenly appeared in the Fontainebleau Museum in 2018, and from there to Tokyo in Japan, under the claim that it belonged to … the collection of stolen artifacts owned by the former Qatari Emir Sheikh Hamad Al Thani, the father of the current Qatari Emir Sheikh Tamim bin Hamad bin Jassim Al Thani") and https://newsyemen.life/new/68335, February 24, 2021 ("French Channel Two was conducting an investigation about the antiquities smuggled out of countries experiencing war, and this statue….flew out of France towards Japan for display there in Tokyo at the National Museum of Japan in 2019 in the name of the Qatar Foundation.")

[4] Sheikh Hamad consigned his Mogul collection for sale at Christie's in New York on June 19, 2019, after a lavish exhibition and publication in 2014. https://www.christies.com/en/stories/a-remarkable-collection-of-mughal-dynasty-jewels-b23e9fe93d344453994077350466c814. "These objects are offered from The Al Thani Collection. From next year, works of art from this encyclopedic collection will be shown at a new museum space in Paris. In addition to new acquisitions, sale proceeds will support ongoing initiatives of The Al Thani Collection Foundation which extend from exhibitions, publications, and lectures to sponsorships of projects at museums around the world."

QIPCO would try to cleanse and launder under-provenanced objects by exhibiting them alongside well-documented objects. Phoenix also became aware of allegations in the press and the antiquities trade that if this "pump-and-dump" scheme failed for a particular object, QIPCO would demand a refund of the purchase price of the objects and threaten to sue any dealer who refused.[5] Sheikh Hamad was a high-volume trader concerned primarily with profiting from quick resale. In contrast, other members of the Al-Thani family, including Sheikh Saud bin Muhammed Al Thani ("Sheikh Saud") and Sheikha Al-Mayassa bint Hamad bin Khalifa Al Thani, are known in the art trade to be dedicated long-term collectors who emphasize connoisseurship over quick profit.

8.      In October 2020, with the CBP detention ongoing, and after more than a year of failed negotiations to revive the Exchange involving different objects offered by Phoenix, QIPCO and Sheikh Hamad filed a complaint against Phoenix in U.K. court alleging that the Nike was not authentic and seeking damages in the amount of $2.2 million (equal to the purchase price for the Nike) plus interest. In addition, QIPCO and Sheikh Hamad attempted to file a second complaint against Phoenix in a U.K. court concerning the Alexander Head that failed due to improper service of process. The lawsuits ended the standstill agreement and shifted the focus of the discussion among QIPCO, Sheikh Hamad, Phoenix, and Electrum to QIPCO's authenticity claims concerning the Purchased Items.  The London lawsuits, which

---

Sheikh Hamad sold his furniture collection at Sotheby's France in a four-volume sale on October 10-14, 2022. https://www.sothebys.com/en/series/hotel-lambert-une-collection-princiere.

[5] "His Highness Sheikh Hamad Bin Abdullah Al Thani is locked in a High Court dispute with Ariadne Galleries over the two sales which date back to December 2013 and July 2014." https://www.standard.co.uk/news/world/sheikh-who-entertained-queen-sues-gallery-over-forged-mosaics-a4539266.html. "[T]he Paris commercial court ruled in favor of the antique dealers and ordered the company Qipco to pay them. "https://www.lemonde.fr/m-le-mag/article/2021/11/16/le-cheikh-hamad-ben-abdullah-al-thani-prend-ses-quartiers-a-l-hotel-de-la-marine-a-paris_6102264_4500055.html.

baselessly challenged the authenticity of the two objects, were commenced in bad faith with the goal of relieving QIPCO of its obligations under the Exchange Agreement.

9.      As a result of the Defendants' fraudulent export and QIPCO's failure to perform under the Exchange Agreement, the Exchange failed with severe adverse consequence to the Plaintiffs resulting in legal fees to contest the detention of the Shipped Pieces, lost opportunity to resell and other expenses related to the Purchased Items, as well as the time, effort, expense, and legal fees related to the London lawsuits, all of which amounts to $10,179,407.

## THE PARTIES

10.     Plaintiff Phoenix is a Swiss company with its principal place of business at 6, rue Verdaine, P.O. Box 3516, 1211 Geneva 3, Switzerland. Phoenix is one of the leading ancient art galleries in the world.

11.     Petrarch LLC dba Electrum ("Electrum") is a New York limited liability company with a principal place of business at 725 5th Ave, New York, NY 10022.  Electrum is the exclusive agent for Phoenix in the United States.

12.     Upon information and belief, Defendant QIPCO is a company formed under the laws of Qatar with its principal place of business at PO Box 8612, Doha, Qatar. QIPCO is controlled by a branch of the Al Thanis, the ruling family of Qatar.[6] On information and belief, QIPCO is an active trading company that buys and sells antiquities and ancient art.

13.     Upon information and belief, Defendant Simon Jones Superfreight Limited is a company formed under the laws of the United Kingdom with its principal place of business at Units 15, 20 & 22 Chancerygate Business Centre, 170 Rowan Road, London SW16 5BN.

---

[6] The chairperson of QIPCO is Sheikh Abdullah Bin Khalifa Al Thani, the Deputy Chairperson is his wife, Sheikha Amna Bint Mohammed Al Thani, and the five Directors are his four sons (including Sheikh Hamad) and one non-family member.

Simon Jones Superfreight Limited is, upon information and belief, a leading international freight forwarder specializing in shipments of antiques and artwork.

14.     Upon information and belief, Defendant Phoenix Freight Inc. dba Door to Door Fine Art Services is a New Jersey corporation with its principal place of business at 50 Tannery Rd, Somerville, New Jersey, 08876. DTD is, upon information and belief, a freight broker that acts as an agent for Simon Jones Ltd. in the United States.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over the Defendants because they regularly transact business in New York City and/or because this action arises out of the transaction of business in New York City.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because the property that is the subject of the action is situated within this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### QIPCO's Acquisition of the Nike

18.     The global antiquities market has become more regulated and reliable for dealers and collectors of  ancient art over the past thirty years. Prudent, law-abiding galleries and collectors are careful to deal only in objects with a documented ownership history, known as "provenance." A documented provenance is critical to a gallery's ability to demonstrate lawful ownership of and transferable title to an object. Collectors rely on the expertise of sophisticated

art sellers, such as Phoenix, to verify an object's legal ownership. Accordingly, the sale of an object at a reputable gallery indicates to the art market that the gallery considers the object to be legally owned, and the art market, in turn, relies on the gallery's imprimatur of legality with respect to future sales, loans, and exhibitions. Since the 1990's, Phoenix has conducted careful provenance research and scholarship on all antiquities it offers for sale.

19.     In September 2012, QIPCO's Director, Sheikh Hamad, together with Sheikh Saud, viewed the Nike on display at Phoenix's booth at the La Biennale des Antiquaires, a prominent art and antiquities fair in Paris. In March 2013, Marc Latamie, QIPCO's art and antiquities adviser and agent, viewed the Nike on display at Electrum's gallery in New York.

20.     On April 2, 2013, Electrum, on behalf of Phoenix, accepted Mr. Latamie's offer on behalf of QIPCO to purchase the Nike for $2.2 million. On request, Phoenix provided QIPCO with a condition report for the Nike done by Walter Haberkorn, a respected conservator confirming the absence of restorations and repairs. In response to Mr. Latamie's request for Phoenix's earliest provenance documentation, Phoenix provided a copy of an invoice evidencing its 2011 purchase of the Nike from a collector in Switzerland. Phoenix also provided Mr. Latamie with a certificate from the Art Loss Register (confirming that it had not been reported as stolen), a hardcover publication in which the Nike is featured,[7] the freight and customs documents covering the Nike's shipment from Phoenix in Geneva to Electrum in New York, and a copy of a scientific report on the Nike done by Dr. Olivier Bobin of CIRAM Laboratories ("CIRAM") in Martillac, France dated October 12, 2012 (the "CIRAM October 2012 Report").

---

[7] CRYSTAL IV, Geneva-New York, 2012, no. 14, pp. 80-87.

21.     On April 24, 2013, Phoenix, Electrum and QIPCO entered into a Sale and Purchase Agreement (the "Nike SPA") for the Nike. The Nike SPA contained extensive representations, warranties and indemnities providing QIPCO with protections concerning title, condition, authenticity and provenance. In addition, pursuant to Section 7 of the Nike SPA, Ian McLaughlin, as the Buyer's designated expert, performed a First Inspection of the Nike at which he raised no objections, and a Second Inspection immediately prior to the closing where he failed to object to the purchase due to any defect in authenticity, provenance, or condition or breach of Phoenix's warranties. Under the Nike SPA, each party agreed that it did not rely on and would have no remedy in respect of any statement, representation, or warranty of any party other than as expressly stated in the Agreement. On May 16, 2013, Mr. McLaughlin performed the Second Inspection, raised no objection, QIPCO paid the $2.2 million purchase price, and the Nike was released by Electrum to DTD, QIPCO's agent instructed by Simon Jones Ltd., for export to the U.K.

**QIPCO's Acquisition of The Alexander Head**

22.     In November 2013, Sheikh Hamad and Mr. Latamie visited Electrum and viewed the Alexander Head. Shortly thereafter, Mr. Latamie requested Electrum's file on the Alexander Head, which Electrum sent on December 23, 2013.

23.     On January 7, 2014, Electrum sent additional files to Mr. Latamie concerning the Alexander Head, including photos, authenticity research, an Art Loss Register Certificate, provenance affidavits, and import and export documents. Eight days later, on January 15, Mr. McLaughlin, QIPCO's appointed expert, inspected the Alexander Head.

24.     The parties entered into a Sale and Purchase Agreement dated January 22, 2014 (the "Alexander Head SPA") providing for the sale and purchase of a marble "Head of

Alexander the Great as Herakles" for $3.0 million, and a Roman Imperial marble portrait for $1.0 million.[8] The First Inspection Report dated January 15, 2014 by Mr. McLaughlin found no inconsistencies to the reports on condition or provenance provided by Phoenix that would warrant further investigation. Mr. McLaughlin conducted a second inspection February 6, 2014, cleared the Alexander Head and QIPCO sent payment the same day.

25.     On February 6, 2014, Electrum released the Alexander Head to QIPCO's shipping company, Simon Jones Ltd. through its New York Agent, DTD for shipment to London.

26.     Later in 2014, QIPCO loaned the Alexander Head and Roman Imperial Marble Portrait to The Metropolitan Museum of Art in New York, where they were exhibited from 2014 to 2017, before being returned to QIPCO.

**The Exchange Agreement**

27.     During the years after the sale of the Nike and the Alexander Head, Phoenix became aware of allegations in the press and the antiquities trade that Sheikh Hamad, through QIPCO, was engaged in questionable business practices in his purchases of antiquities, such as trading in looted antiquities and willfully violating import/export laws. It also became apparent to Plaintiffs that QIPCO had been purchasing antiquities on the market for quick resale and not long-term investment. QIPCO's business model was to buy investment-grade objects, exhibit them in highly promoted exhibitions in important museums in New York, Beijing, Japan, and France and lend objects to leading museums to enhance their value, and then resell them at public auctions and through art galleries. QIPCO would try to cleanse and launder under-provenanced objects by exhibiting them alongside well-documented objects. Phoenix also

---

[8] The terms and conditions of the Alexander Head SPA were substantially similar to those under the Nike SPA, with the addition of representations to the effect that all information disclosed by Phoenix was true and accurate to the best of its knowledge upon due investigation and that the Alexander Head was lawfully acquired in compliance with applicable import/export and cultural heritage laws.

became aware of allegations in the antiquities trade that if this "pump-and-dump" scheme failed for a particular object, QIPCO would demand a refund of the purchase price of the objects and threaten to sue any dealer who refused.

28.    Phoenix, unfortunately, became another victim of Sheikh Hamad's failed "pump and dump" scheme regarding the Nike and the Alexander Head. The first hint of trouble came in November 2017, when Mr. Latamie asked Phoenix if it had any reports on the Nike in addition to the CIRAM October 2012 Report. Phoenix assumed that Sheikh Hamad wanted another report to support his attempts to sell the Nike.

29.    But the trigger for Sheikh Hamad to turn against Phoenix may have been a letter dated February 28, 2018 from the chief curator of the Department of Greek and Roman Art of The Metropolitan Museum of Art. In sum, the Met's letter confirmed the Head's authenticity based on close microscopic examination of the marble's surface and patina and its art historical importance and relationship to the iconography of Alexander portraits of the early Hellenistic Period. The Met had nevertheless returned the Head to QIPCO in September 2017 because the documentation of provenance, which had been satisfactory to Phoenix after diligent investigation, did not entirely satisfy the stringent new recommendations recently issued by The Association of American Museum Directors ("*AAMD*"). This letter apparently caused the Sheikh to realize that the new AAMD recommendations could impair the marketability of any antiquity that failed to satisfy the AAMD's new documentation standards; it potentially endangered his entire scheme to "pump and dump" his inventory.

30.    From and after March 2018, Sheikh Hamad put increasing pressure on Phoenix to rescind the purchase of the Nike and the Alexander Head and refund the $5.2 million purchase price—which Phoenix refused to do—or alternatively, to exchange the Nike and the Alexander

Head for other objects of equivalent value. Phoenix responded offering to either consign objects that Sheikh Hamad wished to sell without commission or consider trades for any of the objects, including the Alexander Head and the Nike, that QIPCO had bought from Phoenix, because Phoenix was fully confident in their authenticity, documented provenance and marketability.

31.     From April through August 2018, Mr. Latamie and Sheikh Hamad, on behalf of QIPCO and Electrum, on behalf of Phoenix, negotiated various iterations of a package of objects to be exchanged by Phoenix for the Nike and the Alexander Head, with Mr. Latamie communicating Sheikh Hamad's increased impatience and urgency.

32.     On September 4, 2018, the parties, in various written communications with each other, agreed to the Exchange of the Exchange Items (five of which were in New York and one of which was in London) as consideration for the return of the Purchased Items (which were in a bonded warehouse in London). In response to Mr. Latamie's request for the provenance and prices of the Exchange Items, Electrum's Gallery Manager, Mr. Gherardi, emailed Mr. Latamie images of the six objects together with their provenances and prices. During the negotiations, QIPCO asked Phoenix to send the silver items to a metallurgist, Pieter Meyers at LACMA for scientific technical exam, which Phoenix did, and Meyers confirmed that the items were authentic. Although QIPCO instructed Meyers to address his invoice to QIPCO at its address in Doha, Qatar, QIPCO failed to pay the invoice, forcing Phoenix to pick up the bill.

33.     The Exchange Items consisted of two groups of objects. The first group was three silver Pre-Achaemenid objects: the Drinking Vessel, the Rhyton, and the Ceremonial Beaker. Mr. Gherardi's email expressly described each of these objects as "Pre-Achaemenid, 7th-6th

century B.C." The second group was three Classical Greek and Roman objects: the Griffon, the Dolphin, and the Horse.

34.     On September 4, 2018, Mr. Latamie told Phoenix that Sheikh Hamad had decided to complete the Exchange and that Richard Hart, QIPCO's U.K. attorney, knew of the Sheik's decision. Mr. Latamie emailed Mr. Simon Jones, Simon Jones Ltd.'s principal executive officer, images and dimensions of the five Shipped Items. Mr. Latamie's email clearly described the two Pre-Achaemenid objects as "Pre-Achaemenid, 7th-6th century B.C." Mr. Gherardi emailed Mr. Latamie a "Final List" that provided images, materials, dimensions, provenance and prices of the Shipped Items and again described the Drinking Vessel and Ceremonial Beaker as "Pre-Achaemenid."

35.     On September 6, 2018, Mr. Jones emailed Mr. Gherardi that he was travelling from the U.K. to meet Mr. Gherardi at Electrum's gallery in New York to supervise the collection of the Shipped Items by his agent, DTD and to finalize arrangements for insuring and bonding the Purchased Items in the UK with a view to "*completing the contract*" [emphasis added] for the Exchange on September 14, 2018. Mr. Jones noted that "the buyer has already spent a significant amount of money in good faith on the import and subsequent transfer back into bond of one of the assets. The money already paid out is non-refundable by HMRC …" Mr. Jones requested that Phoenix pay certain fees and expenses related to packing, shipping, insurance, customs fees, and bonding fees for the Exchange Items, as well as his costs of travel and accommodation in New York. Mr. Jones asked Mr. Gherardi to "please let me know soonest, *as we are creating the export documentation in preparation* [emphasis added] and I would like to have this all set up prior to my departure on Monday, so as not to delay the export

14

and completion." Mr. Gherardi replied by email on September 6, 2018 that Phoenix agreed to pay the transaction expenses but not Mr. Jones's travel costs.

36.     On September 7, 2018, Mr. Gherardi sent Mr. Jones a letter confirming that Phoenix's fine art insurance policy would cover the Shipped Items in New York through the completion of the Exchange. The Rhyton was not included among the five Shipped Items described in the letter because it was already in London, but Mr. Gherardi included the other two Pre-Achaemenid objects—the Drinking Vessel and the Ceremonial Beaker—and again described them as "Pre-Achaemenid, 7th-6th century B.C."

37.     On September 11, 2018, DTD collected the Shipped Items from Electrum's gallery in New York and delivered them to Virgin Atlantic Airways at John F. Kennedy International Airport for a flight to London on September 12, 2018. DTD left Electrum with a Pickup/Delivery invoice documenting the pickup from Electrum in New York and the delivery to Simon Jones Ltd. in London. On September 17, 2018, DTD sent Mr. Gherardi a copy of DTD's Air Waybill. Under the caption "Accounting Information," the Air Waybill referenced "EXW, Phoenix Ancient Art Invoice Attached" but failed to attach the Phoenix Invoice.

**The Government's Seizure of the Exchange Items**

38.     On September 18, 2018, Mr. Jones emailed Mr. Gherardi to say that HMCR was holding the Shipped Items "pending document and consignment examination," had taken images of the five unpacked pieces, and was conducting further research on the objects.

39.     On September 21, 2018, Mr. Jones advised Mr. Gherardi by email that: HMCR had told him that U.S. Customs and Border Protection ("CBP") was demanding, without explanation, that the shipment be returned to the United States; Phoenix should contact Chris

Foulkes, a CBP Officer to determine the nature of the investigation; and he (Mr. Simon Jones) should have no further dealings in the matter.

40.     On September 21, 2018, after finding out that the shipment was being returned, Mr. Gherardi requested a copy of the shipping invoice used for the export.  Mr. Jones replied to Phoenix with a copy of the proforma invoice that Simon Jones Ltd. had used to declare the shipment to HMCR. Simon Jones Ltd.'s Summary Invoice, dated September 6, 2018, described the Shipped Items, provided composition, date range, and price, stated that they were over one hundred years old and therefore antique but critically omitted any description of country of origin of the Shipped Items, such as "Pre-Achaemenid," "Greek" or "Roman."

41.     Simon Jones then informed the Plaintiffs that HMCR was detaining the Shipped Items on behalf of CBP because of "OFAC concerns", which were certainly caused by the omission of information about country of origin on Simon Jones Ltd.'s invoice. Richard Hart, QIPCO's lawyer, sent Electrum's counsel CBP's notice to DTD dated September 30, 2018, which stated: "Specific Reason for the Detention: OFAC."  The return receipt from London cited "OFAC" as the reason for the return.

42.     On October 4, 2018, Mr. Gherardi sent Mr. Latamie an email complaining about Simon Jones' deceptive practices, summarizing the numerous defects in Simon Jones Ltd.'s declaration to HMRC and contrasting that with Electrum's prudent, responsible handling and fulsome declaration of recent shipments to QIPCO. The email states a damning litany of the Defendants' reckless evasion and deceit and prefigures the allegations in this Complaint.

43.     The export of an antiquity of Iranian origin from the United States without properly declaring its origin is illegal. Defendants' failure to properly declare the origin of the Pre-Achaemenid Items deprived the U.S. Government of the opportunity to scrutinize the

objects, their origin and the legality of their export. It is well understood among art historians and in the antiquities trade that Iran is the likely modern country of origin of any object described as "Pre-Achaemenid." With limited exceptions, Iranian objects cannot be imported into the United States without prior specific licensing from the Office of Foreign Asset Controls. As a result, any object of Iranian origin will gain increased scrutiny when exported from the United States without proper declaration. The Defendants' omission of the country-of-origin information for the Shipped Items was indefensible and inexcusable considering each Defendant's extensive experience in exporting items of antiquity overseas (QIPCO as a shipper and Simon Jones Ltd. and DTD as freight forwarders). Defendants' failure to complete the task of providing basic information necessary to reflect that the export of the Shipped Items complied with United States law was reckless and in such disregard for Plaintiffs' interests as to constitute bad faith.

44.     CBP's detention of the Shipped Items left the parties unable to consummate the Exchange and caused severe adverse consequences to Phoenix. Phoenix was forced to engage in a long, expensive dispute with CBP and Immigration and Customs Enforcement that resulted in the release of the Shipped Items. The Horse and the Dolphin were released to Phoenix after four months on January 28, 2019. However, the Griffin and the two Pre-Achaemenid objects—the Drinking Vessel and the Ceremonial Beaker—were not released until October 12, 2023 after more than five years in detention. Phoenix incurred $1,650,753.46 in direct, out-of-pocket expenses to contest the detention and seizure of the Shipped Items to obtain their release.

45.     Between 2019 and 2020, Plaintiffs and QIPCO, as they waited for CBP to release all the Shipped Items, agreed to extend QIPCO's time to perform its obligations under the Exchange Agreement, *i.e.*, to deliver the Purchased Items to Plaintiffs in exchange for the

Exchange Items, until such time as all the Shipped Items were released by CBP or the parties agreed upon substitute objects to replace the Exchange Items. The parties discussed, over the period of a year, replacing the Exchange Items with different objects offered by Plaintiffs, but reached no agreement.

46.     On October 22, 2020, QIPCO made known for the first time that it no longer intended to perform its obligations under the Exchange Agreement by filing the first of two lawsuits against Phoenix in a U.K. court seeking damages in the amount of $2.2 million (equal to the purchase price for the Nike) plus interest. The first complaint alleged that the Nike is not authentic; i.e., not of the age or origin stated in the Nike SPA and has been manufactured in recent times. Consequently, QIPCO asserted, among other things, that Phoenix breached the express and/or implied terms of the Nike SPA and was negligent. QIPCO amended its Complaint on September 8, 2023 to add additional allegations.

47.     The principal basis for the allegation of inauthenticity is a Condition Report dated May 6, 2019 by Conservation and Technical Services Limited, an English company, signed by its principal, Anna Bennett. The Complaint parrots the findings of the Condition Report's materials analysis that purport to establish inauthenticity. Phoenix answered the Complaint on February 2, 2021 by denying the allegations of inauthenticity, breach of contract, and negligence based upon the findings in the original Condition Report dated October 12, 2012 by CIRAM, signed by its CEO, Dr. Olivier Bobin, and a second Scientific report by CIRAM dated January 27, 2021, also signed by Dr. Bobin. The second CIRAM report rebuts Ms. Bennett's report in detail point by point.

48.     The Nike lawsuit is without any factual or legal basis and is a transparent effort by QIPCO, among other things, to extricate itself from the Exchange Agreement.

49.     QIPCO then attempted to bring a second lawsuit based upon similar unfounded allegations of inauthenticity and related claims with respect to the Alexander Head. Phoenix refused to amend the standstill agreement covering the Nike SPA to extend the limitations period to cover the Alexander Head as well, because Phoenix believed that the Defendants were responsible for the failure of the Exchange in September 2018 by reason of their improper export of the Shipped Items that led to their detention and seizure by CBP. In August 2021, the U.K. High Court of Justice, Queen's Bench Division held that QIPCO had failed to make timely service on Phoenix in Switzerland with respect to the Alexander Head. Consequently, QIPCO was time-barred from suing Phoenix under the Alexander Head SPA. Like the Nike lawsuit, the Alexander Head lawsuit was a meritless attempt by QIPCO to avoid its obligations under the Exchange Agreement.

50.     Phoenix incurred $495,802 in direct, out-of-pocket expenses to contest the baseless claims in the London lawsuits, including legal fees, expert fees and travel.

### FIRST CLAIM FOR RELIEF
(Against QIPCO for Breach of Contract)

51.     Phoenix repeats and realleges each allegation set forth in paragraphs 1 through 50, inclusive, as if fully set forth at length herein.

52.     Electrum, Phoenix, and QIPCO entered into the Exchange Agreement, under which Plaintiffs agreed to deliver the Exchange Items to QIPCO in exchange for QIPCO's delivery of the Purchased Items to the Plaintiffs.

53.     Electrum and Phoenix performed their part of the Exchange Agreement by delivering the Exchange Items to QIPCO's shipping companies, Simon Jones Ltd. and DTD in New York.

54.     Electrum and Phoenix performed all their obligations pursuant to the Exchange Agreement and satisfied all preconditions to suit. QIPCO, however, breached its obligations under the Exchange Agreement by (i) failing to deliver the Purchased Items to Plaintiffs, having created a situation that prevented its own performance by recklessly omitting critically important information from shipping documents and causing the Shipped Items to be detained; and (ii) repudiating the Exchange Agreement by commencing meritless litigation in an effort to relieve itself of its obligations under the Exchange Agreement.

55.     Plaintiffs are entitled to recovery, including but not limited to (i) the costs and expenses incurred in contesting the detention of the Shipped Items which resulted from Defendants' improper shipping documentation, in an amount no less than $1,650,753.46, (ii) the costs and expenses, including litigation fees and expenses, Plaintiffs incurred in connection with QIPCO's attempt to extricate itself from the Exchange Agreement by commencing the London lawsuits, in an amount no less than $528,654 (including legal and expert fees and travel expenses); and (iii) Plaintiffs' lost opportunity to resell the Purchased Items at a profit, which Plaintiffs believe they could obtain from resale in the amount of $8,000,000, due to the widely distributed media coverage of the London lawsuits that alleged the Purchased items are "fake," including Phoenix's lost opportunity to sell the Alexander Head for $5 million to an interested collector. Accordingly, because of QIPCO's breach, Electrum and Phoenix have been damaged in an amount to be proven at trial but believed to be in excess of $10,179,407.

### SECOND CLAIM FOR RELIEF
(Against QIPCO for Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Phoenix repeats and realleges each allegation set forth in paragraphs 1 through 55, inclusive, as if fully set forth at length herein.

57.     Phoenix, Electrum and QIPCO entered into the Exchange Agreement, a valid, binding, and certain contract. Plaintiffs fulfilled their duties and obligations under the Exchange Agreement.

58.     QIPCO breached its implied covenant under the Exchange Agreement not to do anything that would defeat Plaintiffs' reasonable expectations with respect to receiving the benefits of the contract by improperly, recklessly or in bad faith, omitting critical information from the documents submitted to CBP and HRMC accompanying the Shipped Items.

59.     Plaintiffs have been damaged by QIPCO's breach by reason of the costs and expenses they were forced to incur because of the detention of the Shipped Items and the lost opportunity to resell the Purchased Items as a profit, all in an amount to be determined at trial, but believed to be no less than $10,179,407.

### THIRD CLAIM FOR RELIEF
(Against all Defendants for Fraud)

60.     Phoenix repeats and realleges each allegation set forth in paragraphs 1 through 59, inclusive, as if fully set forth at length herein.

61.     In connection with the Exchange Agreement, the Defendants insisted on controlling the shipment of the Shipped Items from the U.S. to the U.K. Mr. Jones stated in his email to Mr. Gherardi of September 6, 2018 that he insisted on preparing the export documentation to "expedite" the Exchange. Although Plaintiffs ordinarily would have prepared the export documentation for the Shipped Items, they deferred to QIPCO considering QIPCO's undertaking to "expedite" the Exchange and the Defendants' collective experience and expertise. Plaintiffs reasonably expected that the Defendants would manage the shipment in full compliance with all applicable laws of the U.S. and U.K. considering each Defendant's extensive experience in the international shipping of fine art and antiquities.

62.     QIPCO knew that its omission of material information about the origin of the Shipped Items was false and misleading. QIPCO further knew that the failure to properly declare an object upon export from the United States could lead to the detention, seizure, and forfeiture of such object. Upon information and belief, QIPCO is an active collector and trader that has bought and sold numerous Pre-Achaemenid objects over the years, including some that were exported from the United States. Simon Jones Ltd. and DTD hold themselves out as experts in the customs requirements relating to the international trade in fine art and antiquities. The Defendants are sophisticated, seasoned participants in the international antiquities trade and were fully aware that exporting the Pre-Achaemenid objects without declaring them as Iranian origin was a violation of U.S. law.

63.     Phoenix reasonably relied on QIPCO's assumption of responsibility in exporting the Shipped Items from the United States. Although Phoenix provided Defendants with reasonable and customary paperwork concerning the Shipped Items' origin, it knew of no reason to question the ability of Defendant to export the Shipped Items legally. Although Mr. Gherardi clearly and repeatedly put the Defendants on notice that two Pre-Achaemenid objects in the Shipped Items were of likely Iranian origin, the shipping documents prepared by the Defendants failed to describe those two Pre-Achaemenid objects as "Pre-Achaemenid" on Simon Jones Ltd.'s Summary Invoice. Plaintiffs would not have agreed to Defendants' assumption of the responsibility to export the Shipped Items had they known that Defendants would export the Shipped Items in violation of United States laws.

64.     By reason of the foregoing, Phoenix has been damaged as a proximate cause of Defendants' reckless and fraudulent conduct in an amount to be determined at trial but believed to be no less than $10,179,407.

65.     Phoenix is entitled to punitive damages against the Defendants because they engaged in reckless conduct in the export of the Shipped Items. The Defendants proceeded recklessly with their fraudulent omission and misdeclaration of material information about the Shipped Items' origin despite knowing that such omission was likely to cause injury because the Shipped Items' origin was falsely declared.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

(a)     requiring QIPCO Defendants to pay damages to Plaintiffs for its breach of contract in an amount to be determined at trial but believed to be no less than $10,179,407;

(b)     requiring Defendants, jointly and severally, to pay damages to Plaintiffs for Defendants' fraud in an amount to be determined at trial but believed to be no less than $10,179,407;

(c)     awarding Plaintiffs punitive damages for Defendants' fraud in connection with the Shipped Items;

(d)     awarding Plaintiffs all attorneys' fees and expenses and other costs it has incurred in this action; and

(e)     granting any further and different relief as the Court deems just and proper.

Dated: New York, New York
        March 5, 2024

Respectfully submitted,

Pearlstein & McCullough LLP


By:  S/ William Pearlstein
        William Pearlstein (#2006427)
        Michael McCullough (#266089)

641 Lexington Avenue, 13th Floor
New York, NY 10022
Tel: (646) 762-7264
WPearlstein@PMCounsel.com
MMcCullough@PMCounsel.com

Attorneys for Plaintiffs