O5A3PHOM

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  PHOENIX ANCIENT ART, S.A., et
   al.,

4
                   Plaintiffs,              New York, N.Y.
5
              v.                            24 CV 1699 (GHW)
6
   QATAR INVESTMENT AND PROJECT
7  HOLDING, CO, W.L.L., et al.,

8                  Defendants.

9  ------------------------------x        Motion (Telephonic)

10                                          May 10, 2024
                                            3:00 p.m.
11 Before:

12                      HON. GREGORY H. WOODS,

13                                          District Judge

14                          APPEARANCES

15 PEARLSTEIN & McCULLOUGH, LLP
        Attorneys for Plaintiffs
16 BY:  MICHAEL McCULLOUGH
        WILLIAM PEARLSTEIN
17      ANJU UCHIMA

18 HUGHES HUBBARD & REED, LLP
        Attorneys for Defendant QIPCO
19 BY:  DUSTIN P. SMITH
        GREGORY C. FARRELL
20      J. SCOTT SANDERS II

21 FLASTER/GREENBERG P.C.
        Attorneys for Defendant Simon Jones Superfreight
22 BY:  CHRISTOPHER J. MERRICK

23
   MICHAEL WHITTICAR
24 NICOLE A. SULLIVAN
        Attorneys for Defendant Phoenix Freight Inc. d/b/a Door to
25 Door Fine Art Services

O5A3PHOM

1        THE COURT:  First I'd like to ask everybody to place

2    their phones on mute.  We're hearing a lot of background noise

3    and reverb.  Everyone, please place your phones on mute and

4    please keep them on mute unless you are a participant in this

5    conference and you are intentionally speaking to me or to the

6    representative of a party.  Thank you.

7        So, let me begin by taking appearances from the

8    parties.  I am going to ask the principal spokesperson for each

9    side to identify him or herself and the members of their team,

10   rather than having each lawyer introduce themselves

11   individually.

12       So let me begin with counsel for plaintiff.  Who is on

13   the line for plaintiff?

14       MR. McCULLOUGH:  For plaintiff, good afternoon, your

15   Honor.  For plaintiff, Michael McCullough, Pearlstein

16   McCullough, LLP.  I'm joined today by my co-counsels William

17   Pearlstein and Anju Uchima.

18       THE COURT:  Thank you.  And who is on the line for

19   defendants?

20       MR. SMITH:  Good afternoon, your Honor.  This is

21   Dustin Smith from Hughes Hubbard & Reed appearing on behalf of

22   Qatar Investment and Project Holdings Co. or QIPCO.  I am here

23   with my colleagues Scott Sanders and Greg Farrell.

24       THE COURT:  Who is on line for defendant Phoenix

25   Freight?

O5A3PHOM

| | |
|---|---|
| 1 | MR. WHITTICAR:  Michael Whitticar, your Honor.  With |
| 2 | my local counsel Nicole Sullivan. |
| 3 | THE COURT:  Thank you.  So, let me begin with a few |
| 4 | brief instructions about the rules that I'd like the parties to |
| 5 | follow during this conference.  At the outset -- |
| 6 | MR. MERRICK:  Good afternoon, your Honor.  Chris |
| 7 | Merrick on behalf of defendant Simon Jones Superfreight.  Thank |
| 8 | you. |
| 9 | THE COURT:  So, at the outset, let me begin by |
| 10 | reminding parties that this is a public proceeding.  Any member |
| 11 | of the public or press is welcome to dial into this conference. |
| 12 | I'm not monitoring whether third parties are auditing the |
| 13 | conference, but they're welcome to do so.  I ask you to keep |
| 14 | that possibility in mind. |
| 15 | Second, again, please keep your phones on mute.  You |
| 16 | all have done it, so please keep it up.  Background noise can |
| 17 | be distracting, so please keep your phones on mute, even if you |
| 18 | don't think that there is background noise wherever you may be. |
| 19 | Third, please state your name each time that you speak |
| 20 | during this conference. |
| 21 | Fourth, please abide by instructions from the court |
| 22 | reporter that are designed to help the court reporter do their |
| 23 | job. |
| 24 | And finally, I'm ordering that there be no recording |
| 25 | or rebroadcast of all or any portion of today's conference. |

O5A3PHOM

1          Counsel, with all of that out of the way, let's turn

2     to the substance of today's conference.  This is a conference

3     to discuss defendant Qatar Investment and Project Holding Co.'s

4     proposed motion to dismiss the claims against it on a couple of

5     grounds.  So what I'd like to do is to hear from each of the

6     parties regarding the basis for the motion and the anticipated

7     arguments in response.

8          I've looked at the parties' letters, but I would be

9     willing to hear from each of the parties, to the extent that

10     you'd like to supplement or clarify your positions.  I am going

11     to start with counsel for defendant, and to the extent that you

12     would like to -- that is defendant Qatar -- and to the extent

13     you'd like to respond to some of the anticipated arguments in

14     response that have been previewed in plaintiff's letter, you

15     should feel free to do so.

16          Let me hear from counsel for defendant Qatar.

17          MR. SMITH:  Dustin Smith from Hughes Hubbard & Reed on

18     behalf of defendant QIPCO.  Good afternoon, your Honor.

19          I won't repeat the main argument that we made in our

20     letter to the Court requesting the conference in order to tee

21     up the motion to dismiss.  But, I will take you up on your

22     offer to respond to some of the issues that were raised by the

23     plaintiffs in their response.

24          Specifically, regarding the scope of the forum

25     selection clause that's contained within the sale and purchase

O5A3PHOM

1   agreements.  The dispute related to the artifacts, as laid out

2   in the complaint, has its genesis in these two sale and

3   purchase agreements.  And the scope of the sale and purchase

4   agreements I think is where the dispute really lies.  Our

5   position is that the language of the exclusive jurisdiction

6   provision which provides for any disputes that arise out, arise

7   out of or in connection with the underlying sale and purchase

8   are covered by those exclusive jurisdiction provisions.  And

9   that the dispute over the exchange is something that is arising

10  out of or in connection with the sale and purchase agreements.

11          And I understand that the plaintiffs have taken a

12  different position.  They are arguing for a more narrow

13  reading, but we believe that is incorrect.  And their arguments

14  related to New York law governing the purported agreement in

15  principle that they believe govern the exchange.  We think

16  that's a little bit of a red herring.  With these two

17  underlying agreements we think that's where the Court should

18  look to, and if the Court looks at that and the force of those

19  provisions, the instant case should be dismissed and should be

20  brought appropriately before the English courts where there is

21  already a proceeding ongoing.

22          And finally I'll raise in relation to the fraud claim,

23  I know that defendants have raised the third-party reliance

24  doctrine.  I would just note that that doctrine has been

25  superseded by a case out of the New York Court of Appeals in

O5A3PHOM

2016, that has found that the third-party reliance doctrine cannot support a claim for fraud.  And that case is *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 2016.

And in relation to that, the second request that we made in our letter was for a stay of discovery for two reasons.  One, in light of the motion to dismiss that we would like to bring, and then two, as a result of the anti-suit injunction request that has been made in the English proceeding.  We believe that it would be duplicative and a waste of resources by the parties to engage in discovery at this time while both of those issues are pending.

By way of background, from conversations with our English counsel, we understand that discovery is ongoing in England, and a more pragmatic approach would be to stay discovery in the U.S. allow both the motion to proceed, see how the anti-suit motion comes out, and also see how discovery comes out in the English proceeding.  We think that would leave a much more limited set of follow-up discovery here, if any discovery is required, and would be a more efficient use of resources for all the parties, but also for the Court.  It should minimize the area of potential areas of dispute that could come up in discovery in the future.

And I would just say that we recognize that the plaintiffs have taken the position that they are opposed to that stay.  And we note that once again from conversations with

O5A3PHOM

1    our English counsel, we would hope in light of the positions

2    they've taken in England, that they would join us in seeking to

3    avoid any unnecessary costs in the current proceeding.

4            THE COURT:  Thank you.  First, what are you alluding

5    to when you say in light of the positions they're taking in the

6    U.K. proceeding?  What are you referring to?

7            MR. SMITH:  It is our understanding that in response

8    to the anti-suit injunction, and to the pleadings that are

9    ongoing in the English proceeding, that they've raised concerns

10   over the cost of the English proceedings and the litigation

11   surrounding that.  And I think everyone shares a common concern

12   of making sure that the costs are limited and kept down here.

13   And that is one of the reasons why we're seeking the discovery

14   stay.

15           THE COURT:  Thank you.  And what is your understanding

16   of the timeline for resolution of the anti-suit injunction

17   application in the United Kingdom?

18           MR. SMITH:  Your Honor, if I may, I have my associate

19   Scott Sanders on line.  Would you mind if I kicked this over to

20   him to just provide an update on that timeline?

21           THE COURT:  No, that's fine.

22           MR. SANDERS:  Good afternoon, your Honor.  This Scott

23   Sanders of Hughes Hubbard & Reed.

24           With respect to the anti-suit injunction, as we set

25   forth in our premotion conference letter, that application will

O5A3PHOM

1    be heard in less than a week on May 15 and 16th.  We do not

2    know exactly when the decision will be rendered, although our

3    understanding is that English courts will hopefully move

4    relatively quickly in deciding the motion, just as U.S. courts

5    do with respect to injunctions here.

6         THE COURT:  Thank you.  Good.  Anything else, counsel

7    for plaintiff?

8         MR. SMITH:  The only other clarification I would like

9    to make in response to their letter, I believe they've raised

10   this concept that our position in this case is inconsistent

11   with the position that our English counsel has taken in the

12   anti-suit injunction.  And I think that's just a

13   misunderstanding.  In the motion or the equivalent, the

14   pleadings that English counsel has filed in the English

15   proceeding, they've clearly stated that the primary argument in

16   support of the anti-suit injunction is the exclusive

17   jurisdiction provision contained in both of the SPAs, and as a

18   secondary alternative argument, they have raised the concept

19   that the alleged meeting of the minds and agreement in

20   principle that the plaintiffs referred to in their complaint

21   would incorporate a similar exclusive jurisdiction provision.

22   So just wanted to note that the primary argument in the English

23   proceeding, much as it is here, is the exclusive jurisdiction

24   provision of the SPAs govern.

25        THE COURT:  Let me hear from counsel for plaintiff.

O5A3PHOM

1              MR. McCULLOUGH:  This is Michael McCullough.  Our

2      position is that the two SPAs that were negotiated under

3      English law for the purchase of the two items are inoperative.

4      The parties intended at the time of the exchange, which is four

5      years after the purchases, to create a new agreement.  And the

6      reason for that is that Phoenix was -- did not -- was not

7      interested in rescinding agreements, because Phoenix didn't

8      agree that there was an issue with the objects.  QIPCO claimed

9      that the objects were fake, that they weren't authentic.  And

10     the reports that Phoenix was able to obtain show that the

11     objects were authentic.  There was no issue.  There was no

12     agreement on recision.

13             Instead what the parties intended was to create a new

14     agreement, outside of the original SPAs, that would govern an

15     exchange.  So instead of recision and return and exchange, this

16     is no recision, let's just do a swap to make everyone happy.

17     So we referred to that as the exchange agreement that was

18     agreed in 2018.  That exchange agreement did not contain --

19     which under New York law, as we point out, did not contain

20     anything on forum and choice of law.

21             Now, as we say in our letter, the contacts with New

22     York and the performance in New York favors New York forum and

23     New York law, with regard to the interpretation of that

24     superseding exchange agreement.  In addition, as QIPCO's

25     argued --

O5A3PHOM

1          THE COURT:  Before you move on, let me -- please take
2     a moment to write down what you're about to say.
3          MR. McCULLOUGH:  Sure.
4          THE COURT:  Good.  So just want you to be able to come
5     back to your place.  I apologize for interrupting.
6          MR. McCULLOUGH:  Sure.
7          THE COURT:  First you say that your understanding was
8     that the parties expected that there would be -- that this was
9     in lieu of rescinding the contract.  So you are saying this was
10    in lieu of rescinding the sale and purchase agreements?
11         MR. McCULLOUGH:  That's right.  Not in lieu of.  I
12    would say it -- because there was no agreement to rescind on
13    behalf of the seller, Phoenix.  This was simply an
14    accommodation that was a separate agreement on a swap.  So
15    instead of recision and return, this was just a swap.  No
16    recision.
17         THE COURT:  Thank you.  Good.  And can you just take a
18    couple of minutes if you wouldn't mind talking me through what
19    constitutes the, quote unquote, exchange agreement?  That would
20    be helpful for me to hear from counsel about what series of
21    acts comprised that agreement.
22         MR. McCULLOUGH:  So in 2018, preceding the
23    September 20 sort of consummation of the agreement, there are a
24    series of e-mails and discussions that happened between the
25    parties about a swap.  And the reason why Phoenix was

O5A3PHOM

1    interested in a swap is because the original two items, the

2    purchased items are authentic, Phoenix had other buyers for

3    those.  This was a good deal for Phoenix.  They were interested

4    in doing a swap.

5         The consummation of the agreement was when QIPCO's

6    agent Marc Latamie, who is based in New York, came to the

7    gallery, spoke with Sheikh Hamad, via WhatsApp, showed the

8    Sheikh the objects, images on WhatsApp, and the Sheikh said

9    "yes" on WhatsApp.  And then Sheikh Hamad's agreement to the

10   swap was agreed by his agent Marc Latamie at the gallery.  So

11   all of this happens in New York at the gallery.

12        Then there are a series of e-mails and discussions

13   about the mechanics of the swap.  And we pointed those out in

14   our letter.  So a series of e-mails and discussions before the

15   20th September 2018, there is the WhatsApp discussion and agent

16   agreement on the 20th of September 2018, then there are e-mails

17   on mechanics of the swap that come after.

18        THE COURT:  Thank you.  And do any of those

19   communications reference the purchase agreement or the effect

20   of the exchange agreement on the underlying purchase agreements

21   or what I'll describe it as just the purchase agreement?

22        MR. McCULLOUGH:  Not to my knowledge.  No, because

23   the -- Phoenix's point of this exchange was not to rescind the

24   original agreements.  This was simply a matter of accommodation

25   for both parties, and again, Phoenix's interest here was they

O5A3PHOM

1    had buyers for the original objects.  So there was a good deal

2    for Phoenix let's say.

3            Are there any other questions?  I'd like to get back

4    to the point I was about to make.

5            THE COURT:  Please go on.  I apologize for the

6    interruption.

7            MR. McCULLOUGH:  No.  It is important to the second

8    point, to bolster this argument that this is a separate

9    agreement.

10           In the U.K. proceedings, QIPCO has taken the position

11   that there is a written agreement that governs the exchange.

12   And we pointed out in our letter, there was a deed of exchange

13   that was drafted by QIPCO's lawyers, the same lawyers who draft

14   the SPAs, based on the negotiations that were -- the pre- maybe

15   pre- and post-September 20, 2018 agreement or consummation of

16   the agreement.  And that deed of exchange was delivered to

17   QIPCO's agent in New York, Marc Latamie.  However, Mr. Latamie

18   never transmitted that agreement to Phoenix.  So it is a

19   unilateral agreement that was never transmitted -- and never

20   signed by Phoenix.  So Phoenix knew nothing about it until just

21   recently through the U.K. litigation.

22           Now, again, in the U.K., QIPCO is saying that is an

23   operative agreement for the exchange, not the New York

24   agreement that I described through the e-mails, oral

25   discussions, consummation on 20th of September 2018, and

O5A3PHOM

| | |
|---|---|
| 1 | subsequent e-mails on process.  They're saying this deed is an |
| 2 | operative agreement.  Now, that contradicts QIPCO's position |
| 3 | here on the motion.  Because if there is -- the question really |
| 4 | is, is it the exchange agreement I'm describing, or is it the |
| 5 | deed.  Our position is clear it is the exchange agreement.  It |
| 6 | is not the deed.  But again, there is an argument in the U.K., |
| 7 | in the U.K. discussions that the deed is an operative exchange |
| 8 | agreement, which again, shows that the parties intended to have |
| 9 | a separate agreement. |
| 10 | Now, one last point on the exchange agreement which I |
| 11 | find fascinating is the exchange agreement has forum, it has |
| 12 | choice of law, it also has reps and warranties on performance. |
| 13 | Which, again, which is sort of being argued through the back |
| 14 | door by QIPCO here.  And that we're addressing their |
| 15 | performance obviously in our fraud claim.  But it is curious to |
| 16 | me how all of these issues that QIPCO is bringing up is |
| 17 | addressed in this document, but now I'm hearing it's not |
| 18 | operative and the SPAs are the agreement that's operative with |
| 19 | regard to forum and choice of law. |
| 20 | Should I move on to fraud, your Honor? |
| 21 | THE COURT:  Yes.  But let me just ask a question.  The |
| 22 | defendants argue that the purchase agreement language relates |
| 23 | not only to claims arising under but also in connection with |
| 24 | the purchase agreement. |
| 25 | What's your argument that this exchange agreement is |

O5A3PHOM

1    not in connection with that agreement, even if it does not

2    arise under it?

3           MR. McCULLOUGH:  It's not connected simply because

4    there wasn't an agreement about -- there was no subsequent

5    agreement about authenticity, both, again, there is no --

6    Phoenix never agreed that this issue on authenticity, there's

7    no subsequent recision, and there's -- the exchange has nothing

8    to do with that issue, with the issue of the original objects.

9    There is no -- the objects are subject to a second agreement on

10   an exchange.  It had nothing to do with the original objects,

11   other than the fact that the objects are in the original

12   exchange.

13          THE COURT:  Thank you.  And so, you may go on to

14   fraud.  Thank you.

15          MR. McCULLOUGH:  So, on the fraud point, you know,

16   there is another case that we came up with, which is a 2020

17   case which is *Shavolian v. Donegan*.  It is 2020 New York slip

18   opinion 31, 181, 5th of May 2020, New York County, which is

19   subsequent to the 2016 agreement that finds the same, that a

20   third party, a fraud perpetrated on a third party that has an

21   effect on a plaintiff is allowable as a source of the fraud.

22          And again, I just want to state how important it is to

23   the plaintiff here that there is redress on this fraud.  What

24   happened here is that very sophisticated parties held back

25   material information from the U.S. government about possibly

O5A3PHOM

```
1    sanctioned material and licensable material in the U.S., at the
2    time of export, which deprived the United States government of
3    screening that property.  We don't make that allegation
4    lightly, but that's exactly what happened here.  If there is no
5    redress for that behavior, that goes unabated and that's -- we
6    find that reprehensible.  So, again we'll spend --
7            THE COURT:  Counsel, I'm sorry, let me pause you.  Who
8    is the victim of that fraudulent conduct?
9            MR. McCULLOUGH:  Well, the U.S. government is the
10   victim.  So the people of the United States of America are the
11   victim.  Again, because I should also state and it doesn't come
12   through in our letter.  Phoenix was very concerned that this
13   could happen.  So on a number of occasions, they reminded
14   QIPCO and its agents that these are pre-Achaemenid objects and
15   need to be properly declared.  That's exactly what didn't
16   happen.  Which is another reason why this -- another reason why
17   under the exchange agreement, it would never have been
18   negotiated by Phoenix under New York law.  Because they were
19   very concerned about this.  They were very diligent in pointing
20   this out.  And what they were concerned about is exactly what
21   happened.  What happened was that information about the Iranian
22   origin of these objects was scrubbed from the documents, and
23   that commercial invoice that did not include pertinent,
24   material pertinent information to the U.S. government.
25           So to answer the question shortly, the U.S. government
```

O5A3PHOM

1    and the people of the United States are the ones that are

2    harmed by that fraud.  Now ultimately, it did harm the

3    plaintiff in the sense that the plaintiff was listed by the

4    shipping companies as -- Phoenix was listed as the exporter,

5    and because QIPCO is not in the United States, Phoenix had to

6    clean up the mess.  Phoenix is the one that spent almost a half

7    a million dollars -- a million and a half dollars cleaning this

8    mess up.

9            THE COURT:  Thank you.  And what was the fraud on

10   plaintiff?

11           MR. McCULLOUGH:  Well, plaintiff is harmed -- look,

12   the fraud was on the U.S. government.  The fraud affected the

13   plaintiff and the harm on the plaintiff, again, is having to

14   spend a million and a half dollars and 5 years of legal fees

15   and ultimately the statute of limitation ran on the claim, the

16   five-year statute of limitation or the customs law ran and the

17   objects were returned only because the statute of limitations

18   ran.  The statute ran and the objects were sent back to

19   plaintiff.  But, again, the harm is to the plaintiff, the fraud

20   is on the government.  And again under the case law, we believe

21   that we can use that fraud to redress our harm.

22           THE COURT:  Thank you.  And what's your view of the

23   Court of Appeals decision that counsel for defendant pointed us

24   to during their remarks?

25           MR. McCULLOUGH:  I haven't read that decision.  Again,

O5A3PHOM

1    we had the earlier decision, we have this later decision that

2    I'm looking at, I have not read that decision.  I'm happy to

3    address it in a letter to you if you'd like.

4              THE COURT:  Thank you.  That's fine.

5              So, let me hear from the other defendants and then I

6    want to come back to counsel for plaintiff to give you the

7    opportunity to respond to QIPCO's request for the imposition of

8    a stay.  I'd like to hear from each of the two other defendants

9    in turn.

10             My principal question here is whether you take a

11   position regarding this motion in particular, and whether you

12   take a motion as to the applicability of the stay, and whether

13   a stay on the grounds asserted by the QIPCO defendant would or

14   should redound to the benefits of the other defendants.

15             I'll start with defendant Simon Jones.  Counsel?

16             MR. MERRICK:  Chris Merrick on behalf of Simon Jones

17   Superfreight.  We take no -- we have no opposition, and in fact

18   support the idea of the stay.  We believe that discovery is

19   expensive, and burdensome, and we have not finalized exactly

20   what we plan to do.  I think it's likely we end up filing a

21   motion to dismiss as well.  And we believe that the issues

22   raised in the motion to dismiss should be resolved before the

23   parties proceed to discovery.

24             THE COURT:  Thank you.  Counsel for Phoenix Freight,

25   let me hear from you.

O5A3PHOM

1          MR. WHITTICAR:  Yes, your Honor.  This is Mike

2   Whitticar for Phoenix Freight DTD.  We don't have a position as

3   to QIPCO's motion to transfer the claims against it to England

4   or elsewhere.  We're not joining in that motion and we plan on

5   having our claims determined here.

6          THE COURT:  Thank you.

7          MR. WHITTICAR:  We do anticipate filing a motion to

8   dismiss, but under different grounds.

9          THE COURT:  Thank you.  Fine.  Very good.  So, let me

10  turn back to counsel for plaintiff.  Counsel, you have heard

11  the arguments presented by counsel for defendant QIPCO in favor

12  of a stay.  How do you respond?

13         MR. McCULLOUGH:  Michael McCullough.  There are two

14  issues that the plaintiff Phoenix is facing if we look at this

15  question globally between the two jurisdictions.  One is

16  hardship.  Phoenix is owned by two individuals, Electrum, which

17  is Phoenix's agent, is owned by one of those individuals.

18  Wholly owned by one of those individuals.  And it is a small

19  business.  So, the hardship on Phoenix is significant compared

20  to QIPCO.  QIPCO is run by members of the Qatari royal family.

21  It has tremendous resources.

22         Phoenix has been punching above its weight in the U.K.

23  litigation, but it's cumbersome, it's expensive, and frankly,

24  it should end.

25         So what we hope, both because of the cost issues but

O5A3PHOM

1   also because we think New York is the correct forum for the

2   question of the exchange agreement and its interpretation, what

3   we're hoping is the anti-suit litigation fails, and there is a

4   stay in the U.K., so the U.S., this Court, can adjudicate this

5   issue of the exchange and the harm and the fraud.

6          To be frank, the lawyers in London cost two to three

7   times what I cost.  So the hardship of cost on this small

8   business is much better dealt with through the U.S. case.

9          I guess there's one last point I'd like to make on

10  this, is that the possibility of inconsistent outcomes here.

11  Because the fraud was perpetrated in the U.S., because it was a

12  fraud on the U.S. government, it's questionable whether that

13  fraud is actionable in the U.K.  So, to the extent the Court is

14  inclined to entertain -- well, in the event we're -- we're

15  moving forward with a motion, we'll address that in our motion.

16  With regard to stay, frankly, we'd like to see this case go

17  forward and the U.K. case to be stayed if the anti-suit fails.

18  So, those are our positions there.

19          THE COURT:  Thank you.  Can I try to draw an inference

20  from your comments.  Let me just step back and lay the

21  groundwork for the inference and resulting question.

22          So, the defendant QIPCO is asking for a stay pending

23  briefing and resolution of their anticipated motion.  There is

24  a separate question and related question which is what's going

25  to happen in the U.K. with respect to their resolution of the

O5A3PHOM

1    anti-suit injunction application.  I think that one could view

2    each of those two things as separate.  So what I'm going to do

3    is to frame the possibility of two different types of stays,

4    and I'm then going to draw any inference and ask you all a

5    question.

6         The first stay would be a complete stay of this

7    action, including answers and motion practice, pending

8    resolution of the anti-suit injunction litigation in the U.K.

9    Counsel for plaintiff just picked up on one of the reasons why

10   that might make sense, namely the risk of inconsistent

11   decisions between me and the U.K. court.  And I expect the U.K.

12   court will have a better sense of the U.K. law than I will.

13        The issue is that if we begin litigation of the motion

14   to dismiss while that litigation is pending in the United

15   Kingdom, that we could end up with inconsistent results and the

16   parties will be forced to be running two bills simultaneously

17   litigating that issue in the U.K. court while you are

18   litigating the motion to dismiss and potentially other issues

19   here in the U.S.

20        The second potential scope of the stay would be the

21   one counsel for defendant asked for, namely, a request that I

22   stay discovery pending briefing and resolution of the motion to

23   dismiss.  The potential issue with that is that it means the

24   parties need to brief a motion to dismiss as the price of entry

25   into the stay which has the problems I just described.

O5A3PHOM

1          So my inference from your comments, counsel for

2    plaintiff, is that the plaintiff may not oppose a I'll call it

3    a plenary stay of this action pending resolution of the

4    anti-injunction litigation in the U.K.  The benefit of that

5    would be that the parties would not be doing any work here

6    while you don't know what the outcome will be of that, and then

7    we could come back together to resolve whether or not a stage 2

8    injunction was appropriate, namely one pending briefing and

9    resolution of this motion to dismiss, once it is to be filed.

10         So, let me just float that inference, and then I'll

11   ask the question of all of the parties, namely should I, given

12   the anticipated hearing on the anti-injunction act proceeding

13   in the U.K., stay this case, including motion practice with

14   respect to it with perhaps an exception as it pertains to the

15   answers from the other two defendants or their premotion

16   conference letters pending resolution of the anti-suit

17   injunction proceeding in the U.K.

18         Let me hear first from counsel for QIPCO.  Counsel, I

19   don't know that that's what you are asking for, but let me ask

20   you what your view is regarding a stay with that kind of scope?

21         MR. SMITH:  We would have no -- Dustin Smith from

22   Hughes Hubbard & Reed appearing on behalf of QIPCO.  We would

23   have no opposition to your Honor, and we think that's a

24   pragmatic solution to avoid unnecessary costs while we await

25   the outcome of that decision.

O5A3PHOM

1          THE COURT:  Let me hear from the other defendants.

2    Defendant Simon Jones.

3          MR. MERRICK:  We have no opposition to that either.

4    The only small adjustment I would just make is that Simon Jones

5    Superfreight isn't a party to the anti-suit injunction.  We

6    haven't seen the filings that are pertinent to that injunction

7    request.  But, at least as I understand it, the outcome of that

8    wouldn't necessarily impact us.  So while of course we don't

9    oppose a complete stay, and any stay we think is a good stay,

10   from our perspective we would like to be dismissed from the

11   case.  And I'm not sure that the anti-suit injunction would

12   resolve that for us.

13          So, but again, if it's the choice between no stay and

14   a complete stay, we're certainly in favor of the complete stay,

15   but, we do believe that there are meritorious issues we could

16   raise that are separate and independent from the arguments that

17   QIPCO has made, and we believe that they are grounds for

18   dismissal and should be ruled upon before any discovery

19   proceeds.

20          THE COURT:  Thank you.  Understood.  Counsel for

21   Phoenix Freight?

22          MR. WHITTICAR:  Yes, your Honor.  Michael Whitticar.

23   We agree with counsel for Simon Jones that there are issues

24   unique to Simon Jones and DTD which could be litigated and

25   resolved in this court without burdening either QIPCO or the

O5A3PHOM

1    plaintiff in term of a motion to dismiss relating to validity

2    of the fraud claims in the Montreal Convention, which provides

3    some unique defenses to Simon Jones and DTD that may not be

4    available to QIPCO.  And we should go ahead and probably have

5    those heard.  And then if it turns out that those motions to

6    dismiss are not going to be granted, at that point I think a

7    stay as to discovery and further proceedings would be justified

8    while the London proceedings play out.

9         THE COURT:  Thank you.  Let me turn to counsel for

10   plaintiff.  Counsel?

11        MR. McCULLOUGH:  Michael McCullough again.  I think we

12   are in an awkward position here because Phoenix has a suit

13   against three parties.  The London anti-suit is the only QIPCO.

14   So, but with regard to QIPCO, we have a couple problems.  To

15   the extent that this case goes forward, after the decision over

16   in the U.K. on anti-suit, we know there is going to be a motion

17   to dismiss from QIPCO, and if that is the case, and we're

18   dismissed, then we're back from London, if the Court decides

19   that London is the correct forum.  But in the meantime, we have

20   to deal with the possibility of time bar on our claims or some

21   of our claims, and again, the question of hardship because

22   there might be certain -- there might be certain remedies we

23   can only get in the U.S., and that would have an impact on our

24   case against Simon Jones specifically.  Because again, Simon

25   Jones is acting as agent for QIPCO.

O5A3PHOM

1    So it is problematic for us to have this plenary stay,

2   and again, the problem is we also don't know how long it is

3   going to go on, and I'm worried about time bar on certain

4   claims.  And again, we might be time barred on certain claims

5   already, and that's another hardship.  And again, because of

6   the context of the forum here and the strength of our claim,

7   I'm concerned.  I'm not trying to be difficult.  I understand

8   that the Court wants to find the best path and obviously money

9   is a concern for everyone.  So, I hear the concern.  But I'm

10   concerned about those issues.

11    I should also say one other thing, your Honor.  There

12   is one other point I haven't brought up here that I should

13   bring up.  In the U.K., because of ongoing discovery in the

14   U.K., we will be amending our complaint with new allegations

15   and possible new defendants on our fraud claim.  That is

16   going -- that will be pending a motion in the U.K. to release

17   documents that are in discovery for use in this case, in this

18   action in the U.S.  Again, I'm concerned about the timing here,

19   because we plan to amend, we might have additional claims, and

20   we might lose those if we have a plenary stay.  We won't be

21   able to amend.  So, I'm very concerned about that.  Because I

22   think the nature of this case changes a bit with regard to one

23   or two of the defendants.

24    THE COURT:  Fine.  Good.  So, that's fine.  So, let me

25   do this.  The defendant has asked that I stay discovery pending

O5A3PHOM

1    briefing and resolution of this anticipated motion.  Each of

2    the other defendants have joined in that application.

3         A motion to dismiss does not automatically stay

4    discovery except in cases like those that are covered by the

5    Private Securities Litigation Reform Act, that is the PSLRA.

6    As a result, discovery should not be routinely stayed simply on

7    basis that a motion to dismiss has been filed.  However, upon a

8    showing of good cause, a district court has considerable

9    discretion to stay discovery pursuant to Federal Rule of Civil

10   Procedure 26(f)(C).

11        In determining whether good cause exists, courts

12   consider a number of factors, including whether a defendant has

13   made a strong showing that the plaintiff's claim is

14   unmeritorious, the breadth of discovery, and the burden of

15   responding to it, and the risk of unfair prejudice to the party

16   opposing the stay.

17        Here, I've considered all of those factors in light of

18   what I know about the case and the anticipated motion, and I

19   find that there is good cause to stay discovery here pending

20   briefing and resolution of this anticipated motion.

21        Let me begin with the first factor.  Now, not taking a

22   position regarding this issue and its substance.  Ultimately

23   that will be an issue that I resolve after having the

24   opportunity to review the parties' briefing in full.  I'll

25   simply make a couple of comments and observations.

O5A3PHOM

1          First, the application would be fully dispositive were

2     I to grant the defendant QIPCO's motion on the grounds of forum

3     non conveniens.  They have made a reasoned argument that the

4     exchange agreement dispute arises in connection with the

5     purchase agreement, purchase agreements which gave rise to the

6     subject matter of the exchange agreements.  Again, I don't take

7     a position regarding the ultimate outcome of the issue, but

8     defendant has made a reasonable showing in support of that

9     claim.  And they've pointed me to case law that plaintiff has

10    not read by this state's highest court that they assert means

11    that the fraud claim is not one that can be heard.  So, the

12    first factor weighs in favor of a stay.

13         The second factor also weighs in favor of a stay.

14    That's because all cases involve discovery.  It's expensive and

15    burdensome to respond to it.  Here, as I understand it, the

16    underlying dispute involves this series of transactions

17    involving these objects.  It may involve international

18    discovery.  As a result, the burden may be substantial.  Those

19    burdens will be avoided as a result of the stay.

20         I think that the risk of unfair prejudice to

21    plaintiffs, the party opposing the stay here, is limited.  As

22    both sides have said, among other things, discovery as I

23    understand it in what is arguably a related action proceeding

24    in the U.K. is ongoing.  It is ongoing to such an extent that

25    it may fuel, in plaintiff's view, potential modifications to

O5A3PHOM

1    the complaint here.  So I understand that even if discovery is

2    stayed here, that the parties also have the opportunity in

3    those parallel proceedings to continue to obtain information.

4    Even if they did not, however, I would not find that the risk

5    of prejudice weighed strongly enough in favor of continuing

6    litigation pending briefing and resolution of the motion.

7         I say that in large part because the resolution of

8    this motion should not be substantial.  My expectation is that

9    the parties are well aware of their litigation hold

10   obligations.  I would expect you would tell me now if you are

11   unaware of those obligations.  And that as a result, I don't

12   understand there is a substantial risk of loss of pertinent

13   evidence.  So all of these factor weigh in favor of a stay.

14        So I'm granting the defendant QIPCO's request to stay

15   discovery in the case pending briefing and resolution of their

16   motion.  Because it doesn't make sense to take discovery from

17   the other defendants while it is stayed as to the third, this

18   stay applies to all parties.

19        Very good.  So, now let's set a briefing schedule for

20   the motion.  One thing that I should say now that it's clear

21   that I'm staying discovery pending briefing and resolution of

22   this motion is that the parties may wish to meet and confer

23   regarding whether there is an efficient way to schedule or we

24   should do it now.  We should be thinking about whether there is

25   an efficient way for us to schedule the briefing on this

O5A3PHOM

1    motion, understanding the possibility that there may be

2    intervening case law from the U.K. court that would impact this

3    motion and potentially the parties' ability to engage in it.

4            So, I'd like to hear from the parties about whether

5    and to what extent the timing of the U.K. anti-injunction

6    proceedings should inform the scheduling for the motion to

7    dismiss as we set our schedule now.

8            So let me start with counsel for defendant QIPCO.

9    When would you propose to file your motion?

10           MR. SMITH:  Dustin Smith from Hughes Hubbard & Reed

11   appearing on behalf of QIPCO.  Your Honor, in light of the

12   anti-suit injunction, our thought is that it may make sense to

13   pin the schedule off the issuance of that order.  A, to avoid

14   inconsistent decisions, but also to avoid the expense of going

15   through briefing, if eventually the anti-suit injunction is

16   actually granted.

17           So, our proposal would be to just set a date that's 21

18   days after the issuance of that decision for the motion to

19   dismiss, 14 days after for a reply, and then seven days for a

20   response, which I think is the standard schedule.  I would also

21   just raise for consideration in light of counsel for

22   plaintiff's statements that they are going to be seeking to

23   amend the complaint, whether it makes sense also to wait for

24   the amended complaint to come in to avoid unnecessary briefing,

25   if there are going to be additional revisions to the complaint.

O5A3PHOM

1    So that we're not wasting any resources on that front.

2    THE COURT:  Thank you.  Just again back to

3    Mr. Sanders' point.  Do you have any sense of when that would

4    mean?  Are we looking at mid-June, end of May, any estimate may

5    be helpful for the plaintiff as they're thinking about their

6    position.  Any more detail?

7    MR. SMITH:  Dustin Smith for Hughes Hubbard & Reed

8    appearing on behalf of QIPCO.  With the caveat I'm not an

9    English lawyer, I understand from conversations with English

10    counsel, which admittedly were never projecting these type of

11    estimates, that they would predict a matter of weeks or months.

12    So, maybe mid summer, but we're not looking at, from my

13    understanding, that we're not looking at this dragging on for a

14    year or some extended period of time.

15    THE COURT:  Let me hear from you, counsel for

16    plaintiff.  What's your view regarding that application?  To

17    just to reframe it.  They're asking for me to not set a date,

18    but rather to set it based on the date by which the ruling is

19    released.  What's your view?

20    MR. McCULLOUGH:  Again, my concern is about time bar

21    on claims because of the delay.  So, I understand the concept

22    of hoping that the U.K. court will act quickly.  But, as

23    counsel for defendants states, we don't know.  Could be weeks,

24    could be months, could be longer.  So, we would not favor

25    waiting for a decision on that question.

O5A3PHOM

1          Perhaps we can find somewhere in the middle where we

2     can set a date beyond which we wouldn't wait any longer in the

3     hope that that decision comes.  But I would not want to make

4     this indefinite, because it sounds like just waiting for the

5     anti-suit injunction decision could be months away.

6          THE COURT:  What's your proposal?

7          MR. McCULLOUGH:  I think -- so if we're May 10.  If

8     it's weeks, I mean, I believe next week is the -- if it's next

9     week the hearing happens, that's the 16th.  Then weeks would be

10    mid-May.  Months would be much longer.  I wouldn't want to go

11    into July and August.  I think I would want a June date if we

12    could get it.  If it means June 30, then perhaps that's our

13    date.

14         THE COURT:  So counsel for QIPCO, the plaintiff

15    suggested that we schedule your motion to be due by the 30th of

16    June.  Is that an acceptable deadline?

17         MR. SMITH:  Yes, your Honor.  I think that's a

18    reasonable deadline.  And I would just add, if I was not clear

19    before, that my understanding of the English procedure is the

20    English court can also grant preliminary relief in addition to

21    final relief so that may come sooner.

22         THE COURT:  Good.  Thank you.  They'll have a date to

23    work toward now.  So, the briefing schedule for the motion is

24    as follows:  The motion is due no later than June 30, 2024.

25    Any opposition will be due no later than -- I'm sorry.  Make

O5A3PHOM

1    that July 1, 2024.  The 30th is a Sunday.  July 1, 2024.  Any

2    reply will be due no later than three weeks following the date

3    of service of the motion.  Any reply will be due no later than

4    one week following date of service of the opposition.

5         So again, the motion is due by the 1st of July.  Any

6    opposition is due no later than three weeks, that's 21 days,

7    following the date of the service of the motion, and any reply

8    will be due one week thereafter.

9         I look forward to seeing the other defendants'

10   premotion conference request letters that will be the prompt

11   for potentially another conference or simply an order from the

12   Court establishing a briefing schedule, depending on the nature

13   of the issues raised.  Again, I'll issue an order that

14   establishes the briefing schedule and that also reiterates my

15   order staying discovery pending briefing and resolution of the

16   motion to dismiss.

17        So, thank you all very much.  Is there anything else

18   that any party would like to raise with the Court before we

19   adjourn?  First counsel for plaintiff.

20        MR. McCULLOUGH:  No, your Honor.  But I'll ask my

21   co-counsel to raise anything if they have it.  I think we're

22   good, your Honor.  Thank you.

23        THE COURT:  Thank you.  Counsel for --

24        MR. MERRICK:  This is Chris Merrick.  Just as a

25   housekeeping matter, I see there is an initial conference on

O5A3PHOM

| | |
|---|---|
| 1 | May 21 with some deadlines in advance beginning on Tuesday. |
| 2 | Just in light of the issuance of the stay and the briefing |
| 3 | schedule, just curious if your Honor might be inclined to push |
| 4 | that back or adjourn it until these issues have been resolved. |
| 5 | THE COURT:  Yes.  I will adjourn it. |
| 6 | Anything else counsel for defendant QIPCO? |
| 7 | MR. SMITH:  No, your Honor.  We had the same |
| 8 | housekeeping point, but it's been resolved.  So nothing else |
| 9 | from us. |
| 10 | THE COURT:  Thank you.  And I think there is one other |
| 11 | defendant from whom I've not yet heard.  Counsel for DTD, |
| 12 | anything from you?  Counsel for Phoenix transportation? |
| 13 | MS. SULLIVAN:  This is Nicole Sullivan from White & |
| 14 | Williams.  I don't know if Mr. Whitticar lost contact or not. |
| 15 | MR. WHITTICAR:  I forgot to hit my mute button.  I'm |
| 16 | not good with this advanced technology. |
| 17 | The plaintiff had mentioned it was planning to amend |
| 18 | its complaint.  And I'm wondering does it have the information |
| 19 | it needs now to do that or can we set a schedule for that in |
| 20 | advance of the motion to dismiss briefing schedule? |
| 21 | THE COURT:  Thank you.  I'll leave that to the parties |
| 22 | to discuss and the parties' discussions will guide how you wish |
| 23 | to proceed.  Otherwise the default rules in Rule 15 apply which |
| 24 | you can all look to.  I don't know that we can make great |
| 25 | progress here. |

O5A3PHOM

1                Very good.  So thank you all very much.  This

2     proceeding is adjourned.

3                (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25