

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Office:+1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

June 5, 2024

<u>BY ECF</u>

Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *Phoenix Ancient Art, S.A. et al. v. Qatar Investment*
*and Project Holding Co., W.L.L. et al.*, No. 24-cv-01699 (GHW)

Dear Judge Woods:

We write on behalf of defendant Qatar Investment and Project Holding Co., W.L.L. ("QIPCO") to update the Court that on June 4, 2024, the English High Court of Justice (the "English Court") handed down its judgment granting QIPCO interim relief on its application for an anti-suit injunction and enjoining plaintiffs Phoenix Ancient Art, S.A. and Petrarch LLC from pursuing its claims against QIPCO in this action until trial in England or further order of the English Court. The English Court found that QIPCO had shown "to a high degree of probability" that the exclusive jurisdiction clauses in the Nike and Alexander Sale and Purchase Agreements govern plaintiffs' claims against QIPCO in this action. The interim injunction does not apply to plaintiffs' claims against defendants Simon Jones Superfreight Limited or Phoenix Freight Inc., but the English Court did not preclude an application "that the interim injunction should be extended to cover the position of one or both of those parties." Enclosed herewith is a copy of the English Court's judgment. QIPCO expects that the English Court soon will issue its order documenting the terms of the judgment, including with respect to the anti-suit injunction. QIPCO will submit to the Court a copy of the English Court's order once it is issued.

Respectfully submitted,

*Dustin P. Smith*
Dustin P. Smith

Enclosure
cc: all counsel of record (via ECF)



Neutral Citation Number: [2024] EWHC 1331 (KB)

Case No: KB-2023-003712 & QB-2020-003721

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 4 June 2024

**Before** :

**THE HON MR JUSTICE BUTCHER**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **(1) QATAR INVESTMENT AND PROJECTS DEVELOPMENT HOLDING CO.** | |
| **(2) HIS HIGHNESS SHEIKH HAMAD BIN ABDULLAH AL THANI** | **Claimants** |
| **- and -** | |
| **(1) PHOENIX ANCIENT ART S.A.** | |
| **(2) ALI ABOUTAAM** | |
| **(3) HICHAM ABOUTAAM** | |
| **(4) ROLAND ANSERMET** | **Defendants** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Laurence Emmett KC** (instructed by **Pinsent Masons LLP**) for the **Claimants**
**Gilead Cooper KC and Francesca Mitchell** (instructed by **Herrington Carmichael LLP**) for
the **First to Third Defendants**

Hearing dates: 15-16 May 2024
- - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**This judgment was handed down by the Judge remotely by circulation to the parties'**
**representatives by email and release to The National Archives. The date and time for**
**hand-down is deemed to be 10:00 on Tuesday 4TH June 2024.**

**The Hon Mr Justice Butcher :**

1.      There are three applications before the Court, in two actions which are, subject to the outcome of one of the present applications, to be managed and tried together, namely QB-2020-003721 ('the Nike Action'), and KB-2023-003712 ('the New Action').

2.      These proceedings relate to what are, or purportedly are, ancient artefacts purchased by the First and / or Second Claimants from the First Defendant some ten years ago.

3.      The First Claimant ('QIPCO') is a company incorporated under the laws of Qatar.  The Second Claimant ('Sheikh Hamad') is QIPCO's Chief Executive Officer. The First Defendant ('Phoenix') is a company incorporated under the laws of Switzerland which trades as a dealer in art and antiquities.  The Second Defendant ('Ali Aboutaam') was at all material times the owner of Phoenix with authority from Phoenix in relation to all material matters.  The Third Defendant ('Hicham Aboutaam') is Ali Aboutaam's brother, and also involved in dealing in art and antiquities.  The Fourth Defendant ('Mr Ansermet') has not yet been served with the proceedings.  He did not appear and was not represented at the hearing.  When I refer below to 'the Defendants' without specifying otherwise, I mean the First to Third Defendants.

4.      The applications which have been argued and which are to be decided are as follows:

(1) An application by the Defendants to strike out or for summary judgment in the New Action;

(2) An application by the Claimants to restrain proceedings recently brought in the US District Court for the Southern District of New York by Phoenix and a company called Petrarch LLC d/b/a Electrum ('Electrum'), against QIPCO, Simon Jones Superfreight Ltd ('Simon Jones Superfreight'), and Phoenix Freight Inc. d/b/a Door to Door Fine Art Services, under Civil Docket No. 24-CV-1699 ('the New York Proceedings').

(3) An application by the Defendants for relief from sanctions in the Nike Action.

I will consider those applications in turn, and in the order I have set them out. Before doing so, it is necessary to refer to the, now somewhat involved, procedural history.

Background

5.      The Claimants (or one of them, it being for present purposes immaterial which) bought a chalcedony statuette of a Nike-Victory ('the Nike') from Phoenix by a Sale and Purchase Agreement dated 13 May 2013 ('the Nike SPA') for US$ 2.2 million. It was purchased on the basis that it dated to 400-500 CE.  The Claimants bought from Phoenix a marble head of Alexander the Great as Herakles ('the Alexander' or 'the head') by a Sale and Purchase Agreement dated 24 January 2014, ('the Alexander SPA') for a price of US$ 3 million.  It was purchased on the basis that it dated to around the third to first centuries BCE.  The Claimants bought from Phoenix a phalera with an imperial eagle made of chalcedony ('the Phalera') by a Sale and Purchase Agreement dated 6 June 2014 ('the Phalera SPA'), for a price of US$ 262,705.  It was purchased on the basis that it dated to the first century CE.

6.      On 22 January 2020 the Claimants issued a claim form in QB-2020-000726 ('the First Alexander Action'), in which Phoenix was named as the only Defendant.  In the summary of the claim, it was stated that the Alexander was 'inauthentic and/or a forgery'.  In paragraph 3, it was said that: 'The claim is for breach of contract and/to enforce and/or claim under the terms of the agreement and/or misrepresentation and/or fraudulent misrepresentation and/or fraud and/or deceit and/or negligence and/or under s. 2(1) and/or 2(2) of the Misrepresentation Act 1967 and/or restitution and/or unjust enrichment and/or mistake and/or money had and received and/or total failure of consideration.'  Before the claim form was served, on 7 May 2020, the words 'and/or fraudulent misrepresentation and/or fraud and/or deceit', and all the words after '1967' were deleted.  On 26 June 2020, the Claimants issued an application for an extension of time in which to serve the claim form; and on 20 July 2020 Master Gidden made an order *ex parte* granting an extension of time. That order was then perfected on 22 July 2020.  The order extended time by 4 months, to 22 November 2020.

7.      Particulars of Claim in the First Alexander Action were finalised and dated 4 August 2020.  They pleaded that the Alexander was inauthentic, and had been 'manufactured in recent times'.  Particulars of this were given.  In addition, the Particulars of Claim pleaded what was set out in Schedule 1 to the Alexander SPA as being the provenance of the Alexander, and averred that it was represented that the Alexander had that provenance.  At paragraph 19(4) it was pleaded that it was proper to infer that '… as the Work is a forgery, the Contractual Provenance is false and inaccurate', and that '… Phoenix did not take sufficient steps to establish … that all relevant export and import laws,

licences and regulations pertaining to the Work were complied with …'.  At paragraph 21 it was pleaded that representations made by Phoenix, including as to the accuracy of the Contractual Provenance, were made negligently. And at paragraphs 24 and 25 there was pleaded a claim for damages including on the basis of negligence and under s. 2 Misrepresentation Act 1967.

8.  On 8 September 2020, the claim form in the First Alexander Action, together with the Particulars of Claim, were served on Phoenix in Switzerland.  Phoenix applied to set aside the order granting the extension of time, and on 19 February 2021 Master Gidden set aside his order extending the time for service; and the action was struck out.  The Claimants appealed against that decision, but on 25 August 2021 William Davis J dismissed the appeal.  There was a further appeal to the Court of Appeal, which was likewise dismissed, on 30 March 2022: [2022] EWCA Civ 422.  In the judgment of Whipple LJ, she said, amongst other things:

> '[3] The six year limitation period for the Claimants to bring a claim against the Defendant for return of the purchase price and damages for associated losses expired on 24 January 2020. Just before expiry, on 22 January 2020, the Claimants issued a claim form. Pursuant to CPR 7.5, the Claimants had four months to serve the claim form within the jurisdiction and six months to serve out of the jurisdiction; if the latter course was taken, the period for service, unless extended, expired on 22 July 2020.
>
> …
>
> [5] On or about 23 June 2020, just before issuing the first application and as a result of enquiries set in train on 16 June 2020, Pinsent Masons had found out that the Foreign Process Section of the High Court ("the FPS") was closed due to the pandemic. The FPS is the body responsible for serving proceedings outside the jurisdiction. As matters stood at the time of

QIPCO v Phoenix Ancient Art SA

the two applications for an extension, the FPS was closed, it was unknown when it would reopen, there was a large backlog of cases awaiting service outside the jurisdiction, and the FPS was advising litigants who wanted to serve outside the jurisdiction to seek extensions of time for service.

[6] It subsequently emerged that the FPS had been suspended since 16 April 2020. The FPS remained closed, in fact, until 28 July 2020.

[7] The Claimants submitted their application for service out of the jurisdiction to the FPS on 11 August 2020 (although they suggest that the package of documents was ready by 29 June 2020 – nothing turns on the gap between those two dates). The FPS served the Defendant in Switzerland on 8 September 2020, 28 days later and around 7 weeks after the end of the six months permitted for service out of the jurisdiction absent an extension.

…

[9] The Claimants' case in this Court is based on the effects of the pandemic. It is said that the Master (and the Judge) should have made some or greater allowance for the disruption caused by the pandemic. They point in particular to the closure of the FPS from 16 April to 28 June 2020, but also to the general upheaval experienced by businesses at this time, as the pandemic first struck. They argue that the Master should have refused the application to set aside, alternatively the Judge should have upheld the appeal against the Master.

…

[34] The Master found that the FPS's closure was not a reason for the Claimants' application for an extension, because the Claimants required the extension of time for other reasons, unconnected with that closure. The Master held that the reason or reasons for the Claimants' not having served the claim form in time (and thus seeking an extension of time) was the Claimants' failure to grasp the nettle and get on with preparing for service earlier than they in fact did; he noted that they did not even know the FPS was closed until late June 2020, by which time they were already up against

the deadline for service of the claim form and already in need of an extension.

[35] Those are the facts as found. It is difficult to see how the Claimants can get around them.

[36] But in any event, I believe there is a fundamental flaw in the Claimants' argument. The Claimants say that the Court should have taken account of, indeed found to be determinative, the fact that service would not have been possible by 22 July 2020 in any event given the closure of the FPS. But the Court's task when faced with an application for extension of time under CPR 7.6(2) is to determine the reasons for the application for extension. That is a fact-finding exercise rooted in the evidence provided to the Court. Once the facts are found, the Court evaluates the reasons as good (i.e., are they sufficiently good to justify extension?) or not so good. The Claimants are wrong to suggest that the Court should investigate what the position would or might have been "in any event". That is a different exercise altogether.

[37] It is possible to envisage a case where the closure of the FPS might have been a good reason for the extension application. Mr Cooper gave the example of two claimants who issue on the same day against foreign defendants: the first makes sensible preparations for service and submits the papers to the FPS, only to find that the FPS is closed for the remainder of the period for service; the second does nothing towards service and then finds out that the FPS has in fact been suspended and that service could not have been effected anyway; both are in the same position so far as the outcome is concerned, because the FPS is closed; both make applications for extensions of time for service. Mr Cooper submits that the Court's sympathy might very well be with the first claimant, who can show that the FPS' closure was a reason for seeking an extension, but not with the second claimant who (like these Claimants, he argues) did nothing until it was too late and then relied on the fact of closure opportunistically. I agree that the closure of the FPS would be a reason (arguably, a good reason) for the first claimant seeking an extension of time, but it would not be a reason for the

second having to do so. I agree that this example illustrates the flaw in the Claimants' argument.

[38] In this case, the closure of the FPS was not a reason, let alone the reason, for the Claimants needing to seek an extension of time; they needed an extension anyway. The closure of the FPS, once Pinsent Masons found out about it, simply added to the existing problems….'

9.   Coulson LJ delivered a concurring judgment in which he said:

[49] I agree that, for the reasons given by my Lady, Lady Justice Whipple, this appeal should be dismissed. On the face of it, [counsel for the Claimants'] best point was that, unless the Claimants had effected service outside the jurisdiction by 15 April 2020 (the date that the FPS was suspended) it would always have required an extension of time. But that was not the reason for the delay which actually occurred: on the findings of the Master and William Davis J, the Claimants only woke up to the difficulties of service outside the jurisdiction over two months later, in late June 2020, and it was the delays up to that point, for which there was no good excuse, which made an application for an extension of time inevitable.

[50] That can be tested the other way round. If in late April 2020, the Claimants had been ready to serve outside the jurisdiction, only to be told that the FPS was closed because of the pandemic, a prudent solicitor would have sought an immediate extension of time. It is highly likely that such an application would have been granted. That did not happen because, on the facts here, the Claimants had not even thought about using the FPS until about 23 June 2020, five months into the six month period. It was that delay which necessitated the application for an extension, and that was not a good reason to extend time for service.'

10.  In the meantime, on 22 October 2020, the Claimants had issued the claim form in the Nike Action, which was subsequently served.  The claim initially made was similar to that in the First Alexander Action, namely that the Nike was

QIPCO v Phoenix Ancient Art SA

inauthentic and/or a forgery, together with a case that Phoenix had failed to take sufficient steps to authenticate the provenance of the piece.

11. Phoenix served its Defence in the Nike Action on 2 February 2021, and the Claimants served their Reply on 31 March 2021. Disclosure in the Nike Action took place during 2022. Witness Statements were exchanged in January 2023. Then, on 3 March 2023, the Claimants issued an application to make substantial amendments to their statements of case in the Nike Action. These amendments added Ali and Hicham Aboutaam, and Mr Roland Ansermet, as the alleged seller of the Nike to Phoenix, as Defendants; and, in addition to the existing case on inauthenticity, pleaded a case that the provenance of the Nike stated at the time of the purchase was false and that the Defendants knew it was false or did not believe it to be true.

12. In support of this newly added case, the Claimants pleaded, amongst other things, that: (1) Ali Aboutaam had pleaded guilty in January 2023 before a Swiss Police Court to fabricating provenance documents ('the January 2023 conviction'); (2) the indictment in that case had come about as a result of a criminal investigation opened by Swiss authorities, namely the Western Customs Antifraud Department and the Public Prosecutor's Office of the Canton of Geneva, which had culminated in a report of Jean-Marc Renaud, Deputy Head of Western Customs Antifraud, dated 21 July 2020 ('the Swiss Report'); and (3) that the metadata of certain documents showed them to be forgeries.

13. The amendments were opposed by the Defendants. One basis for the objection was that the new amendments pleaded a new cause of action, which was time

barred. The objections to the amendments were heard on 18 July 2023 by Andrew Burns KC, sitting as a deputy High Court Judge. He gave a judgment dated 20 July 2023: [2023] EWHC 1916 (KB). At the hearing it had been accepted by the Claimants that the new claims were new causes of action, and that they did not arise out of the same or substantially the same facts as already in issue. Mr Burns KC decided, nevertheless, that the amendments should be permitted because, as he held, it was clear (and not arguable to the contrary) that s. 32 Limitation Act 1980 applied. The judge referred to the Claimants' evidence 'that the fraudulent conduct and conspiracy of the Defendants has only recently come to light', in particular by the disclosure in the proceedings of the Swiss Report, and as a result of an article in *Paris Match* of 10 January 2023, which referred to the January 2023 conviction. At para. 62 the judge said:

> 'On that basis I must conclude on the evidence that is available at this preliminary stage that it is not reasonably arguable that a standard 6-year limitation period applies to the proposed new claims. They appear to me (for the purposes of the amendment application) to fall squarely within s. 32 of the 1980 Act.'

14. I do not need to, and do not, express any view as to whether that decision was correct. It has not been successfully appealed. The Nike Action has accordingly proceeded, including the causes of action added by amendment. The directions applicable to the future conduct of the case were set by Mr Burns KC on 20 July 2023 ('the 20 July Nike Order'). That order provided for the Claimants to have permission to amend, and for the Defendants to put in Defences or amended Defences (as applicable), and for an amended Reply. It further provided:

'h. The Claimants and the First Defendant shall provide any supplemental disclosure and the Second, Third and Fourth Defendants shall provide standard disclosure by 4 pm on Friday 13 October 2023.

i. The parties must exchange signed witness statements (or further witness statements of fact) by 4 pm on Friday 17 November 2023.'

The 20 July Nike Order also provided for the trial, at that stage fixed to commence on 29 January 2024, to be vacated and relisted. It is now listed for 10 days, commencing on 13 January 2025. I will return below to the issue of the Defendants' non-compliance with the 20 July Nike Order.

## The New Action

15.    On 8 September 2023, the Claimants issued the claim form in the New Action, which was served on the Defendants on 21 December 2023 together with Particulars of Claim. The New Action relates to two items.

16.    The first is the Alexander. The claim in respect of the Alexander in the New Action does not repeat the allegations in the First Alexander Action as to the head being inauthentic, but equally there is no admission that the head is genuine, and indeed paragraphs 11 and 42 of the Particulars of Claim (the latter quoted below) can be said to contain an assertion that the head was inauthentic.

17.    At paragraph 13, it is pleaded:

'[13] Before the [Alexander] SPA was entered into:

i)      By 09.01.14, Phoenix had provided QIPCO's agent, Marc Latamie ("**Mr Latamie**") with the following documents:

a)      An image of the Head.

b)    A document setting out the provenance of the Head in the following terms:

> "*Ex- Margeritte Motte Collection, Motte Gallery, Paris/ Geneva, 1965*
>
> *Ex- Swiss Numismate/collector, Zurich, 1960's*
>
> *Ex- Jean Lions Collection, Geneva, 1977*
>
> *Ex- Ariss Ancient Art, Geneva, 1996*
>
> *Ex- Swiss private collection, Geneva, 1997*
>
> *With Phoenix Ancient Art, New York, 2013*"

c)    Documents purporting to support the provenance as follows:

i)    A copy of an invoice in French for the Head dated 04.09.1996 ("**the 1996 Invoice**"), Geneva, from Jean Lions to "*Ariss Ancient Art SA c/o Inanna Art Services*". The purchase price was redacted. In translation, the invoice stated (*inter alia*): "*During my absence, the object will be delivered by Mrs Fiorella Cottier*" and "*I have acquired this antique head in 1977 from M. Ybe van der Wielen, a Zurich numismatist*";

ii)    A copy of a letter in French dated 23.02.2013 ("**the 23 February Letter**"), Geneva, from a 'Fiorella' (believed to be Fiorella Cottier-Angeli, as to whom see paragraph 32(6) below) to Frederike van der Wielen stating, in translation:

> "*Dear Frederike,*
>
> *I am currently verifying the origin of the antiquities sold by M. Jean Lions, an*

*international antiques dealer. I am contacting you in reference to the marble head which [sic] picture is enclosed.*

*As you may remember, this piece was purchased in 1977 by Jean Lions through your husband Ybe, when he was a numismatist in Zurich.*

*Can you please confirm in writing that this is really the head you saw when it was sold.*"

iii)    A copy of a letter in French dated 02.03.2013 ("**the 2 March Letter**"), Geneva, from Frederike van der Wielen to 'Fiorella' stating in translation:

"*Dear Fiorella,*

*To answer your note, I can confirm that I remember this beautiful head, because at that time I was impressed by its quality. My husband Ybe, was mandated by a numismatist colleague, to look for a buyer, who happened to be Jean Lions.*

*Historic [sic] of the piece, from the information I have in my possession:*

*Jose Doerig arrived in Geneva in 1968, as a Professor of Classic Archeology [sic]. His priority was to prepare an exhibition of Swiss Romande private collections. His collaborators and colleagues therefore, informed him of all collections they knew. I was part of the editorial board committee. Doerig himself came with many photos of objects given by his colleagues, including*

*pictures of the beautiful marble head, which was for sale by Gallery Motte in 1965 (Paris, Geneva). This piece was sold by Mrs Marguerite Motte to a Zurich numismatist who, in 1977, asked my husband help to re-sell it.*

*That was the moment I saw the head, Doerig showed me the pictures; he did see the piece in Zurich, before it was sold to the late Jean Lions, buyer introduced by my husband…*"

iv)    A US Department of Homeland Security CBP Form 7501 pertaining to the importation of the Head into the US with an import/export/entry date of 20.09.2013, together with a copy of an accompanying 'commercial invoice' dated 13.09.13 in respect of (*inter alia*) the Head on Phoenix' headed paper addressed to Electrum.  The price of the Head (which was described as "*Greek marble head of Alexander the Great wearing a lion skin*") was redacted on the invoice.  The invoice gave the country of origin as Turkey and stated: "*Provenance: Ex Gallery Motte collection, Paris-Geneva, 1965; Ex Marguerite Motte collection; Ex Jean-Lions collection, acquired in 1977*" and "*To the best of our knowledge and belief this piece is an authentic antiquity and dates more than one hundred years*".

v)    A copy of an air waybill evidencing the export of the Head on or about 18 September 2013 from Switzerland to Electrum (Phoenix's agent) as consignee in the US, with a further copy of the Electrum invoice of 13.09.13.

QIPCO v Phoenix Ancient Art SA

> vi)     An Art Loss Register search certificate for the Head
>          dated 16.09.2013.
>
> d)      An undated condition report for the Head.'

At paragraph 19 it is pleaded that the Contractual Provenance was that which appeared in Schedule 1 to the Alexander SPA, which was in the same terms as the document quoted above from paragraph 13(1)(b).

18.    At paragraph 27, under the heading 'Phoenix's Breaches of Duty', it is pleaded, in relation to the Alexander:

> '[27] Regarding the Head:
>
> i)      The documents identified below provided to QIPCO before the HoA
>         SPA was entered into were backdated forgeries created after
>         Phoenix had itself purportedly acquired the Head. In particular:
>
> a)      The 1996 Invoice is dated 04.09.1996 but metadata for the
>         PDF file provided to QIPCO shows that it was created on
>         07.01.2014 (18:35).
>
> b)      The 23 February Letter is dated 23.02.2013 but metadata for
>         the PDF file provided to QIPCO shows that it was created on
>         20.12.2013 (20:57) and modified on 07.01.2014.
>
> c)      The 2 March Letter is dated 02.03.2013, the metadata for the
>         PDF file provided to QIPCO shows that it was created on
>         20.12.2013 (20:57) and modified on 07.01.2014.
>
> ii)     The Contractual HoA Provenance states "*Ex-Swiss Private
>         collection, Geneva, 1997*", then "*With Phoenix Ancient Art, New
>         York, 2013*" but Phoenix has not provided any evidence of a sale by
>         Ariss Ancient Art SA to a third party in 1997, or of its own
>         acquisition of the Head from a third party in 2013.

    iii)    In all the circumstances:

        a)    The information regarding the provenance of the Head contained in the 1996 Invoice, the 23 February Letter and 2 March Letter is false. In the premises, Jean Lions and/or Fiorella Cottier-Angeli and/or Federicke van der Wielen conspired to produce and/or caused or permitted the creation of documents giving false provenance for the Head.

        b)    The Contractual HoA Provenance is false.

        c)    Phoenix knew that the provenance for the Head was false and that documents supplied to QIPCO before the sale were forgeries.'

19.    The other item at issue in the New Action is the Phalera. In relation to this item, it is pleaded that the contractual provenance was:

    'Provenance:

    Private collection Switzerland 1960-1974

    R. Ansermet collection Switzerland circa 2000

    Tanis Antiquities Sep 2010 (for and on behalf of Phoenix Ancient Art (invoice date 9 September 2010 provided by Seller)

    Shipping documents date 20 April 2014 evidencing export from Geneva and import to the US'

20.    The documentation which, in paragraph 16, it is pleaded was produced before the Phalera SPA was entered into to support its provenance included:

    (1) An invoice from Mr Ansermet to Tanis dated 9.9.2010;

(2) An invoice from Fiorella Cottier-Angeli to Roland Ansermet dated 22.2.1968, and a statement that Cottier-Angeli had acquired the Phalera from the Sophie Podgorska Gallery.

21.    At paragraph 28, Phoenix's Breaches of Duty in relation to the Phalera were pleaded as follows:

'Regarding the Phalera:

(1)     The Contractual Phalera Provenance:

(a)     fails to say that the Phalera was (according to the 1968 Invoice) purportedly acquired before 1968 from Galerie Podgorska, Geneva; and

(b)     gives the provenance as "*Private collection Switzerland 1960-1970*" then "*R Ansermet collection Switzerland circa 2000*" whereas the 1968 Invoice purportedly evidences a sale (seemingly) by Fiorella Cottier to Mr Ansermet in 1968.

(2)     In all the circumstances:

(a)     The 1968 Invoice and the 2010 Invoice are forgeries and the information regarding the provenance of the Phalera they contain is false.

(b)     There never was any genuine sale from Mr Ansermet to Tanis. The information about provenance contained in Phoenix's letter of 04.06.2014 is therefore false.

(c)     In the premises, Fiorella Cottier-Angeli and/or Mr Ansermet and/or Tanis conspired to produce and/or caused or permitted the creation of documents giving false provenance for the Phalera.

(d)     Phoenix knew that the provenance for the Phalera was false and that documents supplied to QIPCO before the sale were forgeries.'

QIPCO v Phoenix Ancient Art SA

22.    At paragraph 32 various 'Particulars of Dishonesty' are pleaded, referable to both items, which include:

(1) That Ali Aboutaam owns and controls Tanis and Inanna;

(2) The January 2023 conviction;

(3) Reliance on the Swiss Report, including as to Mr Ansermet;

(4) That Jean Lions was convicted of complicity and concealment of art forgery and fraud in the late 1990s;

(5) That in December 2003 the US Department of Justice filed a complaint alleging that Hicham Aboutaam had committed a violation of 18 USC 545, 542 'Smuggling and Entry of goods by false statement' and that he had subsequently been found guilty in relation to misdemeanour charges of presenting false documents to a customs officer;

(6) Dr Fiorella Cottier-Angeli had been 'charged' in Italy, as a co-conspirator with Giacomo Medici who in 2004 had been convicted of dealing in stolen artefacts;

(7) That, as pleaded in the Nike Action, 'Phoenix fraudulently sold the Nike to QIPCO with a false provenance and having first supplied backdated documents'.

23.    At paragraphs 42-43 the following is pleaded under the heading 'Limitation':

'[42] By a claim form issued on 22.01.2020 (later amended), the Claimants made claims against Phoenix arising out of the inauthenticity of the Head but the amended claim form expired before

it was validly served.  The claims pleaded herein regarding the Head are different to those on the amended claim form and accompanying Particulars of Claim.

[43] The claims pleaded herein are all based on the fraud of the Defendants and/or facts relevant to QIPCO's rights of action were deliberately concealed by the Defendants.  QIPCO did not discover and could not with reasonable diligence have discovered that matters complained of until 16.02.22 when Phoenix disclosed the Swiss Report but, in any event, until a date within 6 years before the commencement of this action.  In the premises, the claims are within time pursuant to ss32(1)(a) and/or 32(1)(b) of the Limitation Act 1980.'

24.    On 20 February 2024, the Defendants issued an application to strike out or for summary judgment in the New Action.

25.    On 6 March 2024 Phoenix filed its Complaint in the New York Action.  I will return to this in more detail in the context of the application for an anti-suit injunction.

<u>The application to strike out or for summary judgment</u>

26.    The Defendants' application is for an order that:

'1. The Claimants' Particulars of Claim be struck out pursuant to CPR Rule 3.4 as an abuse of the court's process and for disclosing no reasonable cause of action.

2. Summary judgment is given on the whole of the Claim against the Claimants pursuant to CPR Rule 24.2.'

27.    As the argument was developed on behalf of the Defendants, there were essentially three grounds relied on in support of this application. Those three grounds were:

(1) That the facts relied on do not meet the threshold for a claim in fraud, and do not establish that the provenance of the documents was false.

(2) That the New Action is an abuse of process or is liable to summary dismissal because it is time barred.

(3) That the New Action is an abuse of process because the First Alexander Action was struck out and the New Action is a vexatious and oppressive attempt at relitigation.

28.    The above ordering of the grounds was not the Defendants', and the arguments on each were not always kept distinct, but the above appears to me to be the logical order to consider the points.

*Inadequately pleaded / no reasonable cause of action*

29.    The Defendants contended that the matters pleaded did not constitute sufficient grounds on which a case of fraudulent production of provenance documents could be pleaded; and that the claim should be struck out and/or summary judgment should be entered against the Claimants in respect of the claim on the basis that the Claimants had no real prospect of succeeding on the claim.

30.    In this regard, the Defendants contended:

(1) That the matters pleaded in paragraph 27 of the Particulars of Claim in relation to the Alexander did not provide an adequate basis for pleading fraud

QIPCO v Phoenix Ancient Art SA

and/or that the claim was bound to fail. Specifically, the pleas as to metadata were misconceived as the Claimants themselves pleaded that what had been provided were copies of the 1996 Invoice, the 23 February Letter and the 2 March Letter, and the metadata would relate to the date of production of the copies, and did not indicate when the originals were produced.

(2) The matters pleaded as Particulars of Dishonesty did not support the case that the relevant provenance documents in respect of these two items were fabricated.  In particular, the Swiss Report related to the fabrication of documents for import purposes in relation to genuine artefacts, whereas the Claimants' case in relation to the Nike is that it was a modern forgery, and they were effectively keeping that case open in relation to the Alexander as well. That would be a very different type of fraud from that identified in the Swiss Report.  In any event, the Swiss Report had not identified the two items which are the subject of the New Action as having had anything wrong with their documentation.

(3) The convictions of Hicham Aboutaam in 2003, which was 'historic', and of Ali Aboutaam in 2023, were unrelated to the claims advanced by the Claimants. They did not amount to any evidence of wrongdoing in this case.

31.    For his part, Mr Emmett KC acknowledged, as I understood it, that the Particulars of Claim could be strengthened, and said that if necessary he would produce a revised draft, though in the event he did not do so.  Nevertheless he argued that the pleas were adequate, and raised a triable issue as to the genuineness of the provenance documents.

32.    I do not consider that it can be said that the Particulars of Claim disclose no reasonable ground for bringing the claim, for the purposes of CPR 3.4(2)(a), or are abusive because of the way that they are pleaded for the purposes of 3.4(2)(b).

33.    Thus, there is no suggestion that the Particulars of Claim do not plead legally coherent causes of action (viz breach of contract, misrepresentation, deceit and conspiracy).  Further, the Particulars of Claim allege the necessary ingredients of such causes of action. For example, it is pleaded, in clear terms, in paragraph 27 that Phoenix knew that the Contractual Provenances were inaccurate and dishonestly breached the pleaded duties.

34.    The Defendants' complaint is, rather, that those allegations should not have been made on the basis of the pleaded facts.  In my judgment, however, it is not possible to say that the pleaded case is obviously unfounded in such a way that it can be struck out as abusive.  In this regard:

(1) While most of the Defendants' attention in argument was focused on the Alexander, their application was to strike out the whole claim.  In relation to the Phalera, however, there appears to be a clearly pleaded discrepancy in relation to the documentation provided by comparison with the Contractual Provenance (paragraph 28(1)).

(2) In relation to the pleas as to the metadata of the three documents relating to the Alexander pleaded at paragraph 27(1), it is not possible for the court to form a decided view as to whether, as the Defendants suggest, they are misconceived and provide no support for the Claimants' case without a fuller investigation of

the facts, and possibly expert evidence.  In that regard, provision has been made in the Nike Action for the possibility of expert evidence on metadata.

(3) The plea at paragraph 27(2) is not confined, as Mr Hicham Aboutaam has suggested, to saying that these documents were not provided at the time of the Alexander SPA. Rather, as Mr Emmett KC submitted, it includes a case that these documents have never been produced.

(4) The plea as to the Swiss Report does, on its face, provide some support for the Claimants' case, in that it suggests that Ali Aboutaam has engaged in the creation of false provenances.  (The translation in paragraph 32(3)(a) of the Particulars of Claim refers to pedigrees being 'quoted', but the original French, and the translation I was directed to in the hearing Bundle, refer to pedigrees being 'created').

(5) The pleas in relation to the Alexander can be said to be supported by the pleas in relation to the Phalera.  If the pleas as to the Phalera were correct, then that would no doubt provide some support for the case that the provenance documents in relation to the Alexander may have been forged.

(6) The pleaded cases in relation to the Alexander and the Phalera can also be said to be supported by the reference to the case made in the Nike Action, which is specifically pleaded in paragraph 32(7) of the Particulars of Claim.  If it were right that the Defendants had supplied the Nike with a false provenance and backdated documents, that might provide some support for the case in the New Action.

(7) While it is of course right that, because Ali and Hicham Aboutaam have had convictions (in 2023 and 2003 respectively) this does not of itself show that there was anything improper with the documentation supplied in relation to the two items at issue here, it may, nevertheless, be capable of supporting other evidence to that effect.

35.    Equally I do not consider that this is a case in which it is possible to give summary judgment dismissing the claim, on the basis that it stands no real prospect of success. At this juncture, I am considering this issue without regard to the question of whether the claim is time barred, which I will return to below.

36.    The test under CPR 24.3 is that the court may give summary judgment if it considers that a party has no real prospect of succeeding on the claim. The principles applicable are set out in the well-known judgment of Lewison J in Easyair Ltd v Opal Telecom Ltd [2009] EWHC 339. Here, I do not consider that it can be said at this stage that the Claimants' case stands no or merely a fanciful prospect of success. Furthermore, I consider that this is a case in which there are reasonable grounds for believing that disclosure may materially add to or alter the evidence relevant to the prospect of the claim succeeding. This is because an evaluation of all the documents that exist (or do not exist) in the hands of any of the parties relating to the two items may well affect (adversely or otherwise) the Claimants' prospects of success. Mr Pulford says in paragraph 106 of his Second Witness Statement that the disclosure which has been already given, and not given, by the Defendants in the Nike Action has been 'very telling'. It is reasonable to believe that the same may be the case in this action.

*Is the claim an abuse or liable to summary dismissal because time barred?*

QIPCO v Phoenix Ancient Art SA

37.    The next question is whether the claim should be struck out, or summary judgment entered, on the basis that the claim is time barred.  If the court is satisfied that a claim is bound to fail by reason of a limitation defence which will be taken, then the court may strike the claim out, or give summary judgment in relation to it.

38.    In the present case, the Defendants say that the claim is time barred. The Claimants say, and have said in the Particulars of Claim, that it is not by reason of s. 32 Limitation Act 1980.  While at trial the burden will be on the Claimants to establish that they can successfully invoke s. 32 Limitation Act, on the present application the burden must lie on the Defendants of establishing that it is clear that the claim is time barred, and that must involve their showing that it is clear that the Claimants cannot rely on s. 32 Limitation Act, or have no more than a fanciful prospect of successfully relying on that section.

39.    Section 32 Limitation Act provides, in part:

'(1) … where in the case of any action for which a period of limitation is prescribed by this Act, either –

(a) the action is based upon the fraud of the defendant; or

(b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant

…

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

…

(2) For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty.'

40. In the present case, the New Action was commenced on 8 September 2023. The question therefore on the present application is whether there is no realistic prospect of the Claimants' establishing that time started to run only after 8 September 2017.

41. In this regard, it appears on the material before me to be clear, and at any rate to be obviously arguable, that the Claimants had not actually discovered the alleged fraud and concealment on which they now rely before 9 September 2017. 'Discovery' in this context means that the claimant must know enough to be able to plead a claim, or at least know enough with sufficient confidence to justify embarking on the preliminaries to the issue of proceedings (OT Computers Ltd v Infineon Technologies AG [2021] QB 1183, 1194-5 at [26]). Here, the evidence of the Claimants' solicitor Mr Pulford, in paragraphs 89 and 91 of his Second Witness Statement is:

'[89] … Mr Burns KC concluded that the very earliest the Claimants could, with reasonable diligence, have discovered the factors giving rise to the

allegations of the Defendants' fraud was 16.2.2022, upon the disclosure of the Swiss Report.  However, … the Swiss Report was initially merely administrative and expressly subject to an ongoing investigation;  it appeared that the Swiss Authorities had not at that stage reached a formal decision on indictment or sentencing and had reserved any administrative criminal proceedings.  The Swiss Report therefore did not, in and of itself, form a sufficient basis upon which to raise allegations of fraud …

[91] Ultimately, the primary basis for the New Proceedings crystallised in mid-January 2023 following publication of the Swiss Conviction … It was from this point that the Claimants were on notice of Mr Ali Aboutaam's (and therefore Phoenix') proven tendency towards fraudulently fabricating documents and which caused the Claimants to carry out the detailed investigations into Phoenix and the relevant transactions…'

42.    Mr Pulford's evidence shows that there is at least a strong argument that there was no 'discovery' until 2022 or 2023.  I should add, moreover, that in any event, on the material I have seen, there is no indication that the Claimants were asking any questions about any items which QIPCO had bought from Phoenix until November 2017.  Then, in the words of the New York Complaint (para. 28), there was 'the first hint of trouble', when Mr Lamatie asked whether Phoenix had any further documents on the Nike.  Further, the New York Complaint states (para. 29) that 'the trigger for Sheikh Hamad to turn against Phoenix may have been a letter dated February 28, 2018 from the chief curator of the Department of Greek and Roman Art of the Metropolitan Museum of

Art….'  Even going by those dates, it would appear that the Claimants had not made any relevant 'discovery' until after 9 September 2017.

43.    The further question which arises is whether it is clear that, even if there was no actual discovery until after 9 September 2017, the Claimants could with reasonable diligence have discovered the fraud or concealment.  In that regard, Mr Cooper KC pointed out that the Claimants had always had access to the metadata of the documents referred to in paragraph 27(1) of the Particulars of Claim; had always been able to see that they did not have the documents in paragraph 27(2); and had always been able to see the discrepancy in paragraph 28(1).

44.    In <u>OT Computers</u> at [47], the following was stated:

'Second, although the question what reasonable diligence requires may have to be asked at two distinct stages, (1) whether there is anything to put the claimant on notice of a need to investigate and (2) what a reasonably diligent investigation would then reveal, there is a single statutory issue, which is whether the claimant could with reasonable diligence have discovered (in this case) the concealment.  Although some cases have spoken in terms of reasonable diligence only being required once the claimant is on notice that there is something to investigate (the "trigger"), it is more accurate to say that the requirement of reasonable diligence applies throughout.  At the first stage the claimant must be reasonably attentive so that he becomes aware (or is treated as becoming aware) of the things which a reasonably attentive person in his position would learn.  At

the second stage, he is taken to know those things which a reasonably diligent investigation would then reveal.'

45.    In the present case, and on the present material, I would regard it as plainly arguable, with a realistic prospect of success, that the Claimants would not, at the time of the purchases, have investigated the metadata of documentation supplied to them, unless they had particular reason to suspect sharp practice; and further that the matters that they did know about the documentation supplied would, reasonably, not have prompted a further investigation as to whether the provenance was fabricated and any documents forged.  The Claimants plead, and I must assume on the present applications it to be the case, that in relation both to the Alexander and the Phalera, QIPCO had, before entering the relevant SPA, appointed an expert, Mr Ian McLaughlin, and he had been satisfied by the provenance documents which had been provided: Particulars of Claim paras. 15, 18.  I regard as arguable that further investigation into the authenticity of the provenance documentation was not required as a matter of reasonable diligence until after the disclosure of the Swiss Report in the Nike Action, and possibly after the Claimants learned of the 2023 Conviction, as suggested by Mr Pulford in his Second Witness Statement paras. 71-81.

46.    For these reasons I do not consider that it has been shown that the claim is so clearly time barred that it should be struck out or summary judgment be entered in favour of the Defendants.

*Abusive re-litigation?*

47.   The third ground on which the Defendants contend that the New Action is an abuse of the process of the court is that it is an attempt at vexatious or oppressive re-litigation.  They argued:

(1) The First Alexander Action had included claims in respect of a false provenance;

(2) In any event, the allegations sought to be made in the New Action could, with reasonable diligence, have been raised in the First Alexander Action;

(3) The First Alexander Action had been struck out; and there should be no re-litigation of matters which were or could have been raised in that action.

48.   The Claimants denied that the New Action was in respect of the same matters as the First Alexander Action.  They contended that the New Action raised different issues: indisputably so in relation to the Phalera, but also in relation to the Alexander, because the New Action was based on the falsification of the provenance not on the (in)authenticity of the artefact.  In any event, even if – or to the extent that – it raised the same issues as the First Alexander Action, the New Action should not be struck out.  The first action had not been struck out on the grounds that it, or the Claimants' conduct of it, was abusive.  It had been struck out because the claim form had not been served in time, which, without more, would not amount to an abuse of process.  In the circumstances the New Action was not an abuse either.

49.   I was referred to a number of authorities on the approach which should be adopted as to when a second claim should be regarded as an abuse of the process of the court.

QIPCO v Phoenix Ancient Art SA

50.    In <u>Johnson v Gore Wood & Co</u> [2002] 2 AC 1, Lord Bingham of Cornhill said (at 22C/D):

> 'The rule of law depends upon the existence and availability of courts and tribunals to which citizens may resort for the determination of differences between them which they cannot otherwise resolve.  Litigants are not without scrupulous examination of all the circumstances to be denied the right to bring a genuine subject of litigation before the court …'

In the same case, Lord Millett said (at 59C/E):

> 'It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the opportunity of litigating for the first time a question which has not previously been adjudicated upon.  This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms (1953)…'

51.    In <u>Securum Finance Ltd v Ashton</u> [2001] Ch 291, Chadwick LJ said, at [34]:

> 'For my part, I think that the time has come for this court to hold that the "change of culture" which has taken place in the last three years – and, in particular, the advent of the Civil Procedure Rules – has led to a position in which it is no longer open to a litigant whose action has been struck out on the grounds of inordinate and inexcusable delay to rely on the principle that a second action commenced within the limitation period will not be struck out save in exceptional cases.  The position, now, is that the court must address the application to strike out the second action with the overriding objective of the Civil Procedure Rules in mind – and must consider whether the claimant's wish to have "a second bite at the cherry" outweighs the need to allot its own limited resources to other cases. The courts should now follow the guidance given by this court in the *Arbuthnot Latham* case [1998] 1 WLR 1426, 1436-7:

"The question whether a fresh action can be commenced will then be a matter for the discretion of the court when considering any application to strike out that action, and any excuse given for the misconduct of the previous action … The position is the same as it is under the first limb of *Birkett v James*. In exercising its discretion as to whether to strike out the second action, that court should start with the assumption that if a party has had one action struck out for abuse of process some special reason has to be identified to justify a second action being allowed to proceed.'"

52.     In <u>Cranway Ltd v Playtech Ltd</u> [2008] EWHC 550 (Pat) Lewison J said this:

'[14] The court must, in my view, take a broad view of the reasons why the original action was struck out, the stage at which it was struck out and the consequences of allowing a second action to continue.

…

[20] I accept [the] submission that the reason why a claim is struck out is an important factor in deciding whether a subsequent claim is or is not abusive. In the present case I did not strike out the original claim because it was an abuse of the process…..

[21] What I have to concentrate on is, in any event, not whether the original claim was abusive but whether the current claim is abusive. It is accepted that the current claim discloses a reasonable cause of action. It is accepted that the current claim has a reasonable prospect of success. Those must be powerful factors in support of the proposition that a claim of that nature should be allowed to go to trial.

[22] I also bear in mind that the first claim was struck out at a very early stage in its life, indeed before the defendants had put in any defence to the claim. In the *Glauser* case at paragraph 23, Mance LJ said: "It is true that the courts' resources are being taxed twice, but they were taxed relatively little by the first action, and the extra burden imposed on them by a second action can hardly be much greater than the burden which could and would anyway have been imposed if the appellant had managed to get its expert

advice and pleading in order". That, as I see it, is the position in the present case, too.'

53. In <u>Aktas v Adepta; Dixie v British Polythene Industries Ltd</u> [2011] QB 894 two separate personal injury actions were under consideration. One claim form was issued shortly before the expiry of the limitation period but was not served within the four month period allowed; time for service was extended pursuant to CPR r. 7.6 but the claim form was still not served and was set aside. In the other action a claim form was struck out as being out of time. Each claimant issued a second claim form and applied to the court to exercise its discretion under s. 33 Limitation Act to disapply the primary limitation period. The Court of Appeal held that a mere negligent failure to serve a claim form in time for the purposes of CPR rr. 7.5 or 7.6 was not, without more, an abuse of process; and that the second claims in each action should not have been struck out.

54. In giving the leading judgment, Rix LJ said this, at [90]-[92]:

'[90] A mere negligent failure to serve a claim form in time for the purposes of CPR 7.5/6 is not an abuse of process. It has never been held to be in any of the many cases cited to this court, nor in my judgment should it be described as such, nor as being tantamount to such. … However, all the cases make clear that for a matter to be an abuse of process, something more than a single negligent oversight in timely service is required: the various expressions which have been used are inordinate and inexcusable delay, intentional and contumelious default, or at least wholesale disregard of the rules.

[91] The reason why failure to serve in time has always been dealt with strictly … is in my judgment bound up with the fact that in England, unlike (all or most) civil law jurisdictions, proceedings are commenced when issued and not when served. However, it is not until service that a defendant

has been given proper notice of the proceedings in question. Therefore, the additional time between issue and service is, in a way, an extension of the limitation period…. In such a system, it is important therefore that the courts strictly regulate the period granted for service. If it were otherwise, the statutory limitation period could be made elastic at the whim or sloppiness of the claimant or his solicitors. For the same reason, the argument that if late service were not permitted, the claimant would lose his claim, because it would become time barred, becomes a barren excuse. But even where the claimant is well within the limitation period despite his delay in serving, there is a clear public interest in the rules and the courts curtailing the efficacy of a claim form which, because it has not been served, is not very different from an unposted letter. Therefore, the strictness with which the time for service is supervised has entirely valid public interest underpinnings which are quite separate from the doctrine of abuse of process. It is sufficient for the rules to provide for service within a specified time and for the courts to require claimants to adhere strictly to that time limit or else timeously provide a good reason for some dispensation. There is no need for that procedure to be muddled up with the different doctrine of abuse of process.

[92] There is of course the (possibly) new argument in the era of the CPR which emphasises the importance of any misuse of court resources. It is well to be aware of the important public interest bound up in the efficient use of those limited resources. However, to seek to turn that proper concern, in such a case as these, into a surrogate for the doctrine of abuse of process is to my mind a disciplinarian view of the law of civil procedure which risks overlooking the overriding need to do justice. Certainly, the authorities have not gone that far, and there is nothing in the CPR themselves to indicate that a mere failure to serve in time is to be regarded as an abuse requiring or deserving anything further than the failure of the claim form itself – with the vital consequence in the absence of section 33 of losing a claim which has become time barred. Moreover, it should not be forgotten that one of the great virtues of the CPR is that, by providing more flexible remedies for breaches of rules as well as a stricter regulatory environment,

the courts are given the powers and the opportunities to make the sanction fit the breach. That is the teaching of one of the most important early decisions on the CPR to be found in *Biguzzi v. Rank Leisure Plc* [1999] 1 WLR 1926 (CA).'

55.    In <u>Davies v Carillion Energy Services Ltd</u> [2018] 1 WLR 1734, Morris J conducted an extensive review of the authorities in this area.  His judgment contains the following:

'[29] The cases fall into two of the categories of abuse of process. The first category is where a party brings a second action in respect of matters which *were* raised in a first action but where that action had been struck out on procedural grounds and without any consideration of the merits. Cases which, on the facts, fall within this first category are *Arbuthnot Latham Bank Ltd v Trafalgar Holdings Limited* (1997) CA 16 December 1997, *Securum*, supra, *C (A Child)*, supra, *Cranway,* supra, *Aktas,* supra and the recent decision of HH Judge Gregory in Liverpool County Court in *Maritime Transport Ltd v Mills* dated 22 June 2017. *C (A Child)* appears not to have been cited in any previous case before it was cited in the *Maritime Transport* case.

[30] The second category is where a party seeks to raise in a second action issues or facts which could and should have been, but were not, raised in a first action, which action had resulted in a substantive adjudication or settlement. This category of case concerns the type of abuse identified in the well known case of *Henderson v Henderson* (1843) 3 Hare 100 and is the subject of the leading modern authority of Lord Bingham in *Johnson v Gore Wood*. In my judgment, the subsequent decision in *Aldi* falls into this second category; the analysis of Thomas and Longmore LJJ is based squarely on *Henderson v Henderson* and *Johnson v Gore Wood* and none of the pre-2007 first category cases appears to have been cited in *Aldi. Stuart v Goldberg Linde* likewise falls into this category.

…

[52] First, the line of cases of *Arbuthnot*, *Securum* and *C (A Child)* are authority for the following:

(1) Where a first action has been struck out as itself being an abuse of process, a second action covering the same subject matter will be struck out as an abuse of process, unless there is special reason: *Securum* §34, citing *Arbuthnot* , and *Aktas* §§ 48, 52.

(2) In this context abuse of process in the first action comprises: intentional and contumelious conduct; or want of prosecution; or wholesale disregard of rules of court: *Aktas* §§72 and 90.

(3) Where the first action has been struck out in circumstances which cannot be characterised as an abuse of process, the second action may be struck out as an abuse of process, absent special reason. However in such a case it is necessary to consider the particular circumstances in which the first action was struck out. At the very least, for the second action to constitute an abuse, the conduct in the first action must have been "inexcusable". *C (A Child)* §§24-25 and *Cranway* §20.

[53] Secondly, *Johnson v Gore Wood*, *Aldi* and *Stuart v Goldberg* are all cases of the *Henderson v Henderson* type of abuse, where the first action has been resolved by way of adjudication or settlement and where it is said that issues which should have been brought in the first action are being sought to be re-litigated. In such cases:

(1) Whether a second action raising matters which could have been, but were not, raised in the first action is an abuse of process is not a matter of discretion, but is a judgment to be made by the first instance judge, assessing and balancing all the relevant factors in the case. …'

56.    The present case is clearly not one in which the previous action resulted in a substantive adjudication or settlement.  It is thus not a case within the 'second category' referred to by Morris J at paragraph [30] of <u>Davies v Carillion</u>.  Nor does it fit neatly into the first category at Morris J's paragraph [29], because

while certain matters in the New Action can be said to overlap with issues in the First Alexander Action, there are differences. Obviously this is so in relation to the Phalera. But it is also the case that the allegations in relation to the Alexander have a different focus, as already discussed. What is, in my view, clear, however, is that the First Alexander Action was, for the purposes of Morris J's dichotomy, struck out on procedural grounds without any consideration of the merits.

57. Furthermore, it would, in my judgment, be wrong to say that the First Alexander Action was struck out as an abuse of process. It was struck out because there had not been a good reason for extension of the time for service of the claim form. That failure, even if it was negligent, was not itself an abuse of the process of the court. I consider that the position is comparable to that in Aktas v Adepta, and the reasoning of Rix LJ at [90]-[92], which I have set out above, is in point. For that reason I consider that the present case does not fall within the category referred to by Morris J in paragraph 52(1) of Davies v Carillion.

58. Instead, the present case, again putting aside for the moment the point that the matters covered by the New Action are not all the same as those covered by the First Alexander Action, is one which would fall into the category of case referred to in paragraph 52(3) of Davies v Carillion. In that category of case, Morris J says, a second action 'may be struck out', but it is necessary to consider the particular circumstances in which the first action was struck out, and 'at the very least … the conduct in the first action must have been "inexcusable"'.

59. Mr Cooper KC argues that the Claimants' conduct of the First Alexander Action was indeed 'inexcusable' and that that is exactly what the Court of Appeal

found: indeed, Coulson LJ had said that there was 'no good excuse' for the delay in effecting service.

60.    For my part, I doubt whether it is always necessary, in a paragraph 52(3) case, for it to be found that the conduct of the first action was 'inexcusable' before a second action can be struck out.  In this category of case, a wider range of considerations might mean that it was appropriate to strike out a second action. But I accept that it will ordinarily be necessary for it to be shown that the conduct of the first action was non-compliant with the rules or orders of the court, or the norms of litigation, in a very marked degree.  That is what I consider was meant by 'inexcusable' in C (A Child) v CPS Fuels Ltd [2002] CP Rep 6, cited by Morris J at paragraph 52(3) of Davies v Carillion.  What was involved in C (A Child) v CPS Fuels Ltd was a series of failures, over a period of more than three years, to comply with orders or rules, a failure to engage with the case management process, and failure to comply with a final unless order. Jonathan Parker LJ (at [41]) called them failures 'of the grossest kind'.  Judge LJ appears to have regarded them as actually an abuse of the process (paragraph 49) on which basis the case would properly be within Morris J's first category, at paragraph 52(1) of Davies v Carillion.

61.    The case of G&D Brickwork Contractors Ltd v Marbank Construction Ltd [2021] 3009 (TCC) is analogous to C (A Child) v CPS Fuels Ltd.  There, again, there had been a series of defaults, over an extended period, which had led to the first action being struck out, in total, three times (see paragraph 41(1) and (2) in the judgment of Joanna Smith J).  The conduct of the first action had been 'inexcusable' in a similar way to the conduct of the first action in C (A Child).

62.    The present case, in my view, is not of that sort.  As I have already said, the reason for its striking out was that there had not been a good reason for the extension of time for service of the claim form.  In that context, the result might have been different if there had been a 'good excuse' for the failure to serve within the initial period.  But the lack of such a 'good excuse' is not the equivalent of the sort of 'inexcusable' conduct of litigation referred to in C (A Child) v CPS Fuels Ltd, or G&D Brickwork.

63.    In my judgment, I need to approach the question of whether the New Action should be struck out by reviewing all the relevant circumstances of the case, to decide whether that new action is an abuse of the process of the court. I have concluded that it is not.  I have reached this conclusion based on the following matters:

(1) As I have said, the First Alexander Action was struck out not for abuse of the process of the court, nor for conduct which might be characterised as 'inexcusable' in the C (A Child) v CPS Fuels Ltd sense.

(2) The First Alexander Action was struck out at an early stage: indeed before Phoenix had had to serve a defence.  True, there were appeals against the decision not to extend the time for service of the claim form, but that does not alter the fact that the First Alexander Action was struck out at a very early stage of its procedural life.

(3) The New Action raises claims which are not themselves capable of being struck out on the basis that they are abusively pleaded or stand no realistic prospect of success (see above).

QIPCO v Phoenix Ancient Art SA

(4) The New Action raises different claims and issues from those in the First Alexander Action. This is clearly the case in relation to the Phalera. But it is also the case in relation to the Alexander, its focus being on falsified provenance rather than on inauthenticity.

(5)  The suggestion made by the Defendants that the new claims based on the alleged fraud in the provenance documentation could and should have been brought in the First Alexander Action is, on the basis of the evidence of Mr Pulford, unrealistic.  His evidence is that the Claimants first became aware of the evidence that Ali Aboutaam may have dishonestly fabricated provenance documentation in relation to other items on the disclosure of the Swiss Report in the Nike Action, on 16 February 2022, and only learned about the 2023 Conviction after 10 January 2023.  The hearing in the Court of Appeal in the First Alexander Action took place on 15 March 2022 and judgment was delivered on 30 March 2022.  Even assuming, contrary to Mr Pulford's evidence, that the Swiss Report was enough to allow the new claims to be made in relation to the Alexander, it would have required some consideration, and it is unrealistic that any application to amend the claim form in the First Alexander Action could have been made before the hearing or the judgment of the Court of Appeal.

(6) The Court's resources will, in any event, be utilised in hearing and determining very closely related allegations to those raised in the New Action in the Nike Action, which will be proceeding in any event.

(7) The suggestion that it is important to the Defendants to have an end to litigation relating to these artefacts is undermined by Phoenix's commencement of the New York Action.

64.    I thus conclude that the New Action is not an abuse of the process of the court. It should, accordingly, not be struck out.

The Application for an Anti-Suit Injunction ('ASI')

65.    As already set out, Phoenix commenced the New York Action on 6 March 2024. The Preliminary Statement in the Complaint states, in paragraph 1:

> 'In this action, Plaintiffs assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Defendant [QIPCO] and assert a claim of fraud against all Defendants. At issue is an agreement reached in September 2018 between Phoenix, Electrum, and QIPCO (the "Exchange Agreement") to exchange (the "Exchange") a group of six antiquities owned by Phoenix through an affiliate (the "Exchange Items") for a pair of antiquities, a chalcedony Statuette of a Nike-Victory [ie the Nike] and a marble Head of Alexander [ie the Alexander]… that QIPCO had previously purchased from Phoenix in 2013 and 2014, respectively. In failing to perform its obligations under the Exchange Agreement, QIPCO acted in bad faith and with reckless disregard for Plaintiffs' rights and interests.'

66.    The nature of the claim pleaded can be summarised as follows:

(1) QIPCO's purchase of the Nike is pleaded at paragraphs 18-21. The production of the provenance documentation is pleaded, as are the inspections by QIPCO's expert Mr McLaughlin.

(2) QIPCO's purchase of the Alexander is pleaded at paragraphs 22-26. It is pleaded that Mr McLaughlin found no inconsistencies in the reports on condition or provenance provided by Phoenix which warranted further investigation.

(3) It is alleged that Phoenix 'became aware of allegations in the press and the antiquities trade that Sheikh Hamad, through QIPCO, was engaged in questionable business practices in his purchase of antiquities, such as trading in looted antiquities and wilfully violating import/export laws'; and it also 'became apparent that QIPCO had been purchasing antiquities on the market for quick resale and not long term investment'; and that if QIPCO's "pump and dump" scheme failed for a particular object QIPCO would demand a refund of the purchase price of the objects and threaten to sue any dealer who refused (para. 27).

(4) Phoenix became a victim of Sheikh Hamad's failed "pump and dump" scheme in relation to the Nike and the Alexander (para. 28). The trigger for Sheikh Hamad to turn on Phoenix may have been a letter from the chief curator of the Department of Greek and Roman Art at the Metropolitan Museum of Art in New York which indicated that the Alexander had been returned because its documentation of provenance 'did not entirely satisfy … stringent new regulations…' (para. 29).

(5) Thereafter Sheikh Hamad had put pressure on Phoenix to rescind the purchases of the Nike and the Alexander; and Phoenix had responded by offering to consign objects that Sheikh Hamad wished to sell or to consider

trades for any objects that QIPCO had bought from Phoenix, including the Alexander and the Nike.

(6) The parties 'on September 4, 2018, … in various written communications with each other, agreed to the Exchange of the Exchange Items [a dolphin, a horse, a griffin, a drinking vessel, a ceremonial beaker and a rhyton] as consideration for the return of [the Nike and the Alexander]'.

(7) Pursuant to the Exchange Agreement, the Plaintiffs delivered five of the Exchange Items to QIPCO's agent in New York, Simon Jones Superfreight, and those items were flown to London, where they were detained by HMRC on the basis of 'OFAC [Office of Foreign Asset Controls] concerns', and shortly returned to the USA at the request of US Customs and Border Protection, who then detained them, in the case of three of the items, for five years.

(8) This detention was the result of the Defendants' having 'unscrupulously misrepresented the nature and origin of the [Nike and the Alexander] by omitting any description of their country of origin … from the commercial invoice that accompanied the export shipment' (para. 3). This was 'reckless and in such disregard for Plaintiffs' interests as to constitute bad faith' (para. 43).

(9) QIPCO made known that it no longer intended to perform the Exchange Agreement by filing the Nike Action in London.  The Nike Action 'is without any factual or legal basis and is a transparent effort by QIPCO, among other things, to extricate itself from the Exchange Agreement' (para. 48).  QIPCO then sought to bring the First Alexander Action, 'based upon similar unfounded allegations of inauthenticity' (para. 49).  Phoenix incurred c$500,000 in expenses 'to contest the baseless claims in the London lawsuits' (para. 50).

(10) QIPCO is liable for breach of contract (First Claim for Relief); QIPCO is liable for breach of the implied covenant of good faith and fair dealing (Second Claim for Relief); and all the Defendants are liable for fraud consisting of their reckless and fraudulent conduct in not specifying that the Nike and the Alexander were 'Pre-Achaemenid'.

67.     By an Application Notice dated 19 April 2024, the Claimants applied inter alia:

(1) For permission to amend the Claim Forms and Particulars of Claim in each of the Nike Action and the New Action to add pleas that the New York Action was brought in breach of the exclusive jurisdiction clause in the each of the Nike SPA and the Alexander SPA, or of an agreement in relation to the proposed exchange that any disputes should be subject to the exclusive jurisdiction of the courts of England and Wales; and for an injunction requiring Phoenix to terminate or stay the New York Action, on the basis of the alleged exclusive jurisdiction clause and/or on the basis that the New York Action is vexatious or oppressive.

(2) For permission to serve Electrum out of the jurisdiction.

(3) For an injunction 'until judgment or further order of this Court' restraining the Defendants from taking any further steps in the New York Action and ordering them to take all steps within their power to ensure that the New York Action is stayed or discontinued.

68.     In the New York Action, QIPCO has been granted permission to file a motion to dismiss, primarily contending that New York is *forum non conveniens* and

QIPCO v Phoenix Ancient Art SA

that the dispute there is one which should be litigated in these courts by virtue of the exclusive jurisdiction clauses in the relevant SPAs.

69.    At a case conference held before Hon. Gregory H Woods on 10 May 2024, the judge stayed discovery in that action pending the briefing and resolution of the motion to dismiss.  He was informed on behalf of Simon Jones Superfreight that it was considering its position, but would probably issue a motion to dismiss as well. He was also informed about the present application here for an ASI, and the Order records that he adjourned the initial pre-trial conference pending resolution of the ASI application here.

70.    Mr Emmett KC contended that the Court should grant an interim ASI.  He put forward a number of bases on which he argued that such an injunction could be granted.  For reasons which will become apparent, I need only consider that which, as I understood it, he put forward as his primary case.

*A Contractual Basis for an ASI*

71.    This is that the Claimants, or at least QIPCO, are entitled to rely on the jurisdiction provisions in the Nike SPA and the Alexander SPA.  Each of those SPAs contained a provision in the following terms:

> 'This Agreement shall be governed by and construed in accordance with the laws of England and Wales and the Parties irrevocably submit to the exclusive jurisdiction of the Courts of England and Wales to settle any dispute or claim that arises out of or in connection with this Agreement, its subject matter or formation (including non-contractual disputes or claims), provided that the Buyer may, in its absolute discretion, choose such other jurisdiction as it sees fit.'

72.    Mr Emmett KC argued that the principles on which the court should proceed
       are as summarised, for example, in <u>AIG Europe SA v John Wood Group plc</u>
       [2021] EWHC 2567 (Comm) at [58] per Jacobs J, as follows:

       '58. The following principles apply equally to arbitration and jurisdiction
       clauses:

       (a)  The touchstone is what the ends of justice require …

       (b)  The Court has the power to grant an interim injunction "in all cases in
       which it appears to the court to be just and convenient to do so": s.37(1) of
       the Senior Courts Act 1981. Further, "Any such order may be made either
       unconditionally or on such terms and conditions as the court thinks just":
       s.37(2) …

       (d)  The jurisdiction to grant an anti-suit injunction must be exercised with
       caution …

       (e)  As to the meaning of "caution" in this context, it has been described
       thus in *The Angelic Grace* [1995] 1 Lloyd's Rep 87 at 92 … per Leggatt LJ:
       "The exercise of caution does not involve that the Court refrains from taking
       the action sought, but merely that it does not do so except with
       circumspection."

       (f)  The Claimant must therefore demonstrate such a negative right not to
       be sued. The standard of proof is "a high degree of probability that there is
       an arbitration agreement which governs the dispute in question": *Emmott* at
       [39]. The test of high degree of probability is one of long standing and
       boasts an impeccable pedigree …

       (g)  The Court will ordinarily exercise its discretion to restrain the pursuit
       of proceedings brought in breach of an arbitration clause unless the
       Defendant can show strong reasons to refuse the relief …

       (h)  The Defendant bears the burden of proving that there are strong reasons
       to refuse the relief …'

73.     Here, Mr Emmett KC argued, the jurisdiction clauses in the Nike and Alexander
        SPAs applied to the dispute sought to be brought in the New York Action.  The
        SPAs and their subject matter were, he argued, 'the focus' of the New York
        Action.  In the circumstances, the court should grant an injunction unless strong
        reasons not to were put forward by the Defendants.

74.     On behalf of the Defendants, Mr Cooper KC argued that the dispute under the
        Exchange Agreement alleged in the New York Action was in relation to 'a
        separate agreement entered into between different parties, in different
        circumstances … and concerning six different items.'

75.     In my judgment, QIPCO has shown a negative right not to be sued, and has
        shown, to a high degree of probability, that there is a jurisdiction clause in
        favour of the courts of England and Wales which governs the dispute in
        question, namely the jurisdiction provisions in the Alexander and Nike SPAs.
        More specifically:

        (1) There is no doubt that those jurisdiction provisions were entered into or that
        they were binding.  There can also be no doubt that they provided, as far as the
        Seller [ie Phoenix] was concerned, that the courts of England and Wales were
        the exclusive jurisdiction in which disputes arising out of or in connection with
        the Agreement or its subject matter might be brought.  That involved a negative
        right on the part of QIPCO not to be sued elsewhere in respect of matters falling
        within the clauses.

        (2) I am satisfied that the claim against QIPCO in the New York Action is one
        which is a dispute which arises out of or in connection with the two SPAs, or
        their subject matter, ie the Nike and the Alexander.  The Exchange which is

alleged in the New York Action was one in which QIPCO would exchange only two items, viz the Nike and the Alexander, for some 6 other items.  The purpose of the Exchange, as pleaded in paragraphs 30-31 of the Complaint, was to attempt to resolve QIPCO's concerns about the Nike and the Alexander.  The fact that the case made against QIPCO in the New York Action arises out of or in connection with the Nike and Alexander SPAs and their subject matter is further borne out by: (a) the pleas in relation to the acquisition of the Nike and the Alexander; (b) the allegation that the Nike Action and the First Alexander Action were attempts by QIPCO to extricate itself from the alleged Exchange Agreement; (c) the allegation that those actions were without basis and unfounded; and (d) the claim made for Phoenix's costs of contesting those actions.

(3)   The position might have been different if there had been a fleshed-out agreement in respect of the Exchange.  But on the material before me this was not the case.  An Exchange Deed was drawn up by the Claimants' solicitors, but not executed by (and may not have been seen by) the Defendants; and it is neither the Claimants' case, nor the Defendants' case, that the Exchange was on the terms of that Deed.  (Parenthetically I note that that Deed itself contains an exclusive jurisdiction clause in favour of the courts of England and Wales). The Defendants' case as to how the alleged Exchange Agreement was made is not entirely clear. The Defendants' original Defence in the Nike Action pleaded that there had been 'some inconclusive negotiations for an exchange agreement'. The New York Complaint, as I have set out, is to the effect that there was an Exchange Agreement concluded 'in various written communications with each other', but does not specify those communications.  By contrast, Hicham

Aboutaam in his Third Witness Statement says in paragraph 16 that the exchange was 'agreed orally between us and Mr Latamie without recourse to lawyers on either side.' Where that leaves the court, at this juncture, is in my view as follows. If there was an exchange agreement, it appears to have been informally made, and did not involve any detailed terms such as choice of law or jurisdiction clauses. I consider that such an agreement would not have been understood by a reasonable observer as having displaced or superseded the jurisdiction provisions in the SPAs, which were the background against which the exchange was being arranged, and applied to all disputes arising out of or in connection with their subject matter, viz the Nike and the Alexander.

76.  This being the position, the court will ordinarily exercise its discretion to grant an ASI unless there are shown, by the defendant, to be strong reasons for not doing so. I did not consider that the Defendants had shown any strong reasons for not doing so. In particular, it was not shown that the Defendants could not get substantial justice here.

77.  On that basis I will grant an interim ASI, to apply until trial or further order, to prevent the Defendants from pursuing the New York Action as against QIPCO.

*Vexation or oppression*

78.  The Claimants also argued that there was a distinct and additional basis on which there should be an ASI, namely that, even without consideration of the jurisdiction provisions in the SPAs, the New York Action was vexatious and oppressive.

79.    I have decided that it is not either necessary or appropriate that I should express views on this additional way of putting the matter at this stage.   It is not necessary because of my decision in relation to the contractual basis for an interim ASI. It is, in my view, not appropriate, because it would mean expressing views on what is the natural forum for the dispute in New York, and on whether those proceedings are vexatious or oppressive, before the New York Courts have themselves expressed a view on such matters.   That would risk offending against comity, when there is no need to do so, because of the conclusion I have already reached.

*The Ambit of the injunction*

80.    As I have said, Simon Jones Superfreight was not represented before me.   Nor was its principal, Simon Jones, who features prominently in the New York Complaint.   Virtually nothing was said in submissions as to whether any order of the court should injunct the Defendants from pursuing the New York Action against Simon Jones Superfreight (or indeed against Phoenix Freight Inc.).   At present I will not make such an order, but that does not preclude an application that the interim injunction should be extended to cover the position of one or both of those parties.

*Permission to Amend*

81.    I will give permission to the Claimants to make the proposed amendments to the Claim Forms and Particulars of Claim in both the Nike and New Actions.

82.    This includes permission to join Electrum. Mr Emmett KC told me that the only reason why it was sought to join Electrum was to ensure that any injunctive

relief granted in respect of the New York Action was effective, and that if the Defendants were prepared to make clear that any ASI would be adhered to by Electrum, then it would not be necessary to join it.  Mr Cooper KC made clear that he was not instructed by Electrum, and no assurances of the sort which the Claimants had been seeking was forthcoming.   In the circumstances I grant permission to join Electrum.

83.   I will also grant permission, insofar as it is necessary, for there to be service on Electrum outside the jurisdiction, on the basis that it is a necessary or proper party to the action, within PD6B, paragraph 3.1(3)(b).

84.   For the avoidance of doubt, my orders insofar as they relate to Electrum will have been made without hearing from Electrum, and Electrum may apply to vary or set them aside.

Relief from Sanction

85.   This arises in the Nike Action.  As set out above, the 20 July Nike Order provided, insofar as relevant, for the Claimants and Phoenix to provide supplemental disclosure, and Ali and Hicham Aboutaam to provide standard disclosure by 4 pm on 13 October 2023; and for the parties to exchange signed witness statements of fact, or further witness statements of fact, by 4 pm on 17 November 2023. Extensions of these dates, to 10 November 2023 for disclosure and to 15 December 2023 for witness statements, were subsequently agreed.

86.   The Defendants have failed to provide supplemental (in the case of Phoenix) or standard (in the case of Ali and Hicham Aboutaam) disclosure, or any further witness statements, by those dates.  It was not in issue between the parties that

the sanction which will have applied, absent relief, in respect of the disclosure failure was that the Defendants could not rely on any documents which they later sought to disclose.  By Application Notice dated 15 December 2023, the Defendants sought an order for relief from sanctions in respect of the disclosure failure, and an order extending the deadline for the filing and service of witness evidence.

87.    The Claimants' stance is that there are no good grounds for relief from sanctions, but that, nevertheless, they would have been prepared not to oppose the application (and leave it for the court), but for the commencement of the New York Action.  In light of that development, the Claimants contend that any relief should be made conditional on the staying of the New York Action, and making any order on 'unless' terms.

88.    The parties referred to the well-known guidance in <u>Denton v TH White</u> [2014] EWCA Civ 906. I regard a failure to comply with the order as to disclosure for a period of five months as obviously significant.  I am also not persuaded that there can be said to have been any good excuse for the entirety of that non-compliance.  I accept that there appears to have been a delay, as described by Mr Baker in his Second Witness Statement, by reason of Phoenix's former solicitors having exercised a lien over the hard drive with the disclosure collection on it.  I am not able, on the present material, to accept that the remainder of the delay has been as a result of the Defendants' impecuniosity.  I would have needed to see considerably more detail as to their financial position.

89.    Nevertheless, I consider that, having regard to all the circumstances of the case, it is appropriate for there to be relief from sanction.  I have in mind in particular

QIPCO v Phoenix Ancient Art SA

that the position in the Nike Action is that much disclosure has already been given, and initial witness statements have been served. Sanctions debarring the Defendants from relying on further disclosure or serving factual witness evidence may mean that the trial proceeds, but on an unsatisfactory basis, with less than complete material and evidence before the court.

90.    It is not necessary, given my decision in relation to the ASI to seek to impose a stay of the New York Action as part of the terms on which relief from sanction is granted, even if that would otherwise be appropriate. It is, however, in my judgment appropriate that relief from sanction should be on 'unless' terms in relation to future compliance with the Defendants' obligations as to disclosure and witness statements. The sanction should be such as to encourage compliance with the Defendants' disclosure obligations, which a condition framed simply in terms of their not being able to rely on further documents might not do, and one framed in terms of their not being able to rely on supportive documents might lead to uncertainty and dispute. The order which I intend to make will be as follows:

(1) That Phoenix should give supplemental, and Ali and Hicham Aboutaam should give standard, disclosure by 4 pm on 26 July; failing which all paragraphs and words of the Re-Re-Amended Defence added pursuant to the 20 July Nike Order, save those on the title page, should be struck out;

(2) That the Defendants should serve witness statements, or further witness statements, of fact by 4 pm on 30 August 2024, failing which they shall be debarred from relying on any such statements.

Disposal

91.    For the reasons I have given above:

(1) The Defendants' application to strike out or for summary judgment in the New Alexander Action fails and will be dismissed.

(2) I will grant an interim ASI to restrain the pursuit of the New York Action against QIPCO until trial or further order herein.  I will also give the Claimants permission to amend and to serve Electrum out of the jurisdiction.

(3) I will grant the Defendants relief from sanction in the Nike Action, on the terms I have described.

92.    I trust that the parties will be able to agree the terms of the order to give effect to my decisions; but I will resolve any outstanding points of disagreement, including any outstanding issues of costs, in writing.