O5THPhoC

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x
3   PHOENIX ANCIENT ART, S.A., *et
    al.*,
4
                    Plaintiffs,
5
            v.                        24 Civ. 1699 (GHW)
6
    QATAR INVESTMENT AND PROJECT
7   HOLDING, CO, W.L.L., *et al.*,

8                   Defendants.        Telephone Conference

9   ------------------------------x    New York, N.Y.
                                       May 29, 2024
10                                     1:00 p.m.
    Before:
11
                        HON. GREGORY H. WOODS,
12
                                       District Judge
13
                            APPEARANCES
14
    PEARLSTEIN & McCULLOUGH, LLP
15       Attorneys for Plaintiffs
    BY:  MICHAEL McCULLOUGH
16       WILLIAM PEARLSTEIN
         ANJU UCHIMA
17
    HUGHES HUBBARD & REED, LLP
18       Attorneys for Defendant QIPCO
    BY:  DUSTIN P. SMITH
19       GREGORY C. FARRELL
         J. SCOTT SANDERS II
20
    FLASTER/GREENBERG P.C.
21       Attorneys for Defendant Simon Jones Superfreight
    BY:  CHRISTOPHER J. MERRICK
22
    NICOLE A. SULLIVAN
23   MICHAEL WHITTICAR
         Attorneys for Defendant Phoenix Freight
24

25

O5THPhoC

<table>
<tr><td>1</td><td>(The Court and all parties present remotely)</td></tr>
</table>

1         (The Court and all parties present remotely)

2         THE COURT:  First, let me ask everybody to please

3 place their phones on mute.  We're hearing a lot of background

4 noise and repetition of what I'm saying.  That's happening

5 because not everybody has their phones on mute.  So, again,

6 thank you for placing your phones on mute.  It's very helpful.

7         Good.  So the first substantive thing that I want to

8 do is to take appearances from the parties.  I'm going to start

9 with counsel for plaintiff.  To the extent that any party has

10 more than one lawyer on the line, I'll ask the principal

11 spokesperson for that party to identify him or herself and the

12 members of their team rather than having each lawyer introduce

13 themselves individually.

14         Let me start with counsel for plaintiff, who's on the

15 line for plaintiff?

16         MR. McCULLOUGH:  Good afternoon, Judge Woods.

17         Michael McCullough, Pearlstein & McCullough LLP,

18 641 Lexington Avenue, 13th Floor, New York, New York 10022.

19 I'm joined on the phone for plaintiff with William Pearlstein

20 and Anju Uchima.

21         THE COURT:  Thank you.

22         Who's on the line for Qatar Investment and Project

23 Holding Co.?

24         MR. SMITH:  Good morning, your Honor.

25         Dustin Smith for Hughes Hubbard & Reed appearing on

O5THPhoC

1   behalf of Qatar Investment and Project Holding Co.  I'm here

2   with my colleagues Greg Farrell and Scott Sanders.

3            THE COURT:  Thank you.

4            Who's on the line for Simon Jones Superfreight?

5            MR. MERRICK:  Good afternoon, your Honor.

6            Chris Merrick on behalf of Simon Jones Superfreight.

7            THE COURT:  Thank you.

8            Who's on the line on behalf of Phoenix Freight?  Is

9   anyone on behalf of Phoenix Freight on the line?

10           MR. WHITTICAR:  Michael Whitticar and Nicole Sullivan.

11           THE COURT:  So let me start with a few brief

12   instructions.

13           First off, thank you again for placing your phones on

14   mute and keeping them on mute at all times except when I'm

15   speaking or one of the parties is speaking; that is, you are

16   the party that's speaking.  Again, please keep your phones on

17   mute at all other times to avoid unnecessary background noise.

18           Second, please state your name each time that you

19   speak.  Please do that even if you have spoken previously.

20           Third, please keep your phones again on mute.

21           Fourth, please abide by instructions from our court

22   reporter that will help her do her job.

23           And finally, I'm ordering that there be no recording

24   or rebroadcast of all or any portion of today's conference.

25           So this is a pre-motion conference with respect to two

O5THPhoC

1    proposed motions to dismiss by two latter defendants.  I'm

2    going to do what we did in our prior pre-motion conference and

3    invite each of the potential movants to describe the grounds

4    for the motion to the extent that there's anything that you

5    want to add to or to clarify from the written pre-motion

6    conference letters.  I'll then give counsel for defendant the

7    opportunity ── plaintiff, rather, the opportunity to respond to

8    any of those comments about the anticipated arguments.  Then I

9    expect to turn to setting a schedule for briefing of the

10    motion.

11         I'm going to begin with counsel for Superfreight.  I

12    expect that you too will have read the plaintiffs' response

13    letter that was filed in response to your pre-motion conference

14    request letter.  So to the extent in your remarks you'd like to

15    address any of those anticipated arguments, you're welcome to

16    do so.

17         So, counsel for Superfreight, let me hear from you.

18         MR. MERRICK:  Thank you, your Honor.  Again, this is

19    Chris Merrick on behalf of Simon Jones Superfreight.

20         And as set forth in our briefing, we have really two

21    main arguments in addition to the forum non conveniens

22    argument.  The first one, and most obvious, is the Montreal

23    Convention argument.  And just at a high level, the goal of the

24    Montreal Convention is uniformity.  So similar to the Carmack

25    Amendment for loss or damage on land or COGSA that would exist

O5THPhoC

1    the sea, the goal is that the law doesn't change every time you

2    pass over a new country or if, God forbid, you get diverted or

3    things like that may happen, but to have one uniform set of

4    rules and regulations and liability in the event of loss,

5    damage, or delay in transit.

6         From reading the plaintiffs' letter, it appears that

7    everybody agrees that when — at least when the Convention

8    applies, it would preempt common law claims like fraud claims.

9    The issue, at least as I read the plaintiffs' letter, seems to

10   be more about whether it applies here, and there seems to be

11   three main theories for why it would not apply.  And if you

12   don't mind, I would address all three of those here.

13        The first one is that Simon Jones Superfreight — but,

14   to be clear, not Door To Door — was just a consignee for the

15   shipment.  It was not a freight forwarder responsible for

16   facilitating the air carriage.  But that's at odds with the

17   plaintiffs' entire theory of the case, as they specifically

18   plead in the complaint that Simon Jones is a freight forwarder.

19   They also refer to Simon Jones Superfreight as a freight

20   forwarder in their letter to the Court for the last hearing.

21   They can't transform their complaint and their theories of the

22   case in the motion papers.

23        Secondly, there's an argument that the culpable

24   conduct —

25        THE COURT:  Hold on.  Can you just point me to the

O5THPhoC

| | |
|---|---|
| 1 | paragraph in the complaint where they describe your client as |
| 2 | that? |
| 3 | MR. MERRICK:  Sure.  Give me one second, your Honor. |
| 4 | Let's see. |
| 5 | Apologies for going too quickly there. |
| 6 | The complaint is paragraph 2 and then paragraph 13, in |
| 7 | particular, is where Simon Jones Superfreight is alleged to be |
| 8 | a freight forwarder. |
| 9 | THE COURT:  Thank you.  Go on. |
| 10 | MR. MERRICK:  So in addition —— and just to be clear |
| 11 | for the record again, this is Chris Merrick.  Attempting to |
| 12 | speak a little slower here as well. |
| 13 | The record referenced for the letter to the Court |
| 14 | where Simon Jones Superfreight was held out to be a freight |
| 15 | forwarder is —— it's ECF 23. |
| 16 | So then the next argument is that the culpable conduct |
| 17 | at issue occurred prior to air carriage.  So even though the |
| 18 | goods were seized in the course of air carriage, it would be |
| 19 | outside of the cope of the Montreal Convention.  But, again, |
| 20 | the text of the Convention itself makes clear that the |
| 21 | operative question is where the loss, damage, or delay |
| 22 | occurred, it's not the location of the conduct that |
| 23 | precipitated the loss, damage, or delay.  That would defeat the |
| 24 | whole purpose of uniformity.  For example, if there was damage |
| 25 | that occurred because the lug nuts weren't put properly on the |

O5THPhoC

1    plane and you had to identify, well, did it happen that morning

2    at the airport or did it happen at a repair facility somewhere

3    else, the question is where the loss or damage occurred, and

4    that is ── in our opinion, that's what the act itself says.

5            And here again, there's an allegation that the goods

6    were transported by air on Virgin Atlantic ── this is

7    paragraph 2 of the amended complaint ── that they were seized

8    at Heathrow Airport and then returned to the Customs and Border

9    Patrol in the United States after carriage.  So it would defeat

10   the whole purpose of uniformity for losses arises at air

11   carriage if the law changed depending on whether the paperwork

12   here was filled out prior to the carriage or on the plane.  The

13   issue is where did the loss, damage, or delay occurred.

14           There's also an argument that the Montreal Convention

15   does not apply because the goods were never delivered.  That's

16   again completely at odds with what the Convention actually

17   says.  I mean, if that were the case, you could never have a

18   claim for a loss of goods during air carriage because if goods

19   are lost inherently they weren't delivered.  So the case that

20   they cite to pertain to situations where there was no air

21   carriage at all or a refusal to provide air carriage.  Again,

22   that's not what happened here.  As alleged in the complaint,

23   Virgin Atlantic transported these things across the Atlantic.

24           Lastly, why does the Montreal Convention matter?  In

25   addition to preempting the claim, there is a two-year statute

O5THPhoC

1    of limitations in addition to a limitation of liability based

2    on the weight of the goods.  The argument against the

3    application of the limitation of liability and the statute of

4    limitations is that we are basing it on some kind of novel

5    interpretation of a new case that was just issued, but that's

6    just not the case.  Article 35 of the Convention provides that

7    there's a two-year statute of limitations beginning with

8    arrival at destination, the date on which the aircraft ought to

9    have arrived, or the date on which carriage stopped.  And here,

10   all three of those are clearly 2018.

11          The fact that customs returned certain goods in 2023

12   and the full effect of the loss maybe was known at that point

13   isn't what at — isn't how the statute of limitations is

14   measured under Article 35 of the Convention.  And this would

15   encompass indemnity claims as well as any claims under the Act.

16   As the Act made clear, it encompasses all claims that would

17   exist in connection with the Act.

18          So moving forward to the fraud component, even if

19   there weren't preemption, the fraud claim would fare no better.

20   The theory of plaintiffs' fraud case seems to have shifted

21   since the last conference where the Court will recall that the

22   plaintiffs alleged that the defrauded party was the American

23   people, and they allege the right to recover under a

24   third-party reliance doctrine that the New York Court of

25   Appeals previously rejected in the context of fraud claims.

O5THPhoC

1          The new theory is that the plaintiffs allege that they

2     were defrauded because Simon Jones and Door To Door didn't

3     inform plaintiffs of their intent to fill out false paperwork.

4     I mean, this doesn't even pass the red face test.  There's a

5     duty to plead fraud with specificity, not just wild speculation

6     and conjecture.  There's no explanation at all in the complaint

7     as to why Simon Jones or Door To Door would have such an intent

8     or how it would possibly benefit Simon Jones or Door To Door.

9     In the case of Simon Jones, it's bad for business to have goods

10     seized.  That's bad for a lot of different reasons, including

11     this case, they didn't get paid.  There's no benefit to them

12     whatsoever in having goods seized.

13          Second, there's no identification of what laws, rules,

14     or regulations Simon Jones violated, if any.  Here, the goods

15     were returned.  It's not even clear — there's no allegation of

16     what Simon Jones — that they even had any obligation when

17     filling out an invoice to provide any information that they

18     didn't provide.  And even if we were to go past that and assume

19     that something — some law, rule, or regulation was violated

20     that hasn't been cited, they haven't established that it was

21     done with ill intent, rather than just a mistake, in failing to

22     include this origin.

23          Additionally, for an omission, as what the plaintiffs

24     are now arguing, for it to be actionable, there would have to

25     be a duty to speak.  And the most common situation is where

O5THPhoC

1    there's the fiduciary relationship between the plaintiff and

2    the defendant.  Here, there's no allegation of that at all, so

3    there's no actionable omission on the fraud front either.

4            We could go through the other elements as well if the

5    Court would like, but we think that it's pretty clear that

6    there's no fraud case alleged or even anything that's close,

7    and therefore, we would ask that the Court allow us to file a

8    motion to dismiss on the grounds stated.

9            THE COURT:  Thank you, counsel.

10           Let me hear from counsel for Phoenix Freight.  What's

11   the grounds for your anticipated motion, if there's anything

12   that you'd like to flag beyond what's included in your letter

13   or to highlight from the letter from counsel for Superfreight's

14   comments.  You are ——

15           MR. WHITTICAR:  Yes, your Honor.  This is Michael

16   Whitticar for DTD, and I reiterate what counsel for Simon Jones

17   said regarding the Montreal Convention and the fraud claim.  I

18   have a few additional points to add.

19           First, plaintiff in its letter response cites a *Danner*

20   case claiming that carriage lasts until the recipient received

21   the goods.  That's an unreported case out of the District of

22   Maryland from 2010.  More recently, there was a case of *We CBD*

23   *LLC v. Planet Nine*, a 2023 case out of the Western District of

24   North Carolina which specifically distinguished *Danner* and said

25   that the rule of that case did not apply where Customs and

O5THPhoC

1    Border Patrol customs seizes the goods or stops the goods.

2    That in that case the carriage has stopped.

3            So in the CBP —— when the Customs and Border Patrol

4    customs authorities seized the goods, then the carriage has

5    stopped.  Under Article 35 of the Montreal Convention with its

6    limitation of actions, it says that the two-year period of

7    statute of limitations or condition to sue, it runs from the

8    date on which the carriage stopped.  I think the authoritative

9    rule is very clear that when your goods get seized by customs

10   authorities for several years, the carriage has stopped and the

11   statute of limitations begins to toll.

12           We agree with Simon Jones that the limitation of

13   liability language of the Montreal Convention runs from the

14   time —— from the time and place of injury rather than the time

15   or place of the wrongful conduct.  Under Article 22,

16   paragraph 3, it talks about the liability of a carrier in the

17   case of destruction, loss, damage, or delay.  The limitation of

18   a liability expressly applied to destruction, loss, damage, or

19   delay.  So that's basically the liability limitation and the

20   statute of limitations in application of the Convention applies

21   to the type of injury and the place and time of injury and not

22   to the alleged misrepresentation.

23           Finally, we agree that an insufficient fraud claim has

24   been pled here, especially against my client, because we have

25   the issue of pleading.  There's really no misrepresentation or

O5THPhoC

1    lie or falsehood to the plaintiff pled against my client.  The

2    facts pled against my client, DTD, are that all we did was

3    recycle incorrect paperwork provided by Simon Jones.  So that

4    would be, at worse, some sort of negligence, failure to warn,

5    failure to perform, which is clearly not actual fraud, and it

6    shouldn't be preempted by the Montreal Convention.

7            And under the *Pasternak* case, we have the issue of a

8    party cannot sue for a fraudulent representation made to a

9    third party unless that third party is like a broker or an

10   agent and expected to relay it to the plaintiff, which is not

11   the case here.

12           And again, there's just a lot of group pleading where

13   they just lump the defendants together and they fail to

14   distinguish my client from the other defendants.  They really

15   plead nothing specifically against my client other than they

16   recycled some allegedly defective paperwork provided by Simon

17   Jones, and I would say that's insufficient to state an actual

18   fraud claim against my client.

19           In the *Pasternak* case, they made it clear that

20   generally a plaintiff cannot claim reliance on a

21   misrepresentation that defendant made to third parties unless

22   the representation is made —— representation is intended to be

23   communicated to the plaintiff and for plaintiff to rely on it.

24   It's clear here that my client made no representations to the

25   plaintiffs, nor is alleged to have made any representations to

O5THPhoC

1    the plaintiff.

2            So then they fall back on fraud by omission, but there

3    was no fiduciary duty or even direct contractual relationship

4    between my client and the plaintiff, so there was no duty to

5    disclose, no fiduciary duty.

6            And in their latest round of letter opposition, they

7    seem to claim that Simon Jones made a false promise to them,

8    but, again, that was a promise made by Simon Jones, not my

9    client, DTD.  And there are insufficient facts alleged to show

10   that the false promise was intended to be false or that anybody

11   intended for it not to be performed when it was made.

12           So I would rely on the Montreal Convention, and also

13   there's insufficient pleading of fraud and the substantive

14   inapplicability of their fraud claim to my client, which was

15   not interacting with the plaintiff.

16           THE COURT:  Thank you.

17           So I'll turn back to counsel for plaintiff to have the

18   opportunity to preview any arguments that you expect to present

19   in opposition to the motion.  Let me hear from you, counsel for

20   plaintiff.  What would you like to share?

21           MR. McCULLOUGH:  This is Michael McCullough.

22           One clarification, your Honor.  Counsel for Door To

23   Door cited a North Carolina case.  I did not get the name of

24   that case or the citation.  I'm wondering if we could clarify

25   that case before we go forward.

O5THPhoC

1           MR. WHITTICAR:  Certainly.

2           THE COURT:  Counsel, would you mind saying the

3     citation again, please.

4           MR. WHITTICAR:  Sure.  It is *We CBD,* as in like the

5     CBD lotion that you put on your aching joints, *LLC v. Planet*

6     *Nine Private Air, LLC,* 2023 U.S. Dist. LEXIS 102029 (W.D.N.C.

7     2023).

8           MR. MERRICK:  This is Chris Merrick for Simon Jones.

9           We also cited that case in our briefing, document 28,

10    second page.

11          THE COURT:  Thank you, counsel.

12          Very good.  Counsel for plaintiff, anything that you'd

13    like to share?

14          MR. McCULLOUGH:  Yes.  This is Michael McCullough.

15          First, our argument with regard to the Convention is

16    that the Convention applies —— Article 19 of the Convention

17    applies to carrier liability for delay in the transport of

18    baggage, passengers, and cargo.  So my understanding from the

19    defendants' letters are that this is a case of delay, and

20    Article 19 applies because it's cargo.

21          Our argument is that, in this action, Superfreight is

22    not acting as a contracting carrier under the terms of the

23    Convention.  So while we use the term "freight forwarder"

24    because Simon Jones holds themselves out to be a freight

25    forwarder, they weren't acting as a carrier under the

O5THPhoC

```
 1   Convention.  So that's our argument.  So the argument that we
 2   said they were a freight forwarder to us doesn't make a
 3   difference.
 4            Superfreight is named on the Door To Door waybill, not
 5   as a carrier but as a consignee of the shipment and therefore
 6   is not a contracting carrier.
 7            Our second argument with regard to Superfreight is,
 8   even if it were a carrier, they don't get any protection under
 9   the Convention because, first, it applies —— the Convention
10   applies to damage due to delay.  And in our fraud claim, which
11   arises out of neither air carriage nor delay, the fraud
12   occurred before the shipped items were shipped, before they
13   were collected by Door To Door on September 11.
14            So let's clarify what we talked about in the last
15   phone conference we had.  The Court asked me about the damages,
16   and what I said is in the first instance the government acts,
17   and in the second instance the pecuniary loss happens.  That's
18   not our fraud claim.  It never was our fraud claim, and as I
19   clarified on that call, the fraud has to do with the omission
20   by all the defendants, all three defendants, of the fact that
21   the invoice provided by Phoenix Ancient Art to Superfreight was
22   not used by the parties, by the defendants.  They created a
23   different invoice.  That invoice isn't represented on the
24   waybill.  So on the waybill it still says Phoenix Ancient Art
25   invoice and has the correct information.
```

O5THPhoC

1          What the defendants did is simply failed to inform us

2     that when they took over the shipping, they weren't going to

3     use the documents we provided, and that's in the complaint.  So

4     there's no — I don't see any argument that it's not — had we

5     known they were going to do this, we would not have allowed

6     them to control the export.  So I think if that's not clear, it

7     could be made clearer.  It's clear enough to me.

8          So again — but this all happens before the items are

9     shipped.  So the false export declaration happens, we're

10    damaged, but the fraud happens before the items are shipped.

11    So I think —

12         THE COURT:  Let me just pause you on that.  I

13    apologize.

14         The counsel for Superfreight argues that the complaint

15    does not plead a duty to speak such that that omission would be

16    actionable as fraud.  How do you respond?

17         MR. McCULLOUGH:  Well, we have to look at all three

18    defendants because there's cascading agencies going on.  So

19    let's just clarify what each party is representing.

20         So within the exchange agreement, the principal in the

21    exchange agreement is QIPCO.  Superfreight and Door To Door are

22    not part of the exchange agreement.  However, QIPCO, the

23    principal, appoints Simon Jones to act on its behalf in

24    collecting the property and for appointing its agent, Door To

25    Door, to act as a shipping company.  It acts as the carrier.

O5THPhoC

1          So when —— QIPCO clearly has a duty under the contract

2     to provide us with information about how this export is being

3     done.  I mean, they said they would take care of this.  They

4     omitted this information.  They had a duty to tell us if they

5     were going to omit this information.  Superfreight is ——

6          THE COURT:  I'm sorry.  I'm sorry.  Let me stop you.

7          That's the question.  Why do they have the duty?  If

8     it's a contractual arrangement, why do they have a fiduciary or

9     other duty to your client?

10         MR. McCULLOUGH:  Well, QIPCO's not a fiduciary.  QIPCO

11    is just a contracting party, but within that contract they

12    assume the responsibility to export.  So our position is as

13    soon as they assume that responsibility and told —— and we gave

14    them the information to use, they had an obligation to tell us,

15    no, we're not using that information.  That was part of the

16    agreement.

17         THE COURT:  Thank you.

18         What section of the agreement describes that duty?

19         MR. McCULLOUGH:  Well, again, it's not a written

20    agreement, so the agreement —— well, there's not a written

21    contract.  The agreement was a series of email conversations

22    that culminated in a meeting in which the parties agreed to the

23    exchange.  Once the exchange was agreed on, there were emails

24    between QIPCO and then Simon Jones as agent acting on behalf of

25    QIPCO about the commercial invoice, about the pickup, about the

O5THPhoC

1   packing, about the execution of the agreement.  So in those

2   emails there is an agreement that QIPCO and Simon Jones and

3   then their agent Door To Door would handle the shipping.  And

4   on a number of occasions, as pled in our complaint, Alex

5   Gherardi, on behalf of Phoenix Freight, said:  Here's the

6   information.  It's important you use this and do this properly.

7   That's ——

8          THE COURT:  I'm sorry.  Let me just call the question.

9          You're describing the Superfreight and DTD as the

10  agents of QIPCO, and I assume that you're going to hold to that

11  position.  If they are QIPCO's agents, why did they owe your

12  client any duty?

13         MR. McCULLOUGH:  Well, Door To Door —— well, let's ——

14  let me preface the next statement on the fact that we've

15  already told the Court we're intending to amend our complaint.

16  And what's not in our complaint is that Door To Door, on behalf

17  of Phoenix, requested that Phoenix Ancient Art appoint Door To

18  Door as their agent for the export.  So there was a power of

19  attorney issued.  So that's not in our complaint.  It will be

20  in our amended complaint.

21         THE COURT:  Thank you.  Go on.

22         MR. McCULLOUGH:  OK.  So we left off at the point

23  where we believe that there —— even if there was —— on behalf

24  of Superfreight, even if there was a —— even if the Convention

25  applies, there wasn't a delay in carriage because Article 19

O5THPhoC

1    cited in Superfreight's letter applies to damages occasioned by

2    delay.  Now, again, the fraud happens before.  Let's put that

3    aside for a second and get back to that.

4            The plain language of Article 19 governs delay, and as

5    we cite a couple of cases, *Vumbaca* and *Samaley*, the delay means

6    the air carrier properly delivered persons, baggage, or cargo

7    to the appropriate destination but did so in an untimely

8    manner.  Now, in this case our fraud claim alleges

9    nonperformance because Door To Door —— Door To Door's waybill,

10   which is referenced in the complaint, clearly shows that the

11   carriage was from Electrum's gallery in New York to

12   Superfreight's offices in Central London, and the objects were

13   stopped by His Majesty's Revenue and Customs, detained, and

14   never delivered to the ultimate destination.  So since the

15   contract of carriage is not performed, this is not a case of

16   delay; this is a case of nonperformance.

17           Furthermore, under Article 19 the carrier must prove

18   that it took all precautions reasonably calculated to prevent

19   the loss or delay —— to prevent the loss.  It doesn't say

20   delay, prevent subject loss.  So to the extent there is a loss,

21   passing a false invoice to two customs services is hardly a

22   reasonable act of precaution.

23           The last point as to Superfreight is that with regard

24   to the time-bar issue, the case cited is *Zurich*.  The *Zurich*

25   case, *Zurich v. China Eastern Airlines*, which was decided by

O5THPhoC

1    the Eastern District in January, this case in applicable

2    because Superfreight nowhere contends that damage rather than

3    delay is at issue, and that was a case of damage.

4            So we believe the claim is timely because —— back up.

5            The *Zurich* case was a case of first impression.  The

6    court in the Eastern District says no one has ever decided this

7    issue before, and our contention is when the waybill provides

8    for a door-to-door delivery, the period for carriage is

9    generally when the goods are received.  In the normal customs

10   case, there's a delay, there's a paperwork issue, there's even

11   possibly a payment and seizure, but eventually the goods are

12   released and then the carrier continues to carry.

13           So all the cases we've seen are cases in which there's

14   a delay in the carriage and then there is at some point a

15   further movement in delivery.  Here, Superfreight, the

16   consignee, never received the goods in Central London, and the

17   consignor, Phoenix Ancient Art, received the goods back on

18   October —— in October 2023.

19           Now, if a court —— if this is a question of first

20   impression with regard to this fact pattern, I would think that

21   a court would reason that if the goods are held by a customs

22   service for five years, the plaintiff doesn't know their cause

23   of action and their damages unless and until the goods are

24   returned.  So if there's not a delivery, if there's never a

25   delivery, I would think the rule would be whenever the

O5THPhoC

1    consignee —— sorry, the consignor receives its goods back would

2    start the statute of limitations.  So that's our argument on

3    statute of limitations.

4              THE COURT:  Is there case law that you're pointing to

5    for that proposition?

6              MR. McCULLOUGH:  No, because, as you mentioned, the

7    *Zurich* case is a case of first impression.  It was just decided

8    in January, and since that case doesn't apply, we have no

9    cases.

10              THE COURT:  Thank you.

11              But, presumably, you're looking at other cases to

12    support the reasoning, which, as I understand it, is that no

13    statute of limitations should logically begin until the amount

14    of damages are known irrespective of when you knew that there

15    was an injury.

16              MR. McCULLOUGH:  We don't have a case on that, no.  I

17    don't have a case on that, no.  I won't represent that there's

18    no case.  So there could be a case.  We don't have a case cited

19    on that.

20              THE COURT:  Thank you.

21              Why, then, do you argue that the natural reading of

22    the statute would be that the cause of action does not accrue

23    until the amount of damages is known?  What's the parallel case

24    law that supports that argument?

25              MR. McCULLOUGH:  Well, we didn't cite any case law

O5THPhoC

1    that supports the argument.  I'm not sure that's the argument,

2    though.  I think the argument is one —— until the goods are

3    returned, there's certainly —— I'll agree with you that there

4    is —— the goods are being held.  So they haven't been received.

5    They haven't been delivered to the consignee, and the consignor

6    doesn't have them.  So they're in limbo.

7         But in this case the consignor, who released the

8    goods, doesn't fully know even what cause of action they have

9    until —— especially if it's a government agency acting because,

10   again, in this case that's exactly what happened.  We didn't

11   fully know if —— again, this is complicated because in this

12   case the statute of limitations ran.  So there never was a

13   final administrative act by the customs service determining the

14   reason for the liability.

15        So in this case we never knew the reason —— these

16   goods were detained.  They were never forfeited.  So we never

17   had a statutory basis for the loss of goods.  In fact, they

18   weren't lost because the statute of limitations ran.  So in

19   this particular case, we never fully knew what our cause of

20   action was and our damages were until the statute of

21   limitations ran and customs just said you can have your goods

22   back.

23        So analogizing to this case, I would say, because

24   there is no rule on statute of limitations and because we

25   couldn't have known fully our causes of action and our damages,

O5THPhoC

1      it would make —— it would just make logical sense to me,

2      without a reference to a case, simply that the statute would

3      start running when we received our goods back.

4              I hope that answers the question, your Honor.

5              THE COURT:  Thank you.

6              You may benefit from supporting your arguments with

7      more than counsel's belief but with instead case law, but

8      that's what the briefing is for.

9              Go on.

10             MR. McCULLOUGH:  Sure.

11             So with regard to the fraud claim, then, let's get to

12     the penultimate point.  The plaintiff has set forth a fraud

13     claim.  And again, as I mentioned earlier, the discussion we

14     had last time with the context of the Court's question about

15     damages, how the damages occurred, I agree that in the first

16     instance it's the government act, but the government's acting

17     on a statutory basis, right?  There's a breach of a statute.

18     There's a breach of a statute that allows the goods to be

19     returned to the U.S.  However, that's not the fraud.  So the

20     fraud is —— the elements of the fraud are the omission.  The

21     omission is the fact that these defendants did not tell us they

22     were going to use the invoice and information we provided.

23     They used another one, and we were damaged because of it.

24             So we were induced, in a sense, to allow them to use

25     —— to control the shipment, to make the declarations on our

O5THPhoC

1    behalf, and they did so in a fraudulent manner.  And we relied

2    on this omission because, as the complaint states, we would

3    have never allowed them to handle the export had we known they

4    were going to do it this way.  We had no reason to believe they

5    would do it this way.  And as we pointed out in our complaint,

6    both Superfreight and Door To Door hold themselves out as with

7    expertise in this area, so there's no reason for us to believe

8    this would have done this way.

9            And we did make a request in our letter of a document

10   that we know exists in the case in London, and this document

11   came up in discovery.  It was disclosed in the UK litigation,

12   but the UK court rules don't allow us to use it in this action.

13   So our UK solicitors will apply for permission to disclose that

14   document in that action, but that timing is uncertain.

15           So we would ask this Court to allow us limited

16   discovery on a single document with regard to our fraud claim

17   which we will ⸺ which we believe will clarify some of the

18   points we're discussing today and would be the basis of a

19   second amended complaint that we think should be the basis of

20   any motions to dismiss going forward.

21           And lastly, on the forum non conveniens argument,

22   again, we ⸺ the forum non conveniens argument put forth by

23   QIPCO is one that is subject to the UK litigation.  With regard

24   to Superfreight, I don't think any of the arguments apply.

25   Superfreight came to the United States, supervised the packing

O5THPhoC

1    of the goods, of the objects; appointed an agent to act as

2    carrier, Door To Door; and then again used this false invoice

3    which was presented to U.S. Customs.  I mean, all of that

4    happened in the United States.  We don't think the United

5    States is an inconvenient forum for Superfreight given the fact

6    that they were physically here and these activities happened in

7    the U.S.  So that's as to Superfreight.

8            As to Door To Door, we made the same arguments about

9    the Montreal Convention not applying, and we made the same

10   argument that this is —— that we're not seeking damages due to

11   delay in carriage.

12           And lastly, we make the Article 19 argument that the

13   carrier is supposed to take precautions, and there were no

14   precautions taken here.  We make the same argument on the

15   statute of limitations question, citing the *Zurich* case —— or

16   distinguishing the *Zurich* case.

17           And the additional arguments for Door To Door is that

18   if the Convention applies, Article 10 of the Convention has

19   certain responsibilities of the carrier that wouldn't apply

20   because Simon Jones wasn't the carrier, and it says the carrier

21   shall indemnify the consignor against all damages suffered by

22   it by reason of the irregularity, incorrectness, or

23   incompetence of the particulars and statements inserted by the

24   carrier on its behalf in the cargo receipt or on the record

25   preserved in other means.  So, obviously, the information on

O5THPhoC

1    the false invoice was a violation of Article 10.

2            And for the same reasons we just discussed, we think

3    we have a viable fraud claim.

4            THE COURT:  Thank you.

5            MR. McCULLOUGH:  Thank you, your Honor.

6            THE COURT:  Briefly, what do you say about the

7    contention that the complaint is deficient as a result of group

8    pleading?

9            MR. McCULLOUGH:  I think, again, because of the

10   cascading agencies going on here, I think the complaint is

11   sufficient.  I think it's sufficient information about which

12   parties are responsible parties, which parties handled the

13   false invoice.  I mean, we claim that both Superfreight and

14   Door To Door were involved in the handling of the invoice.

15   Superfreight created the invoice, and that's something we pled.

16   Door To Door handled the invoice.  I think there's enough in

17   there to show that these parties acted, and the omission of

18   those actions that we discussed earlier was something that

19   harmed the plaintiff.  I think it's sufficient.

20           THE COURT:  Thank you.

21           Just briefly on the nature of the underlying exchange

22   agreement, is it your position that a condition of the exchange

23   agreement was that the QIPCO entity used Superfreight and DTD

24   as its service providers?

25           MR. McCULLOUGH:  Well, our understanding at the time

O5THPhoC

1    that the contract was entered into is that —— that QIPCO would

2    be using Simon Jones.  So Simon Jones is known to be QIPCO's

3    freight agent.  It sort of does freight forwarding work for

4    QIPCO.  So they were known to us because there have been other

5    transactions, obviously, between the parties, and so Simon

6    Jones was a known agent.

7            With regard to Door To Door, I'm not sure Door To Door

8    was.  It could have been.  We didn't plead Door To Door was a

9    known agent at the time, but certainly Simon Jones was.  So to

10   the extent that there was an agreement, I think it was simply

11   —— it was a representation by QIPCO that these agents —— this

12   agent, Superfreight at least, would be working on this

13   shipment.

14           THE COURT:  Thank you.  A representation.  Thank you.

15   Understood.  Very good.

16           So let's work together to set a schedule for these

17   proposed motions.  Let me start with Superfreight.  My

18   inclination here would be to set a briefing schedule that would

19   have both of these motions be fully briefed around the same

20   time.  So let me start with Superfreight.

21           When would you propose to file your motion?

22           MR. MERRICK:  This is Chris Merrick on behalf of

23   Superfreight.

24           Just the one issue that we would have with respect to

25   scheduling is I think, if I heard plaintiffs' counsel right,

O5THPhoC

1    they are making the argument that they believe there should be

2    an amendment that is considered in the context of any motion to

3    dismiss, and we, I think, haven't heard anything to suggest

4    that that amendment would make any difference here to the

5    arguments.  But at the same time, it is a lot of time and money

6    for my client for us to prepare two different sets of motions

7    to dismiss briefing.  So our preference would be, if the Court

8    is inclined to grant leave to amend, that the amendment happen

9    first and then we have one round of briefing rather than two.

10   However, if the Court is not inclined to grant that, then I

11   think we could have our briefing together by the 21st of June,

12   which would be approximately three weeks from Friday.

13            THE COURT:  Thank you.

14        I have not heard a request for me to authorize

15   amendment to the complaint now, and as a result, my

16   understanding of counsel for plaintiffs' comments is that he's

17   thinking about amending in response to a filed motion to

18   dismiss as his one amendment as of right, which they have when

19   they respond to a motion to dismiss.  No one's made a request

20   to me to approve an amended complaint.

21        Just to frame this, if I were to grant a request under

22   15(a)(2), it would not preclude another change to the complaint

23   in response to a motion to dismiss, which parties have of right

24   under Rule 15(a)(1).  So 15(a)(2) can sometimes avoid the need

25   for double briefing, but it doesn't guarantee it because I

O5THPhoC

1    can't, in my view, prevent the plaintiff from taking advantage

2    of 15(a)(1) following an amendment with consent of the Court or

3    the parties.

4           So that's my understanding as a result of what counsel

5    was talking about when they said that they're planning to

6    amend, that they were planning to do so in response to a motion

7    to dismiss once filed, and you all know what the rules say

8    about that.

9           So, counsel for DTD, what's your view about the

10   proposed approach to filing the motion to dismiss?

11          MR. WHITTICAR:  I agree that if plaintiff counsel does

12   want to amend, we should ask them whether they plan to do that

13   and when they could do that, but if that's not in the cards,

14   they don't want to do that before we brief this motion, I would

15   just ask that —— I would ask that we have until June 28, just

16   because I'm going to be on vacation out of the country from

17   about the 8th through the 16th.

18          THE COURT:  Thank you very much.

19          Good.  So, counsel, the motion by QIPCO is due, I

20   think, on July 1.  We pushed back that deadline as a result of

21   the potential proceedings in London as they might impact this

22   and to give space for that court to consider the issues.  The

23   request made by counsel for DTD is that we set the briefing

24   schedule starting on the 28th.  That's very close to July 1.

25          So my inclination is just to set everything on the

O5THPhoC

1    same schedule and to have the motions be due on the 1st of July

2    with the same opposition deadline or reply date.  Given that

3    this would have several motions being filed in parallel, I

4    could have the plaintiffs' response due sooner than the 21 days

5    that I originally established for the first set of briefs, but

6    my inclination at this point would be to keep it the same.

7              So my inclination here would be to set a briefing

8    schedule in which all the briefs would be due on the 1st of

9    July, the oppositions would be due within 21 days following the

10   date of service of the motion, and then any reply would be due

11   a week following the date of service on the opposition.  If

12   there is an amended complaint, that would have to be filed,

13   under the rules, within that same 21-day period.

14             So that's my inclination.  I will say –– well, I

15   remind you of the rules that I can't preclude a party from

16   amending the complaint, again, following a motion to dismiss.

17   If I grant leave to amend the complaint under Rule 15(a)(2), it

18   still is oftentimes very efficient to proceed as counsel for

19   Superfreight suggested.  And so while there's no application to

20   the Court at this time for me to approve an amended complaint

21   –– there is no amended complaint that's been presented to me,

22   and I won't act on a motion without a black line and the

23   amended complaint to look at –– I do strongly encourage the

24   parties to talk about this issue after today's conference.  If

25   plaintiff knows how they want to amend the complaint already,

O5THPhoC

```
 1    it would be efficient for all involved for the amendment to

 2    take place with consent of the parties before the defendants

 3    need to spend a lot of time briefing this motion.

 4              It's in part to facilitate such conversations that I'm

 5    setting this briefing schedule as well.  My hope is that the

 6    parties will talk about whether there is a proposed amended

 7    complaint to which they can agree, subject to any reservation

 8    of rights to move to dismiss the amended complaint.  So I

 9    encourage the parties to talk seriously about that prospect.

10    If there's no agreement, the motions to dismiss will be due on

11    the 1st and any response, whether that be an opposition or an

12    amendment permitted by Rule 15(a)(1), would be filed within 21

13    days.

14              So I think that's it.  Anything else that we need to

15    talk about here?

16              Oh, I should say, my view is that my prior order to

17    stay these proceedings pending briefing and resolution of the

18    motion to dismiss by QIPCO applies with equal force here.

19    There is good cause to stay discovery in this action pending

20    briefing and resolution of these motions, as well as the QIPCO

21    motion for substantially the same reasons that I articulated

22    earlier.  I described the relevant factors with respect to

23    burden of discovery and the prejudice to the nonmoving party in

24    our prior conversation, and my view of each of those factors

25    remains much the same.
```

O5THPhoC

1          With respect to the first aspect of the test that the

2     Court should apply in evaluating whether good cause exists,

3     namely, the strength of the proposed motion, as before, I don't

4     take a position regarding the ultimate merits of the arguments.

5     I will reserve any judgment on that until I've seen the

6     briefing.  But, again, I note that these motions, if

7     successful, will be fully dispositive of all of the issues in

8     this case, which weighs in favor of granting —— of staying the

9     matter pending briefing and resolution of the motions.

10          I also note the defendants' argument regarding the

11     validity of the fraud arguments here.  I look forward to seeing

12     the briefing on the issues given that, as I understand it, the

13     basis for the fraud claim is an omission, but plaintiff asserts

14     that the omission in the voices of Superfreight and DTD are

15     omissions from an agent to QIPCO, not an agent to it.  So I

16     look forward to seeing the briefing on the nature of the duty

17     that gives rise to an obligation to speak such that the

18     omission here is fraudulent, and that's an issue that I'm

19     looking forward to seeing the parties' briefing on.

20          So I'll enter an order with that briefing schedule and

21     staying the action pending briefing and resolution of those

22     motions.

23          Is there anything else that we need to talk about here

24     before we adjourn?  I'll start with counsel for plaintiff.

25          MR. McCULLOUGH:  Yes, Michael McCullough for the

O5THPhoC

1    plaintiff, your Honor.

2            We did make a request for a single document.  Is it

3    possible we could address that?

4            THE COURT:  Please go ahead.

5            MR. McCULLOUGH:  So as we mentioned in our letter,

6    there is a single document that's been produced in the London

7    litigation that bears on our fraud claim, and we don't know how

8    quickly we could get a release of that document from the London

9    judges.  They're working on other issues right now.

10           I'm wondering if it's possible that in this action we

11   could just get limited discovery on the single document, which

12   would facilitate our amendment and might make it easier on all

13   of us in —— as both counsel for Superfreight and Door To Door

14   mentioned, make it easier for us to get through this motion to

15   dismiss.

16           THE COURT:  Thank you.

17           I will hear from each of the defendants on this, and I

18   appreciate that there may be limitations on your ability to

19   talk about these issues.  I frankly don't know what they are,

20   but one challenge here is that I have very limited information

21   about the nature of the discovery that's sought or its effect

22   on the potential pleadings.  I will be fully respectful of any

23   limitations on you and your assessment of what those

24   limitations are, so I'm not pushing you or ordering you to tell

25   me anything that you think would be out of bounds based on the

O5THPhoC

1    constraints in the UK litigation.  You should feel no

2    hesitation in telling me that you do not believe that,

3    consistent with those limitations, you can tell me something.

4    So you're fully authorized to tell me no or to tell me that

5    you're limited in your ability to discuss issues.

6          That said, without more information about what this

7    is, why it's needed, and the nature and scope of the discovery

8    that would be needed, it's hard for me to rule on the request.

9    So any information that you feel that you can properly share

10   with me would be welcome.

11         Counsel for plaintiff.

12         MR. McCULLOUGH:  Michael McCullough.

13         Unfortunately, as we mentioned in the letter, there's

14   not more information that we can give you other than the

15   document would enable us to produce a second amended

16   complaint with greater detail on the fraud claim.  There's not

17   much more I can say without disclosing the nature of the

18   document, which I'm not allowed to do.

19         THE COURT:  Thank you.

20         Let me hear from each of the defendants.  First,

21   defendant QIPCO.

22         MR. SMITH:  Thank you, your Honor.  Dustin Smith from

23   Hughes Hubbard & Reed on behalf of QIPCO.

24         I think we're a little bit at sixes and sevens as

25   well, your Honor.  Being that we don't know what this document

O5THPhoC

1    is, we don't know, as a result, what the restrictions may be on

2    it from the UK proceedings or interplay with the anti-suit

3    injunction.  So it's hard to respond to the request in that

4    regard without having any information, as this is the first

5    we've heard of it is this briefing.  We haven't had any contact

6    from plaintiffs' counsel regarding this or requesting it

7    outside this letter.

8            Then just additionally, it seems to be at

9    cross-purposes with the purpose of the stay that the Court

10   previously entered, which is the gravamen of our argument is

11   that this suit was improperly brought in this court because of

12   the jurisdictional provisions, the choice of jurisdiction

13   provisions.  So it would seem inconsistent with prior rulings

14   to grant any discovery pending the outcome of the anti-suit

15   injunction.

16           So it's kind of where we're at right now in regards to

17   this request.

18           THE COURT:  Thank you.

19           Counsel for Superfreight.

20           MR. MERRICK:  Chris Merrick.

21           MR. WHITTICAR:  I'm sorry.

22           MR. MERRICK:  Chris Merrick on behalf of defendants

23   Simon Jones Superfreight.

24           We would echo all of those comments by QIPCO.  We

25   don't have any idea what this document is or what it would

O5THPhoC

1    purport to show, so it's difficult to comment.

2          And it does seem like your Honor's already made up

3    your mind about amendment.  Just for the purposes of making a

4    record at least, we just wanted to cite *Moore's Federal*

5    *Practice: Civil* Section 15.10 and the rule of 15(a)(1), which

6    is that a party may amend its pleading as a matter of right

7    only once, and that includes any prior amendments the plaintiff

8    may have already made.  Here, there is already an amended

9    complaint, so we don't believe that the plaintiff would have

10   the ability to amend as of right as of this time.

11          So to the extent that there is a desire on the behalf

12   of the plaintiff to amend, we would urge the Court to perhaps

13   set a briefing schedule on the motion for leave to amend or a

14   deadline to amend so that the parties don't spend the time,

15   money, and energy on duplicative briefing to brief and then

16   wait for a motion to be filed and then have additional briefing

17   on the motion and potentially another round of briefing on a

18   motion to dismiss.  My client is a small company.  That's a

19   significant hardship, and we'd be very appreciative if the

20   Court would entertain the possibility of making a determination

21   about whether amendment will be allowed before the motions to

22   dismiss are filed.

23          THE COURT:  Thank you.

24          Good.  So, first, thank you very much for flagging

25   that part of the procedural history here.  To paraphase

O5THPhoC

1   Lin-Manuel Miranda, I did not realize that plaintiff may have

2   thrown away its shot with its one free amendment as of right.

3   I was operating under the assumption that they had not yet done

4   so, and that's an important factor.  I appreciate you bringing

5   it to my attention.  So I will come back to that topic.

6          But let me hear, first, from counsel for DTD.

7   Anything on the additional discovery request?

8          MR. WHITTICAR:  This is Mr. Whitticar, your Honor, for

9   DTD.

10          I don't know — I don't have enough information to

11   agree to it.  I mean, there is a venue challenge here.  But I

12   don't know that I can ascertain who supposedly has it, what it

13   supposedly says, or whether it even involves my client.  So

14   given the lack of information available, I respectfully

15   withhold my consent to the request.

16          THE COURT:  Thank you.

17          I'm going to deny the request.  I stayed discovery

18   here for the reasons that I've already articulated.  Counsel's

19   already raised the pending venue challenge here, so there's a

20   question as to whether or not this case should be here at all

21   and, as a result, whether it should be used as a vehicle to

22   obtain discovery that is restricted in a foreign proceeding.  I

23   understand that there may be an alternative vehicle in the

24   proceedings in the UK court to permit the use of that

25   information, but I stand by my decision that the stay, plenary

O5THPhoC

1    stay, of discovery is warranted in this case.

2              Counsel for plaintiffs, I appreciate again

3    Superfreight's counsel's reminder that you apparently already

4    have amended your complaint once as of right.  I will just

5    encourage you to talk with the parties here.

6              How does this impact your process?  If I grant the

7    motion to dismiss and you have not filed a proposed request to

8    amend the complaint now knowing all of these proposed grounds

9    for amending the complaint, knowing what you know now about the

10   nature of the arguments, I may take the position that, given

11   the fact that you were informed of the nature of the

12   allegations in the letters and you had information and, indeed,

13   have informed the Court that you have information that would

14   enhance your complaint, that you should not be granted leave to

15   amend again.

16             So I strongly encourage you to talk.  I'm not saying

17   that I would do that, but I may do that.  As a result, it makes

18   a lot of sense for the parties to talk about setting a schedule

19   for an amendment under 15(a)(2) with the consent of the parties

20   or for the filing of a motion to amend the complaint, assuming

21   that the parties cannot agree upon a proposed amended complaint

22   here.  So I strongly again encourage the parties to do so, but

23   now I do so without thinking that you have an escape hatch,

24   counsel for plaintiff, and the opportunity to amend the

25   complaint following the filing of the motions to dismiss.

O5THPhoC

1            So I strongly encourage the parties to talk about

2    that, and I'm going to ask that any letter regarding the

3    parties' discussions with respect to a potential amendment be

4    filed with the Court no later than a week from today.  In that

5    letter, I'm going to direct plaintiffs' counsel to advise the

6    Court if plaintiff wishes to amend the complaint.  If it does

7    wish to amend the complaint, you should let me know what the

8    positions of the parties are regarding that proposed amended

9    complaint.  And if there is no agreement amongst the parties,

10   then I will ask that the parties propose a briefing schedule in

11   that letter regarding a timeline for potentially moving to

12   amend the complaint.  All of this will inform the schedule for

13   the motions to dismiss, and it's in part because of that that

14   I'm asking for the letter to be submitted to me relatively

15   promptly so that the defendants can potentially push back the

16   time at which they begin their work on briefing the motion.

17   I'll include that in my order after today's proceeding as well.

18            Very good.  So thank you all very much for your time.

19            Thank you again, counsel for Superfreight, for

20   flagging that detail for the Court.

21            This proceeding is adjourned.

22            (Adjourned)

23

24

25